FILED
2024 Aug-30  PM 03:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **FRANKENMUTH INSURANCE  COMPANY,** an insurance company, | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| vs. | ) ) | **CIVIL ACTION NO.: 2:24-CV-00613-LSC** |
| **CECIL WAYNE SANFORD, STONE POINTE BUILDERS, LLC;** | ) ) ) | |
| **Defendants.** | ) ) | |

### FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

Comes now Frankenmuth Insurance Company f/k/a Frankenmuth Mutual Insurance Company [hereinafter "FIC"] and states to the Court as follows:

### PARTIES AND JURISDICTION

1.      Plaintiff FIC is an insurance company incorporated under the laws of the State of Michigan and its principal office is located in the State of Michigan. FIC is authorized and qualified to do business in the State of Alabama. FIC is a citizen of the State of Michigan for purposes of diversity jurisdiction.

2.    Defendant Cecil Wayne Sanford [hereinafter "Sanford"] is over the age of nineteen (19) years and is a citizen of Tuscaloosa County, Alabama. Sanford is a citizen of the State of Alabama for purposes of diversity jurisdiction.

3.    Defendant Stone Pointe Builders, LLC (hereinafter "Stone Pointe") is an Alabama limited liability company that had its principal offices located in the State of Alabama. Sanford, a citizen of the State of Alabama, is the sole member of Stone Pointe; therefore, Stone Pointe is a citizen of the State of Alabama for purposes of diversity jurisdiction.

4.    An actual justiciable controversy exists between the Plaintiff and the Defendants involving rights and liabilities existing under a contract of insurance issued by FIC to Stone Pointe. The dispute and controversy involves more than Seventy Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

5.    Jurisdiction in this cause is based and founded upon the amount in controversy and diversity of citizenship (28 U.S.C. §1332).

6.    Venue is proper in the United States District Court for the Northern District of Alabama pursuant to 28 U.S.C. §1391 because all of the Defendants are residents of the Northern District of Alabama.

## FACTS AND ALLEGATIONS

2

7.    FIC issued a commercial insurance policy to Stone Pointe Builders, LLC, said policy being further identified as policy number 6678615 [hereinafter "the Policy"].  A true and correct copy of the Policy is attached hereto as Exhibit A.

8.    The Policy provides coverage for certain losses and other insured perils as established by the express terms of the commercial general liability coverage part of the insurance contract.  The commercial general liability coverage part of the Policy provides the following coverage limits:

| | |
|---|---|
| Each Occurrence Limit | $1,000,000 |
| Medical Expense Limit, Any One Person | $    10,000 |
| Personal and Advertising Limit, Any One Person or Organization | $1,000,000 |
| General  Aggregate Limit | $2,000,000 |
| Products Completed Operations Aggregate Limit | $2,000,000 |

9.    The Policy includes the following provisions which are relevant to this action:

Various provisions in this policy restrict coverage.  Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization

qualifying as an Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      **(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

      **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

      No other obligation or liability to pay sums or

perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

    **b.**    This insurance applies to "bodily injury" and "property damage" only if:

        **(1)**    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        **(2)**    The "bodily injury" or "property damage" occurs during the policy period[.]

**********

## SECTION I – COVERAGES
## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**2.**    **Exclusions**

This insurance does not apply to:

    **a.**    **Expected Or Intended Injury**

        "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

    **b.**    **Contractual Liability**

        "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1)     That the insured would have in the
        absence of the contract or agreement; or

(2)     Assumed in a contract or agreement that
        is an "insured contract", provided that the
        "bodily injury" or "property damage" occurs
        subsequent to the execution of the contract
        or agreement.  Solely for the purposes of
        liability assumed in an "insured contract",
        reasonable attorney fees and necessary
        litigation expenses incurred by or for a party
        other than the insured are deemed to be
        damages because of "bodily injury" or
        "property damage", provided:

        (a)     Liability to such party for, or for the
                cost of, that party's defense has also
                been assumed in the same "insured
                contract"; and

        (b)     Such attorney fees and litigation
                expenses are for defense of a party
                against a civil or alternative dispute
                resolution proceeding in which damages
                to which this insurance applies are
                alleged.

**f.     Pollution**

**(1)**     "Bodily injury" or "property damage" arising out
            of the actual, alleged or threatened discharge,
            dispersal, seepage, migration, release or escape
            of "pollutants":

            **(c)**     Which are or were at any time transported,
                    handled, stored, treated, disposed of, or
                    processed as waste by or for:

                    **(i)**     Any insured;

          **(ii)**    Any person or organization for whom you may be legally responsible

    **(d)**    At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are  brought on or to the premises, site or location in connection with such insured, contractor or subcontractor.

**j.**    **Damage To Property**

"Property damage" to:

**(2)**    Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(5)**    That particular part of real property on which you or any contractors or  subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)**    That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

\*\*\*

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products completed operations hazard".

**k.**    **Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l.      Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.      Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)**      A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)**      A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.      Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement,

adjustment, removal or disposal of:

(1)     "Your product";

(2)     "Your work"; or

(3)     "Impaired Property."

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

\*\*\*\*\*\*\*\*\*\*

## SECTION II – WHO IS AN INSURED

1.     If you are designated in the Declarations as:

     c.     A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

\*\*\*\*\*\*\*\*\*\*

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

**2.     Duties In The Event Of Occurrence, Offense, Claim Or Suit**

     a.     You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

          (1)     How, when and where the "occurrence" or offense took place;

        (2)    The names and addresses of any injured persons and witnesses; and

        (3)    The nature and location of any injury or damage arising out of the "occurrence" or offense.

b.    If a claim is made or "suit" is brought against any insured, you must:

        (1)    Immediately record the specifics of the claim or "suit" and the dates received; and

        (2)    Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c.    You and any other involved insured must:

        (1)    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

        (2)    Authorize us to obtain records and other Information;

        (3)    Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

        (4)    Assist us, upon or request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damages to which this insurance may also apply.

**\*\*\*\*\*\*\*\*\*\***

## SECTION V – DEFINTIONS

3.     "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

8.     "Impaired property" means tangible  property, other than "your product" or "your work", that cannot be used or is less useful because:

    a.     It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    b.     You have failed to fulfill the terms  of a contract or agreement;

if such property can be restored  to use by the repair,  replacement, adjustment or removal of "your product" or "your work", or your fulfilling the terms of the contract or agreement.

13.     "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

16.     **"Products-completed operations hazard":**

    **(a)**     Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

        **(1)**     Products that are still in your physical possession; or

        **(2)**     Work that has not yet been completed or abandoned.  However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**(b)** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classifications listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

     **a.**    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

     **b.**    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in the definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications hardware, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**19.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" included:

     **a.**    An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

     **b.**    Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**21.** "Your product":

     **a.**    Means:

          **(1)**    Any goods or products, other than

real property, manufactured, sold, handled, distributed or disposed of by:

 **(a)** You;

 **(b)** Others trading under your name; or

 **(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** **Includes:**

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product;" and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work:"

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

    **(1)**    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work," and

    **(2)**    The providing of or failure to provide warnings or instructions.

    **10.**    The commercial general liability part of the Policy is amended by means of an endorsement entitled, "Contractors Liability Premier" endorsement, which is further identified as endorsement 19263 12 20. This endorsement includes the following pertinent provisions:

### SECTION 2 – COVERAGE EXTENSIONS

This endorsement is subject to the provisions applying to the Commercial General Liability Coverage Form, except as described below.

**A.   BODILY    INJURY  -  EXPENDED   DEFINITION ENDORSEMENT**

Under **Section V** – Definitions, the definition of bodily injury is replaced by the following:

Bodily injury means physical injury, sickness or disease sustained by a person, including death, humiliation, shock, mental anguish or mental injury sustained by that person at any time which results as a consequence of the physical injury, sickness or death.

*** 

**C.   AMENDMENT–   AGGREGATE   LIMITS   OF INSURANCE**

The General Aggregate Limit under **Section III – Limits of Insurance** applies separately to each of your:

1.    Projects away from premises owned by or rented by you; and

2.    "Locations" owned by or rented to you.

"Location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

\*\*\*

**P.    EXTENDED PROPERTY DAMAGE TO ALIENATED PREMISES**

Exclusion j.(2) Damage to Property of **Section I – Coverage A Bodily Injury And Property Damage Liability** is replaced with the following:

Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises and occurred from hazards that were known by you, or should have reasonably been known by you, at the time the property was transferred or abandoned.

\*\*\*

**O.    EXPANDED DEFINITION OF POLLUTANTS**

1.    Paragraph 15 of **Section V – Definitions**, is replaced with the following:

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contamination, including smoke, vapor, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

\*\*\*

## VOLUNTARY PROPERTY DAMAGE EXPENSE COVERAGE

1.  Insuring Agreement

    a.  We will reimburse you for "property damage" claims directly arising from "your work" for a "client"[1];

        The amount of such reimbursement is limited as described in the Limits of Insurance section.[2] no other obligation or liability to pay sums or perform acts or services is covered.

    b.  This insurance applies only if:

        (1)  "Your work" was performed by you or an "employee" and was done with the express knowledge of the insured;

        (2)  "Your work" was performed during the policy period;

        (3)  You reasonably determine, and "we" agree, that payment in the amount of the "property damage" to the "client" for "your work" is necessary;

        (4)  You have received a notarized notification of a demand for remuneration from the "client" by mail within 90 days after the work was performed.

    c.  This insurance only applies to "property damage" while "your work" is being performed.

---

[1] "Client" means an individual, company or organization with whom you have a written contract or work order for your services for a described premises and have billed for your service.

[2] The amount listed in the Declarations Page is $50,000.00.

d. We shall have no duty nor obligation to defend the insured or perform acts or services.

2. **Exclusions**

This insurance does not apply to:

a. "Your work" performed at any location owned by, rented or leased to the insured;

b. Work performed by a subcontractor; or

c. Property damage (other than "your work") excluded under Bodily Injury and Property Damage Liability in the Coverages section.

3. The following is added the Section III – Limits of Insurance: The most we will reimburse you for the sum of all damages covered under the Voluntary Property Damage Expense Coverage because of "your work" is displayed in the Schedule of this endorsement. The Annual Aggregate Limit starts with the beginning of the policy period shown in the Declarations. his coverage is excess if there is any other Voluntary Property Damage Expense Coverage attached to this policy by endorsement.

**11.** The commercial general liability part of the Policy is also amended by means of an endorsement entitled, "Your Work Coverage Extension", which is further identified as endorsement 18198 (11 19). This endorsement includes the following pertinent provisions:

**THIS ENDORSEMENT CHANGES THE POLICY.<br>PLEASE READ CAREFULLY**

**"YOUR WORK" COVERAGE EXTENSION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The provisions of this endorsement apply only with respect to "property damage" and "bodily injury" to or resulting from "your work"

A.   **SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 1. Insuring Agreement, a.** is extended to include damages which you become legally obligated to pay because of "property damage" that is:

   (1)   To "your work", if the damaged work, or the work out of which the damage arises, was performed on your behalf by a subcontractor; or

   (2)   To property other than "your work", if the "property damage" is caused by or results from "your work";

   If such "property damage":

   (1)   Consists of physical injury to tangible property, including loss of use of that property; and

   (2)   Is included within the "products-completed operations hazard."

   For use with this endorsement only, "property damage" shall be deemed to be caused by an "occurrence".

   However, we will not pay for:

   (1)   "Property damage" that was the result of willful, wanton or intentional misconduct; or

   (2)   "Defective or faulty work".

**C.**    All coverage provided by this endorsement is subject to the Commercial General Liability Coverage Part exclusions, terms and conditions.

**E.**    **SECTION V. – DEFINITIONS** is extended to include the following:

"Defective or faulty work" means work that fails to meet or comply with applicable building code(s), fails to meet or comply with industry standards, is not fit for its tended use, or does not meet or comply with a contract's plan or specification. "Defective or faulty work" is not physical damage to tangible property.

**12.**    Sanford is the sole owner, principal and member of Stone Pointe.

**13.**    FIC received notice of numerous claims being asserted against Sanford and Stone Pointe.  The following sets forth the parties names and assigned claim number:

| | |
|---|---|
| 000200156777 | (Hulwi) |
| 000200154247 | (Cobb) |
| 000200154339 | (R. and J. Jackson) |
| 000200154360 | (Hogans) |
| 000200154433 | (Tucker) |
| 000200154468 | (Callaway) |
| 000200154791 | (M. and J. Jackson) |
| 000200154868 | (Chism) |
| 000200151882 | (Brush) |
| 000200154938 | (Wheeler) |
| 000200154955 | (San Fili Holdings (Filippo)) |
| 000200154975 | (Viran Patel) |
| 000200155024 | (Hunter) |
| 000200155027 | (Barham) |
| 000200155055 | (Allen) |
| 000200155071 | (Whittington) |
| 00020015094 | (Killingsworth) |
| 000200155116 | (Mangham) |

000200155173     (Harmon)
000200155213     (Merrymon)
000200155220     (Robinson)
000200155328     (Moore)
000200155759     (Bailey)
000200155966     (Shelton)
000200156117     (Brown)

**14.**     On April 4, 2024, Sanford appeared for an examination under oath ["EUO"], requested by FIC, pursuant to the Duties After Loss provision of the Policy.   Sanford stated at that time that he was invoking his 5th Amendment right against self-incrimination and would not answer any questions asked of him by FIC.  Sanford was cautioned that refusing to answer questions asked of him at the EUO could prevent him from recovering or being covered by the Policy.    Sanford stated that he was refusing, nevertheless, to answer any questions that might be asked of him at the EUO.

## THE JACKSON PROJECT

**15.**     M. Jackson and J. Jackson filed a Complaint against Stone Pointe, Sanford, Wheeler and various fictitious defendants in the Circuit Court of Jefferson County, Alabama, said litigation being further identified as case number 01-CV-2022-902432 (the "Jackson Complaint").[3]   The Complaint filed by the Jacksons contains the following eleven counts:

        1)     Breach of Contract;
        2)     Money Had and Received;

---

[3] A copy of the Jackson Complaint is attached hereto as Exhibit B.

3)  Unjust Enrichment;
4)  Conversion;
5)  Breach of Warranty;
6)  Deceit;
7)  Promissory Fraud;
8)  Negligence;
9)  Negligent Misrepresentation;
10) Breach of Fiduciary Duty; and
11) Suppression.

16.  M. Jackson and J. Jackson are husband and wife. In the Fall of 2019, the Jacksons began searching for a builder who could construct a house for them.

17.  Sanford was licensed as a homebuilder by the State of Alabama. The Jacksons contacted Stanford about having Stone Pointe construct a home for them at 2308 Garland Drive in Vestavia Hills, Alabama. Sanford visited the Garland Drive address and thereafter proposed several potential home designs to the Jacksons.

18.  On January 3, 2020, the Jacksons purchased the Garland Drive property. In February of 2020, the Jacksons met with Sanford and Stone Pointe to review house plans and discuss construction materials. The Jacksons' contend that at this meeting, Sanford told them that he had: extensive experience, knowledge of materials, available subcontractors, performed numerous prior construction jobs, and the ability to timely construct a house for them.

19.    Sanford directed the Jacksons to work with a co-worker of his to finalize a contract for the construction of the house.  From February 2020 to May 2020, the Jacksons met with Sanford and his co-worker several times to discuss the project.  Sanford assured the Jacksons that it would take eight months to complete the build of their house.

20.    On September 14, 2020, the Jackson signed a contract with Stone Pointe for the construction of their house.  Sanford signed the same contract on behalf of Stone Pointe.

21.    Per the contract terms, the Jacksons agreed to pay $441,500 to have their house constructed by Stone Pointe.  It was also agreed that Stone Pointe would complete construction within one hundred and fifty (150) days of the commencement of work.

22.    The Jacksons obtained a construction loan.  On October 16, 2020, they made their first draw on this loan, paying Stone Pointe the sum of $39,696.00.

23.    On December 10, 2020, the Jacksons paid $22,500 in excavation costs to Stone Pointe.  This expense was not part of the $441,500 price set in the construction contract.  Stone Pointe excavated the site and then ceased working on the Jacksons' house. The Jacksons complained about the lack of progress, but no work  was done from January 2021 through May 10, 2021.

24.    On September 20, 2021, Stone Pointe billed the Jacksons $16,000 for a "retaining wall per building inspection department". The Jacksons paid this sum out of their personal account.

25.    On or about November 18, 2021, the Jackson paid $4,191 to Stone Pointe. This sum came from the construction loan. On December 8, 2021, the Jacksons paid an additional $20,953 to Stone Point from the construction loan.

26.    On January 7, 2022, J. Jackson met with Sanford about the lack of progress on the project. Sanford assured J. Jackson that work would resume but demanded another payment prior to the re-start. On January 21, 2022, subcontractors retained by Stone Pointe dug and poured concrete footings at the construction site.

27.    A check in the amount of $8,024.04 was sent to Stone Pointe by the Jacksons on January 25, 2022. The check was negotiated for Stone Pointe, but no additional work was performed on the house.

28.    Approximately two day later, the Jacksons complained to Stone Pointe and Sanford about the lack of progress and demanded an explanation. In response to this demand, Stone Pointe and Sanford agreed to modify their contract by adding an addendum stating that the house would be completed by June 1, 2022.

29.    The addendum was executed on February 22, 2022, and contained a clause stating that if the home was not completed by June 1, 2022, a penalty of $150 per day would be paid by the builder to the Jacksons until the home was completed and a certificate of occupancy was issued.

30.    The Jacksons contend that at the time the addendum was executed, Stone Pointe and Sanford had no intention of complying with said addendum.

31.    The day after the addendum was executed, the Jacksons paid $7,611.77 to Stone Pointe. As of February 23, 2022, the Jackson had paid $125,458.35 to Stone Pointe.

32.    On March 2, 2022, Sanford informed the Jacksons by text that he was going out of business. The Jacksons immediately asked for an accounting, the return of their funds, and an explanation about the abandonment of the job. They did not receive a response.

33.    Sanford instructed the Jacksons to pick up the appliances that had been purchased for their house. The Jacksons retrieved all of their appliances with the exception of a range hood. They later learned that Sanford had installed this range hood in another house.

34.    On March 2, 2022, the Jacksons called Sherman Concrete and learned that it had not been fully paid for pouring the slab and retaining wall

at their new house – despite the fact that funds to cover this specific cost had been sent to Sanford by the Jacksons.

35.    The Jacksons notified their bank of the breach of contract, nonpayment, and job abandonment. On March 3, 2022, the Jacksons learned that Sanford and Stone Pointe might owe unpaid sums to some of the vendors and subcontractors who had provided work, product or services on the Jacksons' house.

36.    The Jacksons further contend that Stone Pointe and Sanford, knew, or should have known, that monies received from the Jacksons from October 16, 2020 to March 3, 2022 were not being used to construct the Jacksons' house.

37.    The Jacksons' note that Stone Pointe failed to complete the house within one hundred and fifty (150) days as required by the contract. The Jacksons state that their contract included a promise to pay $75 per day for each day past the agreed completion date. The Jacksons claim $35,850.00 in construction delay fees (478 days at $75/day).

38.    In their Complaint, the Jacksons aver that, prior to the job being abandoned, work on the house was not properly performed per the construction plan. They contend that Sanford and Stone Pointe failed to fix these issues and thereby breached a warranty given to the Jacksons.

Defendant Kristen Wheeler filed a cross claim against Stone Pointe and Sanford seeking common law indemnity. A copy of the cross-claim is attached hereto as Exhibit G. FIC is defending this litigation pursuant to a reservation of rights.

## THE CALLAWAY PROJECT

**39.** Jonathan Callaway filed a Complaint against Stone Pointe and Sanford, in the Circuit Court of Jefferson County, Alabama, said litigation being further identified as case number 01-CV-2022-902953 (the "Callaway Complaint")[4] In his Complaint, Callaway asserts the following counts:

1) Breach of Contract – Sanford and Stone Pointe
2) Breach of Contract - Wheeler and Premier Vestavia
3) Money Had and Received;
4) Unjust Enrichment;
5) Conversion;
6) Breach of Warranty;
7) Deceit;
8) Promissory Fraud;
9) Negligence;
10) Negligent Misrepresentation;
11) Breach of Fiduciary Duty;
12) Suppression; and
13) Specific Performance.

**40.** In the Fall of 2020, Callaway begin to explore the idea of building a new home in Trussville, Alabama.

---

[4] A copy of the Callaway Complaint is attached hereto as Exhibit C.

**41.**    In November of 2020, Callaway viewed a lot located at 6783 Ivey Way in Trussville.  Sanford and Stone Pointe represented that they were the owners of this lot.

**42.**    Sanford and Callaway visited the Ivey Way lot in December of 2020.  After this visit, Sanford sent several house design proposals to Callaway for his consideration.

**43.**    In December 2020, Callaway began negotiating the terms of a contract for the construction of a house by Stone Pointe.

**44.**    Based upon proposals and representations made to him by Sanford, Callaway agreed to hire Stone Pointe to construct a house for him at 6783 Ivey Way.

**45.**    Callaway engaged in numerous phone conversations about the project with Sanford in December of 2020.  During each such call, Sanford told Callaway that Stone Pointe had:  a) extensive experience in residential construction,  b)  extensive  knowledge  of  materials,  c)  available subcontractors, and d) completed numerous prior construction jobs.

**46.**    Sanford also told Callaway that Stone Pointe had the ability and resources to complete construction of his house in, "less than eight to ten months from the execution date of the construction contract."

**47.**    On or about December 20, 2020, a contract between Stone Pointe and Callaway was finalized.

**48.**    Callaway signed the "Real Estate Sales Contract For New Construction On Lot" on December 22, 2020.   This contract obligated Callaway to pay $460,430.00 to Stone Pointe for the construction and purchase of the house.  The contract obligated Stone Pointe to complete the residence within two hundred seventeen (217) workdays of the commencement of work.  A limited warranty was provided to Callaway.

**49.**    The terms of the contract required work on the project to begin within 21 days after said contract was signed.  Per this contractual provision, work on the project was to begin no later than January 12, 2021.

**50.**    After Callaway signed the contract, Sanford advised him that it would be easier if Stone Pointe carried the construction to permanent loan. Callaway was told that this would require him to pay a 10% down-payment on the contract price and to pay the balance due at closing.  Callaway agreed to this proposal.

**51.**    Stone Pointe and Sanford told Callaway he would have to pay $46,458.00 to Stone Pointe's construction lender before any work on the project would begin.  On February 12, 2021, Callaway paid $46,458.00 to

SouthPoint Bank as instructed.   On or before February 26, 2022, SouthPoint Bank paid $46,457.00 of this sum to Stone Pointe as a construction draw.

**52.**    From February through August of 2021, Callaway sent numerous texts to Sanford.  In each instance Callaway was advised that work on his house was progressing as scheduled.

**53.**    In August of 2021, Callaway learned that the lot had been cleared but very little additional work had been performed.  Sanford assured Callaway that the footing were being designed and constructed.

**54.**    Beginning in October of 2021, Callaway had to rent a home for himself and his family because Stone Pointe and Sanford had not completed construction of the new house.

**55.**    On or about October 10, 2021,  Callaway complained about the delay to Wheeler and Sanford.  They  advised that the delay was due to a material and labor shortage.

**56.**    On October 13, 2021, Callaway requested another update from Sanford. On October 14, Callaway was told that the subcontractors hired to do the foundation footing  were starting work that day.  Callaway contends that this statement was not true.  By November of 2021, no footings or foundational work had been performed.

**57.**    On December 21, 2021 Callaway sent an email to Sanford and Stone Pointe addressing the lack of progress and demanding a time frame for completion of the project. The next day, Sanford responded that rebar workers were working on the house. Callaway went by the house that same day and learned that Sanford had misrepresented the state of the project as no work had been performed.

**58.**    From November of 2021 to January of 2022, Callaway was "in constant communication" with Sanford. Sanford represented to Callaway that footings were being completed, brick and trim had been ordered, materials for framing were in route, cabinets were ordered, and subcontractors had been secured to perform labor. Callaway avers that he later learned that these representations were not true.

**59.**    On January 17, 2022, Callaway sent a written request for a refund to Stone Pointe and Sanford, citing to their failure to construct his house as promised. Callaway did not receive a refund or any type of response.

**60.**    Ten days later Callaway sent another message to Sanford about the lack of progress and the fact that the framing needed to be done so that Callaway could "lock in a mortgage rate for the final closing price." Sanford did not respond.

**61.**    From the end of January through mid-February of 2022, Callaway texted Sanford multiple times asking why no work was being performed on the house. He received no explanation. Callaway continued to demand a refund, but his money was never returned.

**62.**    On February 10, 2022, Sanford informed Calloway that the foundation for his house would be poured the following Monday. This never occurred. Callaway complained to Sanford and Stone Pointe once again, and once again he received no response.

**63.**    Callaway visited the lot and found that no additional work had been performed. Callaway located Sanford working at a nearby construction site, and asked why no work was being performed on his house. In response, Sanford demanded an additional $30,000.00 before he would agree to continue work on Callaway's house. Callaway refused this request and asked Sanford to complete the house or refund his money. Sanford promised that he would complete the house.

**64.**    In March of 2022, after the aforementioned in-person meeting, Callaway sent emails and texts to Sanford requesting an update. Sanford did not respond. Callaway called all of Sanford's last known phone numbers and learned that each of these numbers had been disconnected.

**65.**    In March of 2022, Calloway requested an accounting, a refund, and an explanation as to why the job had been abandoned.  He did not receive a response from Sanford or Stone Pointe.

**66.**    Calloway states that the project was not completed within the two hundred seventeen (217) day period called for in the contract between Calloway and Stone Pointe.  The contract contains a penalty provision which requires Sanford and Stone Pointe to pay $75 per day to Calloway for each day that the house was incomplete past the promised completion date of August 17, 2021.  Calloway avers that as of September 29, 2022, he is owed "at least $30,600.00" in penalties.

**67.**    Calloway avers that the work that was performed on his house, "is incomplete, negligently constructed, negligently mismanaged, and was not performed in a good and workmanlike manner."

**68.**    Calloway states that the Defendant contracted to build the house within the time frame agreed upon, "knowing that they would be unable to meet their own demand."

**69.**    Calloway further avers that, "the Defendants had no intention of honoring their contract",  and that the Defendants "intentionally deceived" him.

70.    Callaway lists facts in his Complaint which he avers to be proof of the Defendants', "lack of intent to perform and their intent to deceive …".

71.    Callaway states that before the job was abandoned and the contract breached, he complained that the work performed by Sanford and Stone Pointe was not properly performed per the construction plans. He avers that Sanford and Stone Pointe failed to fix the issues with the house, and failed to honor the warranty.

72.    With regards to each count of his Complaint, Callaway alleges that he is entitled to the return of his money or that he has been "damaged". He does not specify any particular type of damage, with one exceptions. At the close of his promissory fraud allegation (count eight), Callaway states that the inability to complete and close on the house has caused him "to suffer ongoing anxiety and distress." This allegation is made part of the remaining counts of his Complaint (counts 9 -13) as each adopts this statement by reference. FIC is defending this litigation pursuant to a reservation of rights.

## THE MANGHAM AND BECK PROJECT

73.    Stanford Mangham and Pamela Beck filed a Complaint against Stone Pointe and Sanford in the Circuit Court of Jefferson County, Alabama, said litigation being further identified as case number 01-CV-2023-900149

(the "Mangham-Beck Complaint")[5] In their Complaint, Mangham and Beck assert the following counts:

1) Negligence / Wantonness: Construction
2) Negligence: Repair
3) Negligence: Hiring / Supervision / Training
4) Suppression
5) Breach of Warranties
6) Breach of Contract
7) Fraudulent Misrepresentation And / Or Innocent Misrepresentation
8) Conversion

74. In January of 2021, Mangham and Beck entered into a contract with Stone Pointe for the construction of a house in Jefferson County, Alabama at 920 Ivawood Drive, in the City of Irondale.

75. After the construction work began, Stone Pointe and Sanford fell behind schedule. Mangham and Beck also noticed problems with the materials being used and the quality of the work. Mangham and Beck reported these problems to Stone Pointe and Sanford, but some of these issues were never remedied.

76. Mangham and Beck contend that it will cost over $220,000 to repair the faulty work of Stone Pointe and Sanford, and to finish the original scope of work on their house.

---

[5] A copy of the Mangham and Beck Complaint is attached hereto as Exhibit D.

**77.**    Mangham and Beck aver that Sanford and Stone Pointe have caused them to suffer the following damages:

1)    Difference between the market value of the  house if the work had been performed correctly and the present market value of the house in its damaged and incomplete condition;
2)    Consequential damages for the repairs to the house;
3)    Loss of use;
4)    Costs associated with liens;
5)    Increased financing costs; and
6)    Mental anguish and emotional distress.

**78.**    Mangham and Beck contend that Stone Pointe and Sanford breached their duties to perform work on the house in accordance with all applicable building codes and standards of construction; and breached their duty to utilize and properly install adequate material for all components of the house.

**79.**    Mangham and Beck aver that Stone Pointe and Sanford breached their duty to repair all deficiencies with the structure in a good and workmanlike manner.  This breach is said to be negligent, reckless or wanton.

**80.**    Mangham and Beck aver that Sanford and Stone Pointe breached their duty to properly supervise, inspect, hire, train, instruct, or educate their employees and subcontractors  in the proper construction and renovation of the property.  This breach is described as being negligent, reckless and/or wanton.

**81.**    Mangham and Beck aver that Stone Pointe and Sanford willfully, wantonly, fraudulently or recklessly suppressed material facts, including: a) that the work was not being performed, and 2) that the work was being performed in accordance applicable construction standards;

**82.**    Mangham and Beck further aver that warranties owed to them by Stone Pointe and Sanford were breached when the house was not constructed using proper building practices in accordance with the plans.

**83.**    Mangham and Beck assert that Stone Pointe and Sanford breached the construction contract by failing to complete the house in a good manner.

**84.**    Mangham and Beck aver that Stone Pointe and Sanford falsely misrepresented their abilities to  perform the required work.  Mangham and Beck state that these misrepresentations were made either willfully to deceive, recklessly without knowledge, or my mistake and innocently;  and that these misrepresentations were reasonably relied upon by Mangham and Beck.

**85.**    Mangham and Beck further aver that Stone Point and Sanford "intended to" appropriate to themselves funds belonging to Mangham and Beck and are thus guilty of conversion.  FIC is defending this litigation pursuant to a reservation of rights.

### THE MURRAY PROJECT

86.     D. Murray and H. Murray (collectively "Murrays") filed a Complaint against Stone Pointe in the Circuit Court of Blount County, Alabama, said litigation being further identified as case number 08-CV-2023-900028 (the "Murray Complaint") [6] In their Complaint, the Murrays assert a count of breach of contract.

87.     On or about September 21, 2021, the Murrays entered into a contract with Stone Pointe for performance of improvements to their residence located at 2454 Red Hill School Road, in Hayden, Alabama.

88.     The Murrays contend that they thereafter paid a total of $52,351.30 to Stone Pointe, said sum consisting of a required deposit of $34,851.30 and an additional $25,000.00 to satisfy invoices submitted to them by Stone Pointe.

89.     The Murrays contend that Stone Pointe has failed to perform work covered by the contract. The Murrays also contend that Stone Pointe has breached the contract by:

> a)     failing to complete work in a workmanlike manner;
> b)     failing to complete the work in a timely manner;
> c)     failing to coordinate the work of its subcontractors;
> d)     failing to make payments to it suppliers and subcontractors for materials and/or labor;
> e)     failing to indemnify the Murrays from all claims arising from the misconduct of Stone Pointe;
> f)     failing to supervise and direct the subcontractors;

---

[6] A copy of the Murray Complaint is attached hereto as Exhibit E.

g)      failing to maintain a clean and orderly worksite at all times; and

h)      failing to remove or bond immediately any and all liens on the project for materials, labor or services furnished by Stone Pointe's subcontractors or material providers.

**90.**      The Murrays state that Stone Pointe's failure to perform has caused them to incur additional costs, including but not limited to the cost of renting storage units, costs of their underlying action, and attorney fees. FIC is defending this litigation pursuant to a reservation of rights.

**THE HULWI-POPE PROJECT**

**91.**      Heidi Hulwi and Todd Pope filed a Complaint against Stone Pointe and Sanford in the Circuit Court of Jefferson County, Alabama, said litigation being further identified as case number 01-CV-2024-901150 (the "Hulwi-Pope Complaint"). [7] In their Complaint, the Hulwi and Pope assert claims of:

a)      Nuisance

b)      Trespass

c)      Negligence

**92.**      Hulwi has property ("the Hulwi property") located downstream of a development known as Highland Crest. This property includes the first

---

[7] A copy of the Hulwi-Pope Complaint is hereto attached as Exhibit F.

lake in a series of lakes upstream of the inflow of Queenstown Lake in Jefferson County, Alabama. The Hulwi property drains into a tributary of the Cahaba River known as Stinking Creek.

93.    Pope has property ("the Pope property") located downstream of the Highland Crest development. The Pope property includes the second lake in a series of lakes upstream of the inflow of Queenstown Lake in Jefferson County, Alabama. The Pope property drains into a tributary of the Cahaba River known as Stinking Creek.

94.    As part of the development of Highland Crest, Stone Pointe and Sanford constructed, or were constructing, various residential dwellings. These construction sites were located north of the Hulwi property and the Pope property. All or substantially all of the surface or storm drainage from the aforementioned construction sites flowed into lakes at a point adjacent to or upstream from the Hulwi property and the Pope property.

95.    Stone Pointe and Sanford failed and/or refused to put in erosion control in place at their constructions sites, resulting in an extraordinary amount of silt, rock, dirt and debris being deposited on to the Hulwi property and the Pope property. This has damaged the lakes on the Hulwi property and the Pope property, and the land which comprises the remainder of the Hulwi property and the Pope property.

96.    Hulwi and Pope contend that Stone Pointe and Sanford's acts are a nuisance. They seek injunctions to stop the nuisance and compensatory and punitive damages for the harm done.

97.    Hulwi and Pope aver that the deposit of mud, silt, rock and debris on their respective properties are acts of trespass by Stone Pointe and Sanford. They seek injunctions to stop the trespass, and compensatory and punitive damages for the harm done.

98.    Hulwi and Pope aver that Stone Pointe and Sanford are guilty of negligence in that they breached a duty owed to Hulwi and Pope to prevent the deposit of mud, silt, rock and debris on their respective properties. They seek compensatory and punitive damages on account of the alleged breach. FIC is defending this litigation pursuant to a reservation of rights.

## THE SHELTON PROJECT

99.    Deon Shelton and Michelle Shelton filed a Complaint against Stone Pointe in the Circuit Court of Jefferson County (Birmingham Division), Alabama, said litigation being further identified as case number 01-CV-2024-902772 (the "Shelton Complaint"). [8] In their Complaint, the Sheltons assert claims of:

  a)    Breach of Contract

---

[8] A copy of the Shelton Complaint is hereto attached as Exhibit G.

b)    Breach of Warranty

c)    Fraud

**100.**  On April 27, 2021, the Sheltons entered into a contact with Stone Pointe to perform renovations on a home located at 1309 U.W. Clemons Drive, Birmingham, Alabama 35214.  The total price of the contract was $86,325.00.  The contract purportedly states that Stone Pointe warranted that the house will be substantially free from defects in workmanship and materials for one year, and that the house would meet the standards of Residential Construction Performance Guidelines Section Addition.

**101.**  The Sheltons contend that the following items were not completed:  the screen enclosing the deck, the deck flooring, the brick around the vase of the house, widen driveway or install sidewalk and install ramp. They further contend that the flooring in the addition is defective.

## FACTS APPLICABLE TO ALL PROJECTS

**102.**  The various Plaintiffs in the above referenced suits have submitted a claim to FIC.  Stone Pointe and Sanford never provided FIC with copies of the lawsuits referenced above that were filed against them.

**103.**  FIC investigated all of the aforementioned claims and lawsuits under a reservation of rights.  As part of its investigation, FIC sought to take Sanford's and Stone Pointe's examination under oath.

42

**104.**   Sanford refused to sit for an examination under oath, citing his 5th Amendment privilege against self-incrimination.    Sanford thereby breached the Policy. <u>EMC Prop. & Cas. Co. v. 205 Customz, LLC</u>, 2015 WL 3554737, at *3 (N.D. Ala. June 5, 2015) (citing <u>Pervis v. State Farm Fire & Casualty Co.</u>, 901 F.2d 944, 947 (11th Cir. 1990) (a witness cannot    exercise his Fifth Amendment privilege to avoid a contractual obligation to sit for an examination under oath)).

**105.**   Additionally, it is FIC's position its policy provides no coverage to Stone Pointe and/or Sanford with regards to some or all of the allegations set forth in the above referenced litigated matters:

**a.**   The FIC policy's liability part generally provides coverage for loss or damage caused by an "occurrence" (as that term is defined in the policy).  The allegations contained in the various Complaints do not fall within the scope of the definition of "occurrence" found in the liability part of the FIC policy.

**b.**   The FIC policy provides coverage for "bodily injury" caused by an "occurrence".  The FIC policy provides no coverage for those allegations, in the Complaints that do not allege any damage that falls within the scope of the Policy definition of "bodily injury".

c.      The FIC policy provides coverage for "property damage" caused by an "occurrence".  The FIC policy provides no coverage for those allegations, in the Complaints that do not allege any damage that falls within the scope of the Policy definition of "property damage".

d.      The FIC policy's liability policy is not a performance bond.  It provides no coverage for faulty workmanship.

e.      The FIC policy's liability part provides no coverage for loss that is purely economic.

f.      The FIC policy's liability part contains exclusion a. – Expected Or Intended Injury.  This exclusion negates coverage for certain allegations in the Complaints.

g.      The FIC policy's liability part contains exclusion b. – Contractual Liability.  This exclusion negates coverage for certain allegations in the Complaints.

h.      The FIC policy's liability part contains exclusion f. – Pollution.  This absolute pollution exclusion negates coverage for certain allegations in the Complaints.

i.      The FIC policy's liability part contains exclusion j. – Damage To Property.  Section 2, 5 and/or 6 of his exclusion negate coverage for certain allegations in the Complaints.

44

**j.**     The FIC policy's liability part contains exclusion k. – Damage To Your Product.   This exclusion negates coverage for certain allegations in the Complaints.

**k.**     The FIC policy's liability part contains exclusion l. – Damage To Your Work.   This exclusion negates coverage for certain allegations in the Complaints.

**l.**     The FIC policy's liability part contains exclusion m. – Damage To Impaired Property Or Property Not Physically Injured.   This exclusion negates coverage for certain allegations in the Complaints.

**m.**     The FIC policy's liability part contains exclusion n. – Recall Of Products, Work Or Impaired Property.   This exclusion negates coverage for certain allegations in the Complaints.

**o.**     Sanford and Stone Pointe breached the Duties After Loss provision of the policy by failing to cooperate with the investigation of the claim in that Sanford refused to sit for an examination under oath.  This breach results in no coverage to Sanford or Stone Pointe with regards to the allegations made against them in the Complaints or the claims.

**p.**     Sanford and Stone Pointe breached the Duties After Loss provision of the policy by failing to provide timely notice of occurrence(s),

45

failing to provide timely notice of suit(s), and/or failing to give required information to FIC in the manner required by the Policy.

   **q.** By asserting specific defenses to coverage FIC does not waive any additional defenses, at law or pursuant to the terms of the subject policy, and expressly reserves the right to assert any additional defenses to coverage which may prove to be applicable.

  WHEREFORE, premises considered, FIC prays this Court will accept jurisdiction of this cause and upon hearing the issues will grant the following relief:

  **I.** Declare that the FIC policy issued to Stone Point provides no coverage to Stone Pointe and/or Sanford for loss from or related to the claims and/or lawsuits made against them,

  **II.** Declare that the FIC policy issued to Stone Pointe provides no coverage for loss from or in any way related to the construction work performed as described hereinabove.

  **III.** Declare that the FIC policy does not obligate FIC to provide a defense to Sanford and/or Stone Pointe with regards to any of the Complaints filed against them.

**IV.**    Declare that the FIC policy does not obligate FIC to indemnify Sanford and/or Stone Pointe with regards to any of the Complaints and/or claims filed against them.

**V.**    Grant to FIC any further, other or different relief to which it may be entitled.

/s/ Kori L. Clement
Kori L. Clement  (ASB-5125-L72K)
Attorney for Plaintiff
Frankenmuth Insurance Company

OF COUNSEL:
KLASING, WILLIAMSON & BURKE P.C.
100 Concourse Parkway
Suite 275,  East Tower
Birmingham, Alabama 35244
Telephone: (205)980-4733

## CERTIFICATE OF SERVICE

I hereby certify that on this the 31st day of August, 2024, I served a copy of the foregoing pleading upon each of the following by regular United States Postal Mail:

Cecil Wayne Sanford
Stone Pointe Builders, LLC
5001 JVC Road
Cottondale, AL 35405

/s/ Kori L. Clement
Counsel

47