# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| FRANKENMUTH | ) | |
| INSURANCE COMPANY, | ) | |
| an insurance company, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **CIVIL ACTION NO.:** |
| | ) | **2:24-CV-00613-LSC** |
| CECIL WAYNE SANFORD, | ) | |
| STONE POINTE BUILDERS, LLC; | ) | |
| | ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

EXHIBIT B – JACKSON COMPLAINT

ELECTRONICALLY FILED
8/17/2022 4:53 PM
01-CV-2022-902432.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
JACQUELINE ANDERSON  SMITH, CL

**IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
BIRMINGHAM DIVISION**

**MATTHEW JACKSON & JUYOUNG JACKSON**

      **Plaintiffs,**

**v.**                                     **CASE NO. _____**

**STONE POINTE BUILDERS, LLC; CECIL WAYNE SANFORD (individually); KRISTEN WHEELER (individually); A, B, C, whether singular or plural, that certain person, firm, partnership, corporation or other entity which received monies belonging to or designated for the benefit of the Plaintiffs regarding the construction of their home as described herein; D, E, F, whether singular or plural, that certain person, firm, partnership, corporation or other entity which who negligently constructed Plaintiffs' home as described herein; G, H, I, whether singular or plural, that certain person, firm, partnership, corporation or other entity which is responsible for the actions of the named Defendants for the acts described herein; J, K, L, whether singular or plural, is that certain person, firm, partnership, corporation or other entity which bonded, guaranteed, assured or otherwise insured the actions of the named Defendants; M, N, whether singular or plural, those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal entities who converted the funds Plaintiffs' paid toward the construction of their home as alleged herein; O-P, whether singular or plural, those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal entities who suppressed information from Plaintiffs in order to induce Plaintiffs to contract with the named Defendants; Q-R, whether singular or plural, those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal entities which conspired with the named Defendants to defraud Plaintiffs; S-T, whether singular or plural, those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal entities who breached a fiduciary duty owed to Plaintiffs as alleged  herein; U-V, whether singular or plural, are those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal entities who joined the named Defendants in deceiving Plaintiffs as alleged herein; and W-X, whether singular or plural, that certain person, firm, partnership, corporation or other entity who acted as agent or broker for the "Real Estate Sales Contract  For New Construction On Lot" along with the named Defendants for Plaintiffs' home as alleged herein; Y-Z, whether singular or plural, those certain persons, firms, partnerships, corporations or other entities who are successors-in-interest to the named Plaintiffs. The identity of the fictitious party defendants is otherwise unknown to the Plaintiffs at this time, or, if their names are known, their identity as proper party defendants is not known at this time; but their true names will be substituted by amendment when the aforesaid lacking knowledge is ascertained.**

      **Defendants.**

## COMPLAINT

Come now the Plaintiffs, Matthew and Juyoung Jackson, in the above-styled cause, and make their complaint as follows:

## I.    PARTIES

1.      Plaintiff Matthew Jackson (hereinafter "Plaintiff" or "Mr. Jackson" or "Jacksons") is a resident citizen of Jefferson County, Alabama, aged nineteen (19) years or older.

2.      Plaintiff Juyoung Jackson (hereinafter "Plaintiff" or "Ms. Jackson" or "Jacksons") is a resident citizen of Jefferson County, Alabama, aged nineteen (19) years or older.

3.      Defendant Stone Pointe Builders, LLC (hereinafter "Stone Pointe" or "Defendant") is an Alabama limited liability company licensed to do and doing business in Jefferson County, Alabama.

4.      Defendant Cecil Wayne Sanford ("Mr. Sanford" or "Defendant") is a resident of Jefferson County, Alabama, above the age of nineteen (19) years who routinely conducted business in Jefferson County, Alabama and is the owner and principal of Stone Pointe.

5.      Defendant Kristen Wheeler ("Ms. Wheeler" or "Defendant") is a resident of Jefferson County, Alabama, is a licensed realtor (Alabama Realtors' License No. 000111598-0) who also worked as an accounts manager for Stone Pointe and Mr. Sanford's personal assistant.

6.      Fictitious Defendants A, B, C, whether singular or plural, is that certain person, firm, partnership, corporation or other entity which received monies belonging to or designated for the benefit of the Plaintiffs regarding the construction of their home as described herein.

2

7.      Fictitious Defendants D, E, F, whether singular or plural, is that certain person, firm, partnership, corporation or other entity who negligently constructed Plaintiffs' home.

8.      Fictitious Defendants  G, H, I, whether singular or plural, are those certain persons, firms, partnerships, corporations or other entities which are responsible for the actions of the named Defendants for the acts described herein.

9.      Fictitious Defendants J, K, L, whether singular or plural, is that certain person, firm, partnership, corporation or other entity which bonded, guaranteed, assured or otherwise insured the actions of the named Defendants.

10.     Fictitious Defendants M-N, whether singular or plural, are those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal entities who converted the funds Plaintiffs' paid toward the construction of their home as alleged herein.

11.     Fictitious Defendants O-P, whether singular or plural, are those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal entities who suppressed information from Plaintiffs in order to induce Plaintiffs to contract with the named Defendants.

12.     Fictitious Defendants Q-R, whether singular or plural, are those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal entities which conspired with the named Defendants to defraud Plaintiffs.

13.     Fictitious Defendants S-T, whether singular or plural, are those persons, firms, companies, corporations, contractors, subcontractor, vendors, partnerships, entities, or other legal entities who breached a fiduciary duty owed to Plaintiffs as alleged  herein.

3

14.     Fictitious Defendants U-V, whether singular or plural, are those persons, firms,

companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal

entities who joined the named defendants in deceiving Plaintiffs as alleged herein.

15.     Fictitious Defendants W-X, whether singular or plural, are those certain persons,

firms, partnerships, corporations or other entities who acted as agent or broker under the "Real Estate

Sales Contract For New Construction On Lot" along with the named Defendants for Plaintiffs home

as alleged herein.

16.     Fictitious Defendants Y-Z, whether singular or plural, are those certain persons, firms,

partnerships, corporations or other entities who are successors in interest to the named Plaintiffs.

## II.     JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action as the minimum amount in controversy

is present and venue is proper in Jefferson County.

## III.     STATEMENT OF FACTS

18.     Plaintiffs Matthew Jackson and Juyoung Jackson (collectively "Jacksons") are

husband and wife who sought to build a home in Vestavia Hills, Alabama in the fall of 2019.

19.     Mr. Sanford is a licensed homebuilder in the State of Alabama (Ala. License No.

25790) and he holds the Alabama homebuilder's license for Stone Pointe.

20.     Stone Pointe advertised itself as a general contractor and licensed homebuilder in

Alabama.

21.     While employed by Stone Pointe and Sanford, Ms. Wheeler also worked for Premier

Vestavia, LLC as a real estate agent.

22.     In October 2019, the Jacksons decided to build a home in Vestavia Hills, Alabama,

4

for their growing family and they started by searching the internet for homebuilders.

23.    The Jacksons reviewed Stone Pointe's promotional materials and they were impressed and believed Stone Pointe's and Sanford's representations.

24.    On October 25, 2019, the Jacksons contacted Sanford at Stone Pointe about constructing a home on a vacant lot located at 2308 Garland Drive, Vestavia Hills, Alabama 35216.

25.    Sanford visited the Garland Drive lot with the Jacksons in November 2019 to go over the site and thereafter sent several potential house designs to the Jacksons.

26.    Based on Sanford's proposals, on January 3, 2020, the Jacksons purchased the Garland Drive property with the intent for Sanford and Stone Pointe to build their home.

27.    In February 2020, the Jacksons met with Sanford and Stone Pointe to review plans and construction materials to be used in their home. During this meeting, Mr. Sanford told them that he had extensive experience, knowledge of materials, with available subcontractors, and numerous prior construction jobs and that he had the ability to timely construct the Jacksons' home.

28.    Sanford told the Jacksons to work directly with Kristen Wheeler, their assistant, accounts manager, and agent, to finalize the construction contract details.

29.    From February 2020 to May 2020, the Jacksons met with Wheeler and Sanford at Stone Pointe several times to discuss the project specifics and the build time. During these meetings, Sanford and Wheeler, acting individually and for Stone Pointe, assured the Jacksons it would take less than eight months from start to completion to build their home.

30.    In September 2020, while acting in her capacity as Stone Pointe's agent and account manager and Sanford's assistant, Ms. Wheeler started negotiating the "Real Estate Sales Contract For New Construction On Lot" with the Jacksons.  Wheeler revised the Jacksons' proposed

5

construction contract with Stone Pointe and Sanford ten (10) times during the course of negotiations.

31.    On September 14, 2020, the Jacksons signed the "Real Estate Sales Contract For New Construction On Lot" with Stone Pointe Builders, LLC. (Exh. A, pp. 10). Kristen Wheeler negotiated the deal for Stone Pointe and Sanford with the Jacksons, and she also witnessed the contract signatures on the document. (Exh. A, p. 10).

32.    Per the Contract, the Jacksons agreed to pay $441,500.00 to have their home constructed and they are listed as the "Purchasers," while Stone Pointe Builders, LLC is listed as the "Seller(s)." (Exh. A, p. 1). Stone Pointe and Mr. Sanford agreed to complete the residence within 150 workdays after the date of commencement. (Exh. A, p. 3, ¶ 12). A "LIMITED WARRANTY AGREEMENT" was provided by Defendants to the Jacksons at the time the Jacksons executed the Contract with Stone Point.

33.    Mr. Sanford signed the contract on behalf of Stone Pointe Builders, LLC as its managing member. (Exh. A, p. 10)

34.    In May 2020, Stone Pointe, Sanford, and Wheeler encouraged the Jacksons to use Central State Bank to fund the construction of their home, without disclosing that Central State Bank was one of the primary construction lenders for Sanford and Stone Pointe.

35.    On October 9, 2020, and at the recommendations of the Defendants, the Jacksons executed a Construction Loan Agreement with Central State Bank to fund the construction of their home.

36.    The Jacksons made their first construction draw on their construction loan on October 16, 2020 which was paid to Stone Pointe in the amount of $39,696.00. This was paid by providing a check to Ms. Wheeler who endorsed and negotiated the check even though it was payable to Stone

Pointe.

37.     The Jacksons met Sanford at the property for a site inspection on October 20, 2020 before meeting with Builders Plus to review windows and doors needed for their home on October 21, 2020.

38.     On December 10, 2020, Ms. Jackson paid $22,500.00 in excavation costs to Stone Pointe and Sanford by check. This cost was not included in the construction contract amount of $441,500.00.

39.     Stone Pointe and Sanford stopped working on the Jacksons' residence after excavating the site.

40.     The Jacksons complained to Stone Pointe, Wheeler, and Sanford about the lack of work but no work was done from January 2021 through May 10, 2021.

41.     On May 10, 2021, Mr. and Mrs. Jackson met with Stone Pointe, Sanford, and Wheeler about the lack of progress and Defendants assured them they would resume working.

42.     On September 20, 2021, Stone Pointe and Sanford sent a $16,000.00 invoice to the Jacksons for a "retaining wall per building inspection department" which the Jacksons paid in full from their personal account.

43.     The Jacksons met with Alabama Cabinets on October 1, 2021 to finalize the cabinets and to pay a deposit out-of-pocket to have cabinets constructed.

44.     Around November 18, 2021, the Jacksons paid $4,191.00 from the construction loan account as a draw to Stone Pointe.

45.     On December 8, 2021, the Jacksons paid $20,953.00 from the construction loan account as a draw to Stone Pointe per Defendants' request, but Stone Pointe and Sanford refused to

7

work.

46.     On December 21, 2021, the Jacksons paid $6,482.54 to Alabama Cabinets Company, Inc.

47.     On January 7, 2022, Ms. Jackson again met with Stone Pointe, Sanford, and Wheeler about the lack of progress and Defendants assured her they would resume work on the project, but Defendants demanded another draw to start.

48.     On January 21, 2022, Mr. Sanford and Stone Pointe, through their subcontractors, dug and poured the concrete footing.

49.     On January 25, 2022, the Jacksons paid an $8,024.04 draw to Stone Pointe by check and Ms. Wheeler negotiated for Stone Pointe, but no work was performed. About two days later, the Jacksons complained to Stone Pointe, Wheeler, and Sanford about the lack of work and demanded an explanation.

50.     In response to the Jacksons' complaints, Stone Pointe and Sanford agreed to modify the Construction Contract by executing an addendum on February 22, 2022 which stated that the home would be completed by June 1, 2022. (Exh. B, p. 1). The addendum also contained a penalty clause stating: "In the case that the home is not completed by June 1, 2022 builder (Wayne (Sanford) with Stone Point Builders) agrees to pay $150.00 each day until home is completed and the certificate of occupancy has been delivered to builder." *Id*.

51.     At the time Stone Pointe and Sanford executed the addendum (Exh. B), neither had any intention to comply with its terms as shown by the facts here.

52.     Based on the assurances, the Jacksons paid another draw of $7,611.77 on February 23, 2022 to Defendants, but AGAIN no work was performed.

8

53.     As of February 23, 2022, the Jacksons had paid $125,458.35 (over 25% of the contract price) toward the construction of their home to Stone Pointe, Sanford, and Ms. Wheeler, but little work was performed by Defendants.

54.     On March 2, 2022, Mr. Sanford texted Mr. Jackson to state that he and Stone Pointe were going out of business. Sanford instructed the Jacksons to pick up their appliances.

55.     The Jacksons immediately asked for an accounting, the return of their funds, and explanation about abandoning the job, but received no response. The Jacksons picked up their appliances, but the range hood was missing.[1]

56.     On March 2, 2022, the Jacksons called Sherman Concrete and learned Sherman was never fully paid for pouring the slab and retaining wall - despite Defendants receiving draw money specifically for that.  The Jacksons then notified Central State Bank and Kristen Wheeler about the breach of contract, nonpayment, and job abandonment.

57.     On March 3, 2022, Ms. Wheeler told the Jacksons she was not sure if she, Stone Pointe and Sanford paid all the vendors and subcontractors who provided work, product, and/or services for the Jackson's home,  despite receiving draw payments from the Jacksons for  the same.

58.     The Jacksons then notified Stone Pointe's and Sanford's insurance company about their contract and warranty claims against Defendants on March 4, 2022.

59.     Ms. Wheeler managed Stone Pointe's and Mr. Sanford's bank accounts and checkbook from September 2020 - March 2022 while also acting as a signatory on the accounts.

60.     Upon information and belief, Ms. Wheeler, Sanford, and Stone Pointe knew or should have known the monies they received from the Jacksons from October 16, 2020 to March 3, 2022

---

[1] The Jacksons learned later Sanford  installed the hood in another house.

9

were not being used as designated to construct the Jacksons' home.

61.     Stone Pointe, Sanford, and Wheeler did not use Plaintiffs' funds for the construction of their home and instead converted the funds for their own use.

62.     Stone Pointe and Sanford failed to complete the construction project within the 150 days as the Contract required after commencing work on December 31, 2020.

63.     Per the Contract, Mr. Sanford and Stone Pointe agreed to pay $75.00 per day for each day past the promised completion date of May 30, 2021-July 21, 2022 (using December 31, 2020 as the commencement date), totaling 478 days=$35,850.00 in construction delay fees.

64.     The work Defendants performed is incomplete, negligently constructed, negligently mismanaged, and was not performed in a good and workmanlike manner.

65.     Prior to Stone Pointe and Sanford abandoning the job and breach of contract, the Jacksons complained that the work performed by Defendants was not properly performed per the construction plan. Defendants failed to rectify the issues at the Jacksons' home, honor the warranty and perform the work for the negotiated fixed price amount.

66.     Since Defendants' abandonment, the cost of materials and labor has increased drastically. The Jacksons have been forced to hire counsel to pursue the Defendants and hire another contractor to finish their home.

## IV.    CAUSES OF ACTION

### COUNT ONE
### BREACH OF CONTRACT
### (Against Defendants Wayne Sanford and  Stone Pointe Builders)

Plaintiffs re-allege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

67.    The Jacksons contracted with Stone Pointe and Sanford to build their home on September 14, 2020.

68.    Pursuant to the terms of the contract, Stone Pointe and Sanford agreed to fulfill their obligations under the terms of the Contract by building the Jacksons' home in a good and workmanlike manner and in the time prescribed by the Contract.

69.    In return, the Jacksons agreed to pay Defendants $441,500.00.

70.    Plaintiffs fulfilled their obligations to the Defendants under the Contract.

71.    Defendants breached the terms of the Contract between themselves and Plaintiffs by abandoning the job and failing to perform the work on the home in a good and workmanlike manner in accordance with all residential construction industry standards, applicable building codes and the plans, and by mismanaging draws and money paid for the construction of Plaintiffs' home.

72.    The Jacksons have been damaged as a result of the breach of said contract and are entitled to recover damages.

### COUNT TWO
### MONEY HAD AND RECEIVED
### (Against Defendants Wayne Sanford, Stone Pointe Builders, LLC)

Plaintiffs re-allege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

73.    Pursuant to Defendants' contractual and warranty demands, Defendants had and received $125,458.35 from the Jacksons as payments made toward the construction of their home located at 2308 Garland Drive, Vestavia Hills, AL 35216.

74.    Defendants failed to perform as promised to construct Plaintiffs' home in accordance with the contract, all to the Plaintiffs' detriment and have received and misapplied the Plaintiffs'

money.

75.     As shown in the facts stated above, Defendants owe the Jacksons $125,458.35 for

money had and received from September 2020-February 2022.

76.     The Plaintiffs are entitled to judgment against Defendants for the money had and

received.

## COUNT THREE
## UNJUST ENRICHMENT
## (ALL DEFENDANTS)

Plaintiffs re-allege, as if fully set forth, each and every allegation contained in the preceding

paragraphs, and further allege that:

77.     As a result of conduct described above, Defendants have been unjustly enriched from

the $125,458.35 from the Jacksons which they were paid and should be required to return those

funds to the Plaintiffs.

78.     Defendants and Fictitious Defendants should be required to account for all monies

spent, profits, and gains which they have obtained or will unjustly obtain in the future at the expense

of Plaintiffs, and a return on monies should be imposed thereon to compensate Plaintiffs for the loss

incurred.

## COUNT FOUR
## CONVERSION
## (ALL DEFENDANTS)

Plaintiffs re-allege, as if fully set forth, each and every allegation contained in the preceding

paragraphs, and further allege that:

79.     Defendants converted the $125,458.35 of Plaintiffs' funds for their use and benefit

without the intention of returning the same.

12

80.     As a direct and proximate result of Defendants' acts, Plaintiffs have suffered direct
and consequential damages as set forth in the above Statement of Facts.

**COUNT FIVE**
**BREACH OF WARRANTY**
**(Against Defendants Wayne Sanford and Stone Pointe Builders, LLC)**

Plaintiffs re-allege, as if fully set forth, each and every allegation contained in the preceding
paragraphs, and further allege that:

81.     By contract and operation of law, Defendants impliedly and expressly warranted the
construction of the Jacksons' new home to be done in a timely manner and in a good and
workmanlike manner.

82.     Defendants breached the warranty owed to the Jacksons by failing to construct and
complete the Jacksons' new home timely and in a good and workmanlike manner with good and
substantial materials, in accordance with the plans and specifications, applicable building code and
applicable industry standards.

83.     Prior to abandoning the project on March 3, 2022, the Jacksons notified Defendants
about their failure to construct the house per the contract and gave the Defendants an opportunity to
correct and/or repair the work performed.

84.     Defendants' breach of these warranties has caused Plaintiffs' damage.

85.     As a direct and proximate result of Defendants' breach, the Jacksons have been
damaged and continue to be damaged.

**COUNT SIX**
**DECEIT**
**(ALL DEFENDANTS)**

Plaintiffs re-allege and incorporate herein by reference the allegations contained in the

13

proceeding paragraphs.

86.     In the fall of 2020, Ms. Wheeler, Mr. Sanford, and Stone Pointe, on behalf of themselves individually and all Defendants, represented to the Jacksons that their new home would be constructed within 150 days or within seven to eight months after the agreement date of September 14, 2020 and that the money requested for that would be used to pay the costs of construction and not otherwise.

87.     Ms. Wheeler, Mr. Sanford, and Stone Pointe represented to the Jacksons the construction of their new home would be performed in a good and workmanlike manner and in accordance with local and state building codes.

88.     After several delays, in February 2022, Mr. Sanford and Stone Pointe offered  a contract addendum promising completion by June 1, 2022.

89.     At that time, Defendants had no intention of honoring their contract.

90.     From September 2020-March 2, 2022, Defendants intentionally deceived the Jacksons to induce them to pay $125,458.35 (not including loan costs and interest) in payments toward the construction of their new home by telling Plaintiffs their home would be built timely and in a good and workmanlike manner, by failing to use the funds Plaintiffs paid to them for the construction of Plaintiffs' home, by telling Plaintiffs they were working on Plaintiffs' home when in fact Defendants did nothing, by demanding additional payments from Plaintiffs without the intention of applying the payments toward the construction of Plaintiffs' home, by modifying the construction contract to include a June 2022 completion date when Defendants had no intention to abide by the terms of the construction contract, and by misrepresenting the progress of Plaintiffs' home construction when Plaintiffs complained about the lack of work being performed.

14

91.     Defendants' lack of intent to perform and their intent to deceive is shown by the facts stated above, including but not limited to their demand of a substantial percentage of the full contract price up front before beginning the construction; by taking a permit out for a much smaller amount than the full contract price paid to Defendants; by failing to perform or do any work for an extended period of time despite the Jacksons' requests; by failing to respond to the Jacksons' concerns about the delays and performance; by demanding an additional payment even though minimal work had been done and the construction paid for to date remained incomplete; by failing to complete the work contracted for despite being paid; and by converting the funds provided by Plaintiffs.

92.     Defendants' deceit proximately caused and continues to cause damages to the Jacksons.

**COUNT SEVEN**
**PROMISSORY FRAUD**
**(All Defendants)**

Plaintiffs re-allege and incorporate herein by reference the allegations contained in the proceeding paragraphs.

93.     On September 14, 2020, Mr. Sanford, Stone Pointe, Ms. Wheeler, as the agent of Stone Pointe and Sanford, promised to the Jacksons that in exchange for the full contract price of $441,500.00 (not including the money Mr. and Mrs. Jackson paid for the Subject Property), they could and would construct the Jacksons' new home per the Contract in the time prescribed and/or they would repair the same as needed in accordance with the Warranty Agreement.

94.     Sanford and Stone Pointe promised and agreed to construct the Jacksons' new home timely and in a good and workmanlike manner and in accordance with local and state building codes. Defendants also promised that the money requested from the Plaintiffs during the course of the

15

construction would be used for the costs of the construction and not otherwise.

95.     At the times Defendants promised to perform these acts, Defendants knew these promises and representations were false, but Defendants made these promises and representations with the intention of the Jacksons relying on them and in reliance, paying the money requested by Defendants.

96.     Plaintiffs believed Defendants' promises and in reliance on those paid substantial sums to Defendants.

97.     At the times Defendants made these promises, Defendants did not intend to perform as promised and intended to deceive the Jacksons.

98.     Defendants' lack of intent to perform and their intent to deceive is shown by the facts stated above, including but not limited to their demand to receive a substantial sum of the construction contract price (over $125,458.35) without performing the work Plaintiffs hired Defendants to do; by failing to perform or do any work for an extended period of time despite the Jacksons' requests and despite being paid; by failing to pay costs of construction; by failing to respond to the Jacksons' concerns about the delays and performance; by demanding additional payments even though minimal work had been done and the work performed was incomplete; by failing to complete the work contracted for despite being paid; and by negotiating instruments in order to take the Jacksons' funds directed toward the construction.

99.     At all relevant times, Defendants made multiple false misrepresentations to the Jacksons about the construction status of their home for the purpose of acquiring additional contract draw payments.

100.    Defendants' representations were made knowingly and with the intention that

16

Plaintiffs would rely upon them.

101.    The Jacksons justifiably believed Defendants' promises and representations and in reliance on them, paid the $125,458.35 (not including loan costs and interest) toward the contract price of $441,500.00 as requested by the Defendants from September 2020-March 2, 2022.

102.    Defendants' fraudulent actions proximately caused and continues to cause damage to the Jacksons.  As stated above, the Jacksons have been unable to complete the repairs and construction on their home and continue to suffer ongoing anxiety and distress as a result.

**COUNT EIGHT**
**NEGLIGENCE**
**(ALL DEFENDANTS)**

Plaintiffs re-allege and incorporate herein by reference the allegations contained in the proceeding paragraphs.

103.    Defendants had a duty to properly construct the Jacksons' home in a timely manner and in a good and workmanlike manner and in accordance with local and state building codes.

104.    Defendants breached their duty by negligently failing to properly construct the Jacksons' new home as identified and discussed above, failing to perform all of the repairs they warranted, and by failing to meet the time line bargained for and required by the Jacksons.

105.    The construction that was undertaken by Stone Pointe and Sanford was not done in a good and workmanlike manner and was not completed and the partial construction which was done was negligently done to the extent the work will need to be corrected and repaired further.

106.    As a direct and proximate consequence of Defendants' negligence, Plaintiffs have been damaged and continue to be damaged.

## COUNT NINE
## <u>NEGLIGENT MISREPRESENTATION</u>
## (ALL DEFENDANTS)

Plaintiffs re-allege and incorporate herein by reference the allegations contained in the proceeding paragraphs.

107.    Defendants negotiated the construction contract between Stone Pointe and the Jacksons.

108.    Defendants knew or should have known that the Jacksons' home would not be built in the time prescribed the contract.

109.    Defendants knew or should have known the money the Jacksons paid to Wheeler, Stone Pointe, and Sanford was not and/or would not be used for the intended purpose of constructing the Jacksons' home.

110.    Despite this knowledge, Defendants negligently represented to the Jacksons that their home would be constructed as they intended to build.  These Defendants made these representations to induce the Jacksons' performance.

111.    These Defendants made these representations despite the fact they knew throughout the construction process that the draws they took, received, negotiated, and withdrew from the Jacksons' account were not being used to construct their home.

112.    At all relevant times, Defendants negligently misrepresented to the Jacksons how the funds were being applied toward the construction of their home.

113.    As a direct and proximate consequence of Defendants' negligent misrepresentations, the Jacksons have been damaged and continue to be damaged.

18

## COUNT TEN
## <u>BREACH OF FIDUCIARY DUTY</u>
## (ALL DEFENDANTS)

Plaintiffs re-allege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

114.    Stone Pointe and Sanford were aware through the Construction Contract that the Jacksons' placed their trust and confidence in them to use the funds requested from the Jacksons to pay the costs of construction of their home and not otherwise.

115.    At all relevant times, Stone Pointe and Sanford had a fiduciary duty to use the funds received from the Jacksons solely for the construction costs of their home.

116.    The funds the Jacksons paid were under the exclusive control of Ms. Wheeler, Stone Pointe, and Sanford.

117.    Stone Pointe and Sanford had a duty to account for the funds the Jacksons paid and to not convert and/or mismanage the funds received.

118.    Stone Pointe and Sanford breached their duty owed to Plaintiffs and as a result the Plaintiffs were damaged.

119.    Plaintiffs' payments and draws made to Defendants at their request and to Fictitious Defendants were for the specific purposes of paying for the construction costs of their home.

120.    Defendants breached the fiduciary duty they owed to Plaintiffs by failing to apply the funds toward the construction of the home, by failing to return the monies Plaintiffs paid toward the construction of their home when Defendants abandoned the job on March 3, 2022, by failing to tell the Plaintiffs pertinent facts concerning the construction of their home, and by failing to account for the funds received.

19

121.    Upon information and belief, Defendants and Fictitious Defendants converted the funds Plaintiffs paid to them for the construction of their home for Defendants' own use and gain.

122.    As a direct and proximate consequence of Defendants' breach of fiduciary duty, Plaintiffs have been damaged and continue to be damaged.

**COUNT ELEVEN**
**SUPPRESSION**
**(ALL DEFENDANTS)**

Plaintiffs re-allege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

123.    Defendants had superior knowledge of the facts and construction expertise not shared by Plaintiffs.

124.    The Plaintiffs also made numerous inquiries of the Defendants which required Defendants to fully disclose to Plaintiffs the material facts.

125.    Despite the Plaintiffs' questions, Defendants suppressed material facts from Plaintiffs including, but not limited to the following: (1) the money negotiated/received/paid to Defendants was not used for construction of Plaintiffs' home; (2) Plaintiffs' home was not being built by competent and knowledgeable subcontractors; (3) Plaintiffs' home was not being built in compliance with the applicable building codes and in a good and workmanlike manner in accordance with applicable residential construction industry standards; (4) Plaintiffs' funds earmarked for certain phases of construction were not being properly managed; and (5) Defendants could not construct Plaintiffs' home in the time frame agreed upon.

126.    Defendants suppressed and concealed material facts from Plaintiffs in order to induce Plaintiffs to enter into the Contract for the construction of their home and to continue payment to

20

Defendants.

127.    During construction, Defendants suppressed and concealed material facts from Plaintiffs in order to induce Plaintiffs to continue to utilize Defendants for constructing their home.

128.    Without knowledge of the foregoing material facts, Plaintiffs acted to their injury by continuing to pay the requested funds to the Defendants.

129.    The actions of Defendants constitute suppression of material facts pursuant to Ala. Code § 6-5-102 (1975).

130.    As a direct and proximate result of the above-described suppression, the Jacksons have been and continue to be damaged.

### PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs demand judgment against Defendants for compensatory damages, consequential damages, punitive damages, special damages, attorneys' fees and costs, interest, and costs of these proceedings, and all such other damages to which Plaintiffs may be entitled under Alabama law and in an amount to be determined by the Court, and for such other relief and costs that are deemed just and proper.

Respectfully submitted this the 17th day of August, 2022.

s/ Daniel Patrick Evans
Daniel Patrick Evans
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone:  (205) 870-1970
Fax: (205) 870-7763
EVA-048
E-Mail: dpevans@evanslawpc.com
Attorney for the Plaintiffs

21

## JURY DEMAND

Plaintiffs demand trial by jury of all the claims so triable in this complaint.

Plaintiffs' Address:

c/o The Evans Law Firm, P.C.

Defendants' Addresses:

**SERVED DEFENDANTS VIA CERTIFIED MAIL**

Stone Pointe Builders, LLC
Registered Agent USCA, Inc.
100 Oxmoor Road, Suite 110
Birmingham, Alabama 35209

Cecil Wayne Sanford
905 Forestdale Boulevard
Birmingham, Alabama 35214

Kristen Wheeler
24207 Hilbun Way
Birmingham, Alabama 35242

22

# EXHIBIT A

## REAL ESTATE SALES CONTRACT FOR NEW CONSTRUCTION ON LOT

The undersigned Purchaser(s) [Matthew Jackson and Juyoung Jackson] hereby agrees to purchase and the undersigned Seller(s) Stone Pointe Builders LLC hereby agrees to sell the following described real estate, together with all improvements, shrubbery, planting, fixtures and appurtenances (the "Property") situated in the City of VESTAVIA HILLS County of Jefferson _____, Alabama, subject to all easements, restrictions, covenants, rights of way, and other matters of record, on the terms stated below:

```
2308 GARLAND DR
VESTAVIA HILLS, AL 35216-3002
PID #  28-00-29-3-007-013.000
Legal Description:
VESTHAVEN 6 SECT 3RD ADD BK 80 PG 55 BLK 3 LOT 14
```

**1 CONSTRUCTION OF RESIDENCE; ACCEPTANCE OF PLANS AND SPECIFICATIONS.**
Purchaser and Seller acknowledge that the Property, and the Purchase Price set forth below, includes a residential dwelling (The "Residence") constructed or completed by Builder on the above described lot in accordance with the plans and specifications attached hereto as Exhibit "A" and initialed or signed by Purchaser and Builder on each page. Purchaser hereby confirms acceptance of the plans and specifications as well as the quality, design and appearance of the Property at the time Purchaser h signed this Contract. The Residence to be constructed or completed is commonly known as the Plan name   Plan # (if applicable)
_20211 _____     _____.

**2 PURCHASE PRICE.**
The Base Price of the "Residence" (including the home site) is:                  $ 419,000 _____
**plus any change orders or additions**                                          $ 22,500 _____    | 22,500 to remove existing house foundation |
Purchaser request extras or upgrades in addition to the basic plan             $ _____ as
outlined on the "Contract Summary" for the following sum in
addition to the base price stated above:
                                                                                $ _____
TOTAL PURCHASE PRICE                                                            $ 441,500 _____

**PAYMENT OF PURCHASE PRICE**
The Purchase Price of the Residence shall be paid as follows:                  $ 441,500 _____
Earnest money                                                                   $ (0 _____ )
Amount of deposit made due to extras or upgrades being
chosen at time of contract and included in sales price                         $ 2,500 _____
(the additional deposits are non-refundable for any reason)
Balance due from purchaser at the time of the closing*                         $ TBD _____

*this may be from additional cash down payment and/or loan proceeds. Closing costs are not included in this amount. Any monies due personally from the purchaser must be paid by to the closing agent by such method (cashier's check or wire transfer) as the closing agent may require.

4.   FINANCING. (Check as applicable)

(1)   Buyer will pay cash or obtain a loan for the property with no financing contingency.

(2)   This contract is contingent on Buyer obtaining approval of a ☐ Conventional ☐ FHA ☐ VA ☐ Other loan in the amount of $ _____ or 80 ____ % of the purchase price (excluding any financed loan costs) at the prevailing interest rate and loan costs. If FHA or VA financing is utilized, the "FHA/VA Amendatory Clause Addendum" mu be part of this agreement. Purchaser will apply for financing within _____ days from finalized date (5 days if not specified and provide a letter of loan approval within 10 days and will provide any and all credit, employment, financial, and other information required by the Lender. After Purchaser provides the approval letter, this contingency is removed, and all earnest money is non-refundable due to any failure of the Purchaser to obtain financing. If Purchaser does not provide a letter of acceptance or denial to Seller within 10 days, this contingency is removed, and all earnest money shall become non-refundable due to any failure of the Purchaser to obtain financing.

5   **EARNEST MONEY AND PURCHASER'S DEFAULT. Purchaser hereby authorizes the Seller to hold the earnest m** pending the fulfillment of this Contract. In the event Purchaser fails to carry out and perform the terms of this Contract, the earnest money shall be forfeited, and Purchaser shall execute a general release relieving the Seller from any liability as it relates this contract. Further, nothing in this provision shall prohibit Seller from seeking reimbursement of all other costs, expenses a damage suffered as a result of Purchaser's breach.

6   **NON-REFUNDABLE FEES, UPGRADE/CUSTOM SELECTION CHARGES. Seller and Purchaser acknowledge that** the event this contract is canceled or does not close for any reason attributable to the Purchaser, any fees, upgrade selections (including but not limited to any floor selections, wall paper, lighting, appliance upgrades, custom changes in construction, etc. that have been paid will be NON-REFUNDABLE). Items unpaid will result in forfeiture of earnest money in the amount of the upgrade or custom selection. These items rarely increase the appraised value of the home and shall be forfeited as liquidated damages should Purchaser fail to close. Extras/upgrades chosen and included in sales price must be accompanied by addition money in the amount of the upgrade or extra that is non-refundable for any reasons.

7   **NON-PAYMENT. In the event Purchaser shall fail to pay any monies due Seller under this Contract for scheduled do** payments, extras or other additional items required by Purchaser, Seller may refuse to perform any further work to the premises under warranty or otherwise until Purchaser pays the full sum, plus interest at the legal rate, attorney's fees and court costs. Extras must be paid in full prior to installation or work involving said extras being performed.

8   **ALL LOAN CLOSING COSTS, DISCOUNTS AND PREPAID ITEMS. All loan closing costs, discounts, and prepaid** are to be paid by Purchaser unless agreed otherwise or otherwise specified herein.

9   **FHA VALUATION. If FHA financing is utilized, it is expressly agreed that notwithstanding any other provisions of the** Contract, Purchaser shall not be obligated to complete the purchase of the Property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless Seller has delivered to Purchaser a written statement issued by the Federal Housing Commissioner setting forth the appraised value of the Property (excluding closing costs) of not less than $ _____ which statement Seller hereby agrees to deliver to Purchaser promptly after such appraised value statement made available to Seller. Purchaser shall, however, have the privilege and option of proceeding with the consummation of the Contract without regard to the amount of the appraised valuation made by the Federal Housing Commissioner. The appraised valuation is arrived at to determine the maximum mortgage the Department of Housing and Urban Development will insure. H does not warrant the value or the condition of the Property. Purchaser should satisfy himself/herself that the price and condition of the Property are acceptable.

10  VA LOAN. If VA financing is used, it is expressly agreed that, notwithstanding any other provisions of this Contract, Purchas shall not incur any penalty by forfeiture of earnest money or otherwise be obligated to complete the purchase of the Property described herein, if the Contract purchase price or cost exceeds the reasonable value of the Property established by the Veteran Administration. Purchaser shall, however, have the privilege and option of proceeding with the consummation of this Contract without regard to the amount of the reasonable value established by the Veterans Administration.

11  ROCK AND OTHER SUBSURFACE CONDITIONS. If initialed by Seller and Purchaser here (Seller _____ Purchaser _____ ), the price above does not include any costs or contingencies for rock or other abnormal subsurface conditions, includes but not limited to, sink holes, soft soils, etc. and Purchaser shall be responsible for the abnormal costs of correcting any such conditions. Should such abnormal conditions be encountered on the building site in connection with foundations and footing excavation, or installation of sewer lines, water lines, or other utility services, Seller shall promptly inform Purchaser of same estimate costs of additional work. Such costs may include, but are not necessarily limited to, blasting expenses, jackhammer, drill operations. Additional costs shall be billed at costs plus a twenty-five percent (25%) management and overhead fee and, the time that rock or subsurface conditions are encountered. Seller shall provide a maximum cost for written approval by Purchaser prior to proceeding with construction.

**Choose "A", "B" or "C" (check only one)**

**12 (A)** ☒   RESIDENCE TO BE CONSTRUCTED. Purchaser and Seller acknowledge and agree that the Property (and To Purchase Price) includes a residential dwelling (the "Residence") which will be constructed by Seller or its agents on the above described lot. Seller agrees to commence construction of said residence within 21 days after this Agreement has been finalized, and after all contingencies are removed, including but not limited to financing and Seller verifying himself/herself o through his agents, that desired home will fit on described lot and all necessary permits are obtained. Residence shall be completed within 150 workdays after date of commencement, except when Seller shall be prevented from complete such buildings by reason of change in plans or specifications required by Purchaser, or additional change orders required by Purchaser, rain or inclement weather delays, by warfare and terrorism, Acts of God, governmental regulations or decrees, strike acts of Purchaser, or shortage of material and supply beyond the control of the Seller or other causes beyond the control of Se Seller agrees to construct the Residence in a good and workmanlike manner in substantial accordance with the Plans and Specifications and in a quality substantially equal to the standards of construction currently prevailing in the greater Birmingham Alabama metropolitan area for single-family residential dwellings similar to the Residence. Purchaser hereby confirms acceptance of the Plans and Specifications as well as the quality, design, and appearance of the Property as it exists at the time Purchaser has signed the Agreement. Purchaser acknowledges that, in the course of construction of the Residence certain changes, deviations or omissions in the Plans and Specifications may be required by governmental authorities having jurisdiction over the Property or by any utility company providing utility service to the Property. Furthermore, job or site conditions on the Property may require certain changes, deviations, or omissions in the Plans and Specifications or Seller may determine that certain changes, deviations, additions, or omissions in the Plans and Specifications are necessary. Purchaser hereby consents any of the foregoing described changes, deviations, and omissions in the Plans and Specifications in the construction of the Residence. Purchaser also acknowledges and agrees that Seller may substitute materials, equipment, and appliances of equal quality for those specified in the Plans and Specifications. If Purchaser fails to close by the Closing Date set by Seller or its agents because of financing delays or any other matters attributable to Purchaser, Seller reserves the right to terminate this agreement or increase the Total Purchase Price by an amount equal to $75.00 per day for each day that the Closing is delayed beyond the Closing Date. If Purchaser fails to pay the increase in Purchase Price, Seller may, at its option, cancel and termination this Agreement in which event the Earnest Money and any amounts paid to Seller for Upgrade Costs and Change Orders, if an shall be retained by Seller and, except for the obligations and liabilities under this Agreement which survive the termination Agreement, neither party shall have any further obligation or liability to the other hereunder. Possession shall be given upon delivery of the deed.

**12 (B)** ☐   RESIDENCE UNDER CONSTRUCTION. Purchaser and Seller acknowledge and agree that the property and the total purchase price includes a residential dwelling "the Residence" which is under construction by Seller or its agents. The residence shall be completed within 7-8 Months    after this agreement has been finalized except where by the Seller sha prevented from completing such residence by reason of change orders required by Purchaser, rain or inclement weather delays warfare and terrorism, Acts of God, governmental regulations or decrees, strikes, act of Purchaser, or shortage of material and supply beyond the control of the Seller or other causes beyond the control of the Seller. Seller agrees to complete the residence good workmanlike manner in substantial accordance with the plans and specs already established prior to this agreement, excessive for change orders, if any, agreed upon between Purchaser and Seller, and in a quality substantially equal to the standards of construction currently prevailing in the greater Birmingham, Alabama metropolitan area for single-family residential dwelling similar to the residence Purchaser hereby confirms acceptance of the plans and specs already established prior to the agreement in addition to change orders agreed upon between Purchaser and Seller, if any, as well as the quality, design, and appearance o the property as it exists at the time Purchaser has signed the agreement, except that Purchaser acknowledges that a homeowner orientation will be completed prior to the closing date. Purchaser acknowledges that the homeowner orientation will be completed with the Purchaser and the Seller or its agents to bring together a punch list. If Purchaser fails to close by the Closing Date set by Seller or its agents because of financing delays or any other matters attributable to Purchaser. Seller reserves the right to terminate this Agreement or increase the Total Purchase Price by an amount equal to $75.00 per day for each day that the closing is delayed beyond the Closing Date. If Purchaser fails to pay the increase in purchase price, Seller may, at its option, cancel and terminate this Agreement in which event the earnest money and any amounts paid to Seller for upgrade costs and change orders, if any, shall be retained by Seller and except for the obligations and liabilities under this Agreement which survey the termination of the Agreement, neither party shall have any further obligation or liability to the other hereunder. Possession shall be given upon delivery of the deed.

12  (C)  ☐    COMPLETED CONSTRUCTION.  Purchaser and Seller acknowledges and agree that a residential dwelling (the "Residence") has been constructed and completed on the Lot.  Purchaser acknowledges and agrees that Purchaser has had the opportunity to inspect the Property and does hereby accept the Property in its current "AS IS" condition, subject to those change and upgrades agreed upon between Purchaser and Seller, except that Purchaser acknowledges that a homeowner orientation w be completed prior to the closing date.  Purchaser acknowledges that the homeowner orientation will be completed with the Purchaser and the Seller or its agents to bring together a punch list.  The sale shall be closed and the deed delivered on or before
_____, hereinafter called Closing Date, except Seller shall have a reasonable length of time within which to complete any item required as a result of the homeowner orientation and/or perfect title or cure defects in the title to said Property.  If Purchaser fails to close by the Closing Date set by Seller or its agents because of financing delays or any other matters attributable to Purchaser, Seller reserves the right to terminate this Agreement or increase the Total Purchase Price by amount equal to $75 per day for each day that Closing is delayed beyond the Closing Date.  If Purchaser fails to pay the increase in Purchase price, Seller may, at its option, cancel and terminate this Agreement in which event the Earnest Money and any amounts paid to Seller for Upgrade Costs and Change Orders, if any, shall be retained by Seller and, except for the obligations and liabilities under this Agreement which survive the termination of the Agreement, neither party shall have any further obligation or liability to the other hereunder.  Possession is to be given upon delivery of the deed.

13  CONVEYANCE.  Builder agrees to convey the Property to Purchaser by statutory warranty deed (check here  ☐  if Purchas desire title as joint tenants with right of survivorship), free of all encumbrances except as permitted in this Contract.  Builder a Purchaser agree that any encumbrances not herein accepted or assumed may be cleared at the time of closing from sales proceeds
THE PROPERTY IS SOLD AND IS TO BE CONVEYED SUBJECT TO ANY MINERAL AND MINING RIGHTS NOW OWNED BY Seller AND SUBJECT TO PRESENT ZONING CLASSIFICATION, AND  ☐  IS  ☑  IS NOT LOCATE A FLOOD PLAIN, AND , UNLESS OTHERWISE AGREED HEREIN, SUBJECT TO UTILITY EASEMENTS SERVING THE PROPERTY, DEVELOPER'S DECLARATION OF MASTER PLAN, RESIDENTIAL SUBDIVISION COVENANTS AND RESTRICTIONS, AND BUILDING LINES OF RECORD AND OTHER EASEMENTS, PROVIDED THAT NONE O THE FOREGOING MATERIALLY IMPAIRS USE OF THE PROPERTY FOR RESIDENTIAL PURPOSES IN ADDITION TO THE GENERAL EXCEPTION FOR MINERAL AND MINING RIGHTS NOT OWNED BY THE Seller.  Seller MAKE NO REPRESENTATIONS REGARDING THE STATUS OR CONDITION OF THE PROPERTY BELOW THE SURFACE OR RELATING TO THE EXISTENCE OF MINING SHAFTS, TUNNELS, GASES OR OTHER CONDITIONS BELOW O AFFECTING THE SURFACE OF SAID REAL PROPERTY.

14  TITLE INSURANCE.  Seller agrees to furnish Purchaser a standard form owner's title policy insurance at Seller's expense, issued by a company qualified to insure titles in Alabama, in the amount of the purchase price, insuring Purchaser against loss account of any defect or encumbrance in the title, subject to exceptions herein; otherwise, the earnest money shall be refunded the event both Owner's and Mortgagee's title policies are obtained at the time of closing, the total expense of procuring the two policies will be divided equally between Seller and Purchaser, even if the Mortgagee is Seller.  In the event of a second loan, Purchaser will pay the costs for the second lender's title policy.

15  SURVEY.  Purchaser  ☐  does  ☑  does not (check one) require a  ☐  Full  ☑  Foundation survey by a registered Alabama land surveyor. If Purchaser chooses to require a survey, the Builders or Builder's agents will order the survey on the behalf of the Purchaser.  Unless otherwise agreed herein, the survey shall be at Purchaser's expense. (NOTE: Lender may require a survey.)

16  SELECTION OF SETTLEMENT/CLOSING AGENT: Buyer and Seller hereby agree that the closing of this transaction shall be conducted by a closing attorney or title insurance company and Buyer and Seller  ☑  do  ☐  do not agree to share equal the settlement or closing charge imposed by the settlement agent. Buyer and Seller acknowledge and agree that such sharing m involve a potential conflict of interest and they may be required to execute an affidavit at closing acknowledging their recognition and acceptance of same. The parties further acknowledge that they have a right to legal representation of their own choosing, a their own expense, at all times in connection with this contract and the closing of this transaction.

If Purchaser elects to use a loan program that requires more than one closing fee, the Builder will only share equally the cost o the closing attorney's fee on the primary loan.

17  PRORATIONS.  Ad valorem taxes and assessments (whether paid in arrears or advance) fire and library district assessments, any, for the property as determined on the closing date are to be prorated between Seller and Purchaser as of the Closing Date All ad valorem taxes, except municipal taxes, are presumed to be paid in arrears for purposes of proration; municipal taxes, if are presumed to be paid in advance.  Seller and Purchaser acknowledge that the proration of taxes is based on prior year tax assessments and/or estimated amounts based on the time of the year of the start of construction of the house situated on the property and the date that the record map, if any, for the development was recorded in the Probate Office.  The actual ad valor taxes payable by Purchaser for the Property after the Closing Date may be greater than or less than the prorated amount but shall not be subject to re-proration after the Closing.  Purchaser shall be responsible for the payment of all real estate and ad valorem taxes and assessments, including any "roll-back" taxes assessed to the Property after the date of the Closing pursuant to Ala. C Section 40-7-25(3) (1975).  The foregoing provisions shall survive the Closing.

18  ASSESSMENTS.  At the Closing, any homeowner's association assessments shall be prorated between Seller and Purchaser a of the Closing Date.  From and after the Closing Date, Purchaser shall be solely responsible for the payment of all assessments attributed or assessed to the Property.  To the extent any transfer fees or other amounts are payable which may encumber the Property, Purchaser shall be responsible for the payment of the same at the Closing.  Such amounts shall be in addition to all o amounts payable by Purchaser at the Closing.  At the time of the execution of the contract, the annual homeowner's assessment $ 0 but is subject to change from time to time.  ☐  Monthly  ☐  Quarterly  ☐  Annually  N/A

BUILDER WARRANTS: Seller has not received notification from any lawful authority regarding any assessments, pending public improvements, repairs, replacement, of alterations to the Property, which remain outstanding except as, set forth herein

19  CONDITION OF PROPERTY/LIMITATION OF WARRANTY: Seller shall provide Purchaser with a one-year Limited New Home Warranty ("Warranty"), the form of which is attached as Exhibit "B", and Purchaser agrees to accept the terms and conditions of the Warranty as the only implied or express warranty from Seller.  Seller represents that to the best of Seller's
20  knowledge, no underground mining shafts or tunnels exist below the surface of the Property.  Seller further represents that Seller has not used any lead based paint in the construction of the Dwelling, has not installed any underground storage tanks on the Property, that Seller has not disposed of toxic or hazardous substances or wastes on the Property and that to the best of Seller' knowledge no such tanks have been installed or toxic or hazardous substances or wastes have been disposed of on the Property

EXCEPT AS SET FORTH IN THIS SECTION, SELLER HAS NOT MADE AND DOES NOT MAKE ANY REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, AS TO THE CONDITION OF THE PROPERTY OR THE DWELLING INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, HABITABILITY OR WORKMANSHIP. PURCHA EXPRESSLY WAIVES AND RELEASES ANY CLAIMS BASED ON ANY SUCH IMPLIED OR ALLEGED WARRANT AND REPRESENTATIONS.  EXCEPT AS SET FORTH IN THIS SECTION, SELLER HAS NOT MADE AND DOES NO MAKE ANY REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, AS TO THE CONDITION O THE PROPERTY AND WHETHER THERE EXISTS ANY TOXIC OR HAZARDOUS SUBSTANCE OR WASTE (INCLUDING, BUT NOT LIMITED TO, RADON GAS, MOLD OR FUNGUS), OR OTHER SUBSTANCE OF ANY KIN ON THE PROPERTY OR IN THE DWELLING.  FURTHERMORE, PURCHASER HEREBY WAIVES AND RELEASES SELLER, ITS AGENTS, EMPLOYEES, OFFICERS, DIRECTORS, SHAREHOLDERS, PARTNERS, MORTGAGEES AN THEIR RESPECTIVE HEIRS, REPRESENTATIVES, SUCCESSORS AND ASSIGNS FROM ANY LIABILITY OF ANY NATURE ON ACCOUNT OF LOSS, DAMAGE OR INJURY TO THE PROPERTY, IMPROVEMENTS, PERSONAL PROPERTY OR TO PURCHASER OR ANY OWNER, OCCUPANTS OR OTHER PERSON WHO ENTERS UPON ANY PORTION OF THE PROPERTY AS A RESULT OF ANY PAST, PRESENT OR FUTURE SOIL, SURFACE AND/OR SUBSURFACE CONDITIONS, KNOWN OR UNKNOWN (INCLUDING, WITHOUT LIMITATION, SINKHOLES, UNDERGROUND MINES, TUNNELS AND LIMESTONE FORMATIONS AND DEPOSITS) UNDER OR UPON THE PROPERTY OR ANY PROPERTY SURROUNDING, ADJACENT TO OR IN CLOSE PROXIMITY WITH THE PROPER THE AGENT MAKES NO REPRESENTATION OR WARRANTY AND IS NOT AUTHORIZED BY SELLER TO MAKE ANY REPRESENTATION OR WARRANTY OF ANY KIND AS TO THE CONDITION OF THE PROPERTY.  AS ADDITIONAL CONSIDERATION TO SELLER, THE FOREGOING PROVISIONS SHALL SURVIVE CLOSING AND MAY BE INCLUDED IN THE DEED.

SELLER AND PURCHASER HAVE NEGOTIATED AND AGREED UPON THE LIMITATIONS OF WARRANTY CONTAINED HEREIN AND IN THE LIMITED NEW HOME WARRANTY ATTACHED TO THIS CONTRACT

PURCHASER ACKNOWLEDGES THAT THE LIMITATION IN THE DURATION OF THE LIMITED NEW HOME WARRANTY IS IN CONSIDERATION FOR SELLER AGREEING TO SELL THE PROPERTY FOR THE PURCHASE PRICE SPECIFIED IN THIS CONTRACT.

**Purchaser(s) has read and agrees to the foregoing limitations of Warranty:**

Seller [SPB / 09/04/20 / 3:12 PM CDT / dotloop verified]    Purchaser [signature / 09/14/20 / 8:52 PM CDT / dotloop verified]    Purchaser [NO / 09/14/20 / 8:49 PM CDT / dotloop verified]

21  EXCLUSIONS FROM WARRANTY. THE EXCLUSIONS FROM WARRANTY ARE IMPORTANT. PURCHASER MUS READ ALL EXCLUSIONS CAREFULLY AND INITIAL BELOW. Notwithstanding anything to the contrary in this Contractor any Addendum, the Limited New Home Warranty attached as Exhibit "B" shall not extend to, include or be applicable to, and there is no warranty of any kind from the Seller with respect to (a) defects in outbuildings not attached to the Property; swimming pools; other recreational facilities; driveways; walkways; retaining walls; fences; landscaping; or items furnished or installed b the Purchaser or parties who have dealt directly with the Purchaser; (b) any cosmetic finishes including but not limited to painting, sheetrock (including nail pops and shrinkage cracks), and caulking not identified for correction during the walk-thru; damaged concrete due to stains of gas, oil or any foreign fluid; (d) damage to personal property of the Purchaser, or cleaning o personal property of the Purchaser; or (e) any repair after the warranty period. The Limited New Home Warranty shall further extend to, include or be applicable to any loss, damage or injury caused by or resulting from riots; civil commotion; fire; explosion; smoke; accidents; water escape; falling objects; aircraft; vehicles; acts of God; lightning; windstorm; hail; flood; m slides; damage to personal property; earthquakes; volcanic eruptions; wind driven water; radon gas; mold, fungus(i) or spore(s any substance, vapor or gas produced by or arising out of any mold, fungus(i) or spore(s), or any material, product, building component or structure that contains, harbors, nurtures or acts as a medium for mold, fungus(i) or spore(s), or any material, product, building component or structure that contains, harbors, nurtures or acts as a medium for mold, fungus(i) or spore(s); infestation from termites or other insects; sink holes; subsurface conditions; or changes in the underground water table; included but not limited to, any damages for mental anguish or bodily injury or death and any incidental, consequential or secondary damages caused or claimed to be caused thereby; and the Purchaser hereby waives any claim arising out of any such loss, dam or injury. The Purchaser hereby waives any claim arising out of any such occurrences or defects. A more comprehensive list exclusions from the warranty provided in this Contract is in Exhibit "B". Any exclusion listed in this Section or in Exhibit "B hereby accepted as a binding exclusion from the Limited New Home Warranty - even if it is not listed in Exhibit "B". Slight deviations from Plans and Specifications are normal and shall be construed as substantial compliance with this Contract and a Warranty hereunder.

**Purchaser(s) has read and agrees to the foregoing exclusions from Warranty:**

Seller [SPB / 09/04/20 / 3:12 PM CDT / dotloop verified]    Purchaser [NO / 09/14/20 / 8:52 PM CDT / dotloop verified]    Purchaser [signature / 09/14/20 / 8:52 PM CDT / dotloop verified]

22  SELLER'S RIGHT TO TERMINATE FOR INTERFERENCE BY PURCHASER: PURCHASER AGREES NOT TO **ISSUE ANY INSTRUCTIONS TO OR OTHERWISE INTERFERE WITH SUBCONTRACTORS AND WORK FORCES. For Seller to fulfill its obligations under this Contract, Purchaser must not interfere in any manner** Seller's subcontractors or other labor forces. Any such interference could substantially delay progress of the work and impose additional costs and Seller is unwilling to construct the Dwelling for Purchaser if Purchaser interferes with such construction. Therefore, the Purchaser agrees, prior to closing, neither to negotiate for additional or different work with Seller's subcontract nor to engage other contractors, subcontractors, vendors or material suppliers except with Seller's consent and then only in accordance with any instructions given by the Seller and in such a manner as, in Seller's sole discretion, will not interfere with Seller's completion of work under this Contract. In the event of the violation by the Purchaser of any one or more of the provisions of this Section 22, or in the event that the Purchaser should in any manner interfere with the progress of work on the Property or inspections of the Property or any portion thereof by any building inspectors or other governmental officials or by utility companies or quasi-governmental personnel, or in any other manner interfere with the progress of construction of the dwelling upon the Property, then the Seller shall have the right, at the election of the Seller and in the sole discretion of the Se to terminate this Contract, whereupon both parties shall be relieved of all obligations hereunder and the Seller shall be free to the Property to another party. The rights of the Seller under this Section 22 are in addition to and independent to any rights the Seller might have under Alabama law or pursuant to the provisions of this Contract as the result of any default by the Purchaser of the obligations of Purchaser hereunder. The Purchaser acknowledges that the terms and provisions of this Section 22, including the right of termination by the Seller, are material to the willingness of the Seller to enter into this Contract, and the provisions of this Section 22 shall be fully enforceable by the Seller in the discretion of the Seller. In the

event Seller shall terminate this contract, Seller shall reimburse Purchaser for all earnest money and upgrade money received from Purchaser an both parties shall be released from any further liability to the other party.

23  ENTRY INTO PROPERTY.  Purchaser acknowledges and agrees that any entry onto Property at any time prior to the Closing by Purchaser or any of Purchaser's agents, representatives, or invitees is at the sole risk of Purchaser and Purchaser does hereby (a) waive and release Seller or its agents from and against any and all claims for damages to person or property occurring as a result of any entry into the Property prior to Closing by Purchaser or any of Purchaser's agents, representatives, or invitees and does agree to indemnify, agree to defend and hold Seller and/or its agents harmless from and against, any and all claims or demands for loss, damage, injury, liability, cost or expense (including reasonable attorney's fees and expenses) of any nature suffered, paid or incurred by Seller or its agents as a result of any entry onto the Property by Purchaser or any of Purchaser's agents, representatives, or invitees at any time prior to Closing.  Purchaser further covenants and agrees with Seller that any onto the Property by Purchaser and any of Purchaser's agents, representatives, or invitees shall occur only on days or at times which are approved or specified by Seller and shall not, in any event, interfere with the construction of the Residence.  The provisions of this Paragraph shall survive the termination of this Agreement and the Closing.

24  ACCESS TO THE DWELLING.  Purchaser must provide Seller with timely, reasonable workday access to the Dwelling (weekdays between 7:30 a.m. and 3:30 p.m.) in order to perform any warranty service required under the Limited New Home Warranty.  Failure or refusal of Purchaser to provide such access to Seller or its agent will relieve the Seller of its obligations under the Limited New Home Warranty.

25  AGENCY DISCLOSURE:

The Listing Company is <u>Keller Williams Vestavia</u>
(Two blocks may be checked)
☐ An agent of the Builder
☐ An agent of the Purchaser
☐ An agent of both Builder and Purchaser, and is acting as a   limited consensual dual agent
☑ Assisting the ___ Purchaser ☐ Builder as a transaction broker
☐ Seller    *SPB*  09/04/20 3:12 PM CDT dotloop verified

The Selling Company is <u>Keller Williams Vestavia</u>
(Two blocks may be checked)
☐ An agent of the Builder
☐ An agent of the Purchaser
☐ An agent of both Builder and Purchaser, and is acting as a   limited consensual dual agent
☑ Assisting the ___ Purchaser ___ Builder as a transaction broker
☐ Purchaser    *JJ*  09/14/20 8:52 PM CDT dotloop verified    Purchaser    *JG*  09/14/20 8:49 PM CDT dotloop verified

26  DISCLAIMER.  Purchaser acknowledges that Purchaser has not relied upon any advice or representations of Seller or Listing Agent (or Broker's associated salesperson) relative to (i) the legal or tax consequences of this Contract and the sale, purchase ownership of the Property; (ii) except as provided in the Warranty, the structural condition of the Property; (iii) the character o the neighborhood; (iv) the investment or resale value of the Property; (v) the use or condition of adjoining or neighboring property; (vi) subsurface conditions including radon and other potentially hazardous materials and or gases; (vii) any other

matters affecting Purchaser's willingness to purchase the Property on the terms and price herein set forth. Purchasers represent that if such matters are of concern to Purchaser's purchase of the Property; Purchaser has sought and obtained independent ad relative thereto. Purchaser further acknowledges that the promotional brochures and drawings are not exact depictions of the Property or surrounding areas but are Seller's reasonable approximations and are subject to change at Seller's discretion.

**27** RISK OF LOSS. Seller agrees to keep in force sufficient hazard insurance on the Property to protect all interests until this sale closed and the deed is delivered. If the Property is destroyed or materially damaged between the date hereof and the Closing, Seller is unable or unwilling to restore it to its previous condition prior to Closing, Purchaser shall have the option of canceling this Contract and receiving a refund of the Earnest Money and any Additional Earnest Money or extending the Closing Date a sufficient time for Seller to complete construction. If Purchaser elects to extend the Closing Date, this Contract shall continue full force and effect with the extended Closing Date.

**28** ARBITRATION OF DISPUTES. The Seller and the Purchaser acknowledge that this Agreement involves interstate commerce in that many of the transactions necessary for Purchaser and Seller to perform their obligations hereunder, including without limitation, the manufacture of materials and components contained in the Dwelling, the financing of loans related to construction of the Dwelling, the provision of insurance related to the construction of the Dwelling and other activities, occur in interstate commerce. Each of the undersigned hereby agrees that any past, present or future dispute, controversy or claim arising out of, relating to, this Contract, the parties' relationship under this Contract, the construction of the Dwelling or the breach of this Contract shall be submitted to final and binding arbitration by the American Arbitration Association under its the Commercial Arbitration Rules or by such other arbitration tribunal and under such other arbitration rules as the parties may agree. The obligation of arbitrate such disputes shall extend to claims not only between the parties to this contract, but also their respective agents, brokers, employers, employees, contractors, suppliers, settlement service providers, title insurers, closing agents and attorneys and any other person or entity who provides goods or services to the parties to this Agreement in connection with the Property. The decision of the arbitrator appointed thereunder shall be final and binding (subject to rights of appeal contained I the rules of arbitration) and judgment on the award may be entered in any Court of competent jurisdiction. Each party agrees pay all reasonable attorney's fees and arbitration or court costs which the prevailing party may incur in enforcing any provision this Contract. Payment of arbitration fees may be required in advance of any proceedings. In the event this arbitration provision shall be held to be invalid or unenforceable in whole or part for any reason, then the parties agree that the resolution of any dispute arising out of this contract shall be in the state courts located in the county in which the Property is located, with the tr of said dispute being tried to the judge of said court, who shall hear and decide such dispute without a jury. Each party hereby waives its right to trial by jury under the provisions of the United States Constitution and the Constitution of the United States America. The provisions of this section 28 shall survive the closing of the transaction contemplated by this agreement and the delivery of the deed.

**29** MISCELLANEOUS: Purchaser may not assign, transfer, convey or encumber this Contract or any interest herein, without Seller's prior written consent. This Contract shall be binding upon and shall inure to the benefit of Seller and Purchaser and the respective heirs, executors, successors and assigns. This Contract and Addenda attached hereto constitute the sole and entire agreement between the parties hereto and supersede any and all prior discussions representations, negotiations and agreements between Purchaser and Seller, whether oral or written. Neither Purchaser, nor Seller, nor Listing Agent, nor any sales agent shall be bound by any understanding, agreement, promise, or representation concerning the Property, express or implied, not specification herein. This Contract may not be modified or amended except in writing signed by all parties hereto. No representations, promises, warranties, understandings or inducements with respect to this Contract or any of the matters contemplated herein which are not set forth in this Contract shall be binding upon the parties hereto. The section headings are used for convenience reference only and in no way define, limit or describe the scope or intent of this Contract. Time is of the essence of this Contract This Contract has been executed in the State of Alabama and the laws of the State of Alabama shall govern this Contract. If a provision of this Contract should be invalid or unenforceable, then such provision only shall be held unenforceable and the validity and enforceability of the remaining provisions hereof shall not be affected thereby. Each party agrees to pay all reasonable attorney's fees and arbitration or court costs which the prevailing party may incur in enforcing any provision of this Contract. Except pursuant to the Limited New Home Warranty and the terms and provisions hereof which specify their surviving after Closing and delivery of the deed, Closing shall be deemed to satisfy and fulfill the obligations of the parties hereunder an neither party shall thereafter have any further obligation hereunder.

30  INSULATION.  Insulation has been or will be installed in the home as follows:
    a.    Exterior walls will be insulated with (type of insulation) fiberglass batt to a thickness of 3 ½ inches, which, according to the manufacturer, will yield an R-value of 11.
    b.    Ceilings in all areas will be insulated with (type of insulation) blown fiberglass to a thickness of 10-12 inches, which according to the manufacturer, will yield an R-value of 30.
    c.    Interior walls and garage walls will be insulated with (type of insulation) N/A to a thickness of N/A inches, which, accord into the manufacturer, will yield an R-value of N/A. d. Exclusions:

31  SEWER/SEPTIC SYSTEMS.  Builder represents that Property ☑ is ☐ is not connected to sewer and all impact and connection fees have been paid.  If not on sewer, Builder represents that the property ☐ is ☑ is not connected to a septic system.  If property is on a septic system, Purchaser ☐ does ☑ does not require a septic system inspection at Purchase expense.

32  TERMITE CONTRACT.  Builder shall transfer current termite contract to purchaser at time of closing at Builder's expense.  The termite contract will be effective for 1 year from the soil treatment date that was completed at the start of construction.

33  INTEREST RATE LOCKS AND MOVING DAY. Purchaser(s) agree that they shall not make any final moving plans or interest rate locks until a firm closing date has been established by the Builder. Under no circumstance shall the Builder accept responsibility for interest rate locks, temporary housing, furniture storage or other expenses related to a changed closing date.

34  UTILITIES: Seller agrees that the water, gas, and electric meters when installed will be in Seller's name through the Closing Date at which time Purchaser is obligated to transfer such utility services to Purchaser.

35  MAINTENANCE AND PREVENTION OF MOISTURE-RELATED CONDITIONS.
(A)  Purchaser hereby acknowledges and agrees that, upon the completion of the construction of the Home and occupancy of the Property by Purchaser: (i) it shall be the responsibility and obligation of Purchaser to maintain the Property, including the Home and all components thereof, in good condition and repair, including caulking, water seals, exterior surfaces and finishes mortar, water pipes, drainage systems, HVAC pipes and systems, basement and crawl space areas, gutters, roofs, and landscape for the prevention of water penetration, mildew, mold, spores, fungi, damage to wood and other materials, and other moisture related conditions;  (ii) the failure to do so could result in health-related problems and/or damage of the Property; (iii) Builder/Seller shall have no liability or responsibility with respect to same; and (iv) Purchaser hereby waives and disclaims any claims against Builder/Seller arising out of any such condition and any loss, damage, or injury resulting there from.
(B)  Purchaser further acknowledges and agrees that: (i) if Purchaser becomes aware of water intrusion into the Property, Purchaser should respond immediately; (ii) in cases of serious water damage, Purchaser should hire construction and indoor a quality consultants to assess the damage and determine what remediation is needed; (iii) inadequate remediation, even if well intentioned, will only create more problems; (iv) water damaged materials may need to be removed, and the source of the water intrusion should be addressed; (v) the Property may have to be vacated while remediation work is in progress; and (vi) a certified industrial hygienist experienced with testing for molds in indoor environments should be retained to determine whether the water damage has caused a source of mold growth and amplification.

(C)  Purchaser further acknowledges and agrees that: (I) unusual odors should be investigated promptly; (ii) unusual odors may be indicative of water intrusion and mold growth and (iii) chronic complaints of illness (especially respiratory, breathing, allergy-type problems), headaches or nausea may indicate indoor air quality problems and should be taken seriously and investigated promptly.
**The Purchaser acknowledges that the Purchaser has read, understood and accepted the foregoing.**
(Initials)

| *JG* | *MG* |
|---|---|
| 09/14/20 | 09/14/20 |
| 8:52 PM CDT | 8:49 PM CDT |
| dotloop verified | dotloop verified |

36  SEVERABILITY.  In case any one or more of the provisions contained in the Contract shall for any reason be held to be illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision here of and this Contract shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

**37** AFFILIATED BUSINESS ARRANGEMENTS. In connection with the purchase or sale of this property, you may need to obtain certain services. This is to notify you that the Builder may have a business relationship with certain services, and this relationship may provide the Builder a financial or other benefit. If applicable, the nature and extent of any affiliated business relationship will be fully described in a separate disclosure statement.

**38** OTHER OFFERS WHILE PURCHASER'S OFFER IS PENDING. Purchaser acknowledges that offers other than the Purchaser's may have been made or may be made before Builder acts on the Purchaser's offer or counteroffer or while Builder considering Purchaser's offer or counteroffer. Builder expressly reserves the right to accept, reject, counter or withdraw any o or counteroffer at any time prior to one of the offers becoming the primary contract.

THIS IS A LEGALLY BINDING CONTRACT. IF YOU DO NOT UNDERSTAND THE LEGAL IMPLICATIONS OF AN PART OF THIS CONTRACT SEEK LEGAL ADVICE BEFORE SIGNING.

Witness to Purchaser's Signature(s) _____  Purchaser _Matthew Jackson_
                      dotloop verified 09/14/20 8:49 PM CDT ATQW-FG9U-UNGV-YEOW

Witness to Purchaser's Signature(s) _____  Purchaser _Jyjung Jackson_
                      dotloop verified 09/14/20 8:52 PM CDT

Witness to Seller's _Kristen Wheeler_  Seller _Stone Pointe Builders LLC_
      dotloop verified 11/12/20 8:27 PM CST SUSM-EADL-YMR2-K1NH           dotloop verified 09/04/20 3:12 PM CDT GFHW-I4Z2-UJYM-B7I8

**EARNEST MONEY: Receipt is hereby acknowledged of the earnest money as hereinabove set forth:** _____

Cash _____ Check  Seller/Agent _____

Real Estate Agent _____ Date _____ Builder _____ Date _____

# EXHIBIT B

## ADDENDUM TO SALES CONTRACT

Date: 02/15/2022

This Addendum is a part of the Agreement on the Property located at

2308 GARLAND dr, 14, VESTAVIA HILLS, AL 35216

and dated 09/14/2020 _____ between the undersigned Purchaser(s) and the undersigned Seller(s).

Updated timeline states the home will be completed by June 1. 2022. In the case that the home is not completed by June 1, 2022 builder (Wayne with Stone Pointe Builder) agrees to pay $150 each day until home is complete and the certificate of occupancy has been delivered to builder.

Seller agrees to complete basement at the cost of $8,000.

*Matthew Jackson*

dotloop verified
02/15/22 7:55 PM CST
0QJR-2UWE-NQUK-0SY3

Purchaser

_____
Witness

*Juyoung Jackson*

dotloop verified
02/15/22 7:58 PM CST
USB9-GSIM-WNJI-LYYT

Purchaser

_____
Witness

*Stone Pointe Builders LLC*

dotloop verified
02/21/22 6:53 AM CST
2H0R-QBGP-RT4M-4NOY

Seller

_____
Witness

_____
Seller

_____
Witness

02/15/2022

Date