# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **FRANKENMUTH** | ) | |
| **INSURANCE  COMPANY,** | ) | |
| **an insurance company,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO.:** |
| | ) | **2:24-CV-00613-LSC** |
| **CECIL WAYNE SANFORD,** | ) | |
| **STONE POINTE BUILDERS, LLC;** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT</u>

EXHIBIT C– CALLAWAY COMPLAINT

9/30/2022 3:37 PM
03-CV-2022-902953.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABA
JACQUELINE ANDERSON  SMITH,

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
## BIRMINGHAM DIVISION

JONATHAN CALLAWAY

      **Plaintiff,**

v.                                   **CASE NO. _____**

**STONE POINTE BUILDERS, LLC; CECIL WAYNE SANFORD (individually);PREMIER VESTAVIA, LLC D/B/A "Keller Williams Vestavia," KRISTEN WHEELER (individually), A, B, C, whether singular or plural, that certain person, firm, partnership, corporation or other entity which received monies belonging to or designated for the benefit of the Plaintiff regarding the construction of his home as described herein; D, E, F, whether singular or plural, that certain person, firm, partnership, corporation or other entity which who negligently constructed Plaintiff's home as described herein; G, H, I, whether singular or plural, that certain person, firm, partnership, corporation or other entity which is responsible for the actions of the named Defendants for the acts described herein; J, K, L, whether singular or plural, that certain person, firm, partnership, corporation or other entity which bonded, guaranteed, assured or otherwise insured the actions of the named Defendants; M, N, whether singular or plural, those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal entities who converted the funds Plaintiff paid toward the construction of his home as alleged herein; O-P, whether singular or plural, those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal entities who suppressed information from Plaintiff in order to induce Plaintiff to contract with the named Defendants; Q-R, whether singular or plural, those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal entities which conspired with the named Defendants to defraud Plaintiff; S-T, whether singular or plural, those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal entities who breached a fiduciary duty owed to Plaintiff as alleged herein; U-V, whether singular or plural, those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal entities who joined the named Defendants in deceiving Plaintiff as alleged herein; and W-X, whether singular or plural, that certain person, firm, partnership, corporation or other entity who acted as agent or broker for the "Real Estate Sales Contract For New Construction On Lot" along with the named Defendants for Plaintiff's home as alleged herein; Y-Z, whether singular or plural, those certain persons, firms, partnerships, corporations or other entities who are successors- in-interest to the named Plaintiff. The identity of the fictitious party defendants is otherwise unknown to the Plaintiff at this time, or, if their names are known, their identity as proper party defendants is not known at this time; but their true names will be substituted by amendment when the aforesaid lacking knowledge is ascertained.**

      **Defendants.**

## COMPLAINT

Comes now the Plaintiff, Jonathan Callaway, in the above-styled cause, and makes his complaint as follows:

## I.    PARTIES

1.    Plaintiff Jonathan Callaway (hereinafter "Plaintiff" or "Mr. Callaway") is a resident citizen of Jefferson County, Alabama, aged nineteen (19) years or older.

2.    Defendant Stone Pointe Builders, LLC (hereinafter "Stone Pointe" or "Defendant") is an Alabama limited liability company licensed to do and doing business in Jefferson County, Alabama.

3.    Defendant Cecil Wayne Sanford ("Mr. Sanford" or "Defendant") is a resident of Jefferson County, Alabama, above the age of nineteen (19) years who routinely conducted business in Jefferson County, Alabama and is the owner and principal of Stone Pointe Builders, LLC.

4.    Defendant Premier Vestavia, LLC (hereinafter "Premier" or "Defendant") is an Alabama Limited Liability Company operating a real estate brokerage firm licensed to do business in Jefferson County, Alabama. At all relevant times, Premier did business in Jefferson County, Alabama, as "Keller Williams Realty" and "Keller Williams Vestavia" and it employed Kristen Wheeler as its real estate agent from its Vestavia Hills, Alabama, location and who contracted with Mr. Callaway as a "Dual Agent" concerning sale of the property that is the subject of this dispute.

5.    Defendant Kristen Wheeler ("Ms. Wheeler" or "Defendant") is a resident of Jefferson County, Alabama, is a licensed realtor (Alabama Realtors' License No. 000111598-0) who at all times pertinent worked for Premier while also working as an accounts manager for Stone Pointe and Mr. Sanford's personal assistant. At all relevant times, Ms. Wheeler was also employed as the Dual

Agent for Plaintiff and Defendants.

6.      Fictitious Defendants A, B, C, whether singular or plural, are those certain persons, firms, partnerships, corporations or other entity which received monies belonging to or designated for the benefit of the Plaintiff regarding the construction of his home as described herein.

7.      Fictitious Defendant D, E, F, whether singular or plural, are those certain persons, firms, partnerships, corporations or other entity who negligently constructed Plaintiff's home.

8.      Fictitious Defendant G, H, I, whether singular or plural, are those certain persons, firms, partnerships, corporations or other entities which are responsible for the actions of the named Defendants for the acts described herein.

9.      Fictitious Defendants J, K, L, whether singular or plural, are those certain persons, firms, partnerships, corporations or other entity which bonded, guaranteed, assured or otherwise insured the actions of the named Defendants.

10.      Fictitious Defendants M-N, whether singular or plural, are those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal entities who converted the funds Plaintiff paid toward the construction of his home as alleged herein.

11.      Fictitious Defendants O-P, whether singular or plural, are those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal entities who suppressed information from Plaintiff in order to induce Plaintiff to contract with the named Defendants.

12.      Fictitious Defendants Q-R, whether singular or plural, are those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal

3

entities which conspired with the named Defendants to defraud Plaintiff.

13.     Fictitious Defendants S-T, whether singular or plural, are those persons, firms, companies, corporations, contractors, subcontractor, vendors, partnerships, entities, or other legal entities who breached a fiduciary duty owed to Plaintiff as alleged herein.

14.     Fictitious Defendants U-V, whether singular or plural, are those persons, firms, companies, corporations, contractors, subcontractors, vendors, partnerships, entities, or other legal entities who joined the named defendants in deceiving Plaintiff as alleged herein.

15.     Fictitious Defendants W-X, whether singular or plural, are those certain persons, firms, partnerships, corporations or other entities who acted as agent or broker under the "Real Estate Sales Contract For New Construction On Lot" along with the named Defendants for Plaintiff' home as alleged herein.

16.     Fictitious Defendants Y-Z, whether singular or plural, are those certain persons, firms, partnerships, corporations or other entities who are successors in interest to the named Plaintiff.

## II.     JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action as the minimum amount in controversy is present and venue is proper in Jefferson County.

## III.     STATEMENT OF FACTS

18.     In the fall of 2020, Mr. Callaway sought to build a new home in Trussville, Alabama for himself and his family.

19.     Mr. Callaway was informed about Stone Pointe Builders, LLC and Mr. Sanford by his real estate agent, Kristen Wheeler.

20.     During the same time, Ms. Wheeler was also employed as Stone Pointe's accounts

4

manager and Mr. Sanford's personal assistant.

21.    Mr. Sanford is a licensed homebuilder in the State of Alabama (Ala. License No. 25790) and he holds the Alabama homebuilder's license for Stone Pointe.

22.    Stone Pointe marketed itself as a general contractor and licensed homebuilder in Alabama.

23.    In November 2020, Ms. Wheeler showed Mr. Callaway a lot located at 6783 Ivy Way, Trussville, Alabama 35173, also known as Lot 6 in the Lake Highland Subdivision (hereinafter "Home") which Stone Pointe Builders and Mr. Sanford represented they owned.

24.    Mr. Callaway reviewed Stone Pointe's promotional materials and he was impressed and believed Stone Pointe's and Sanford's representations.

25.    Sanford visited the Ivy Way lot with Mr. Callaway in December 2020 to go over the site and sent several house design proposals to Mr. Callaway.

26.    Sanford told Mr. Callaway to work directly with Kristen Wheeler, his assistant, accounts manager and agent, to finalize the construction and purchase contract details.

27.    Shortly after, Callaway spoke with Ms. Wheeler who informed him that she would be representing both Wayne Sanford, Stone Pointe Builders, LLC and himself as "dual agent" through the construction process and through the property sale closing.

28.    In December 2020, Mr. Callaway began started negotiating the terms of the contract with Kristen Wheeler in mid December. Ms. Wheeler went over the design, materials, home specifications, costs, and build-time with Callaway and she represented Sanford and Stone Pointe could build the home he wanted within his time frame. During this same period, Ms. Wheeler also discussed the purchase of the Ivy Way lot from Mr. Sanford with Callaway once the home was

5

completed.

29.    Based on Sanford's and Wheeler's proposals and representations, Mr. Callaway agreed to employ Ms. Wheeler as his agent to negotiate and finalize a new-build real estate sales contract between himself, Stone Pointe, and Mr. Sanford for the property located at 6783 Ivy Way, Trussville, Alabama 35173, also known as Lot 6 in the Lake Highland Subdivision (hereinafter "subject property"). At all relevant times, Stone Pointe and Sanford represented to Mr. Callaway that they owned 6783 Ivy Way ("Lot 6").

30.    Through December 2020, Mr. Callaway corresponded and spoke with Sanford, Stone Pointe, and Wheeler about plans and construction materials to be used in his home. During each call, Mr. Sanford and Wheeler told Callaway that Stone Pointe had extensive experience in residential construction, as well as extensive knowledge of materials, available subcontractors, that they had completed numerous prior construction jobs. All Defendants told Callaway that they had the ability and resources to timely manage and construct Callaway's home for closing in less than eight to ten months from the execution date of the construction contract.

31.    Wheeler revised the "Real Estate Sales Contract For New Construction On Lot" contract between Callaway and Stone Pointe several times,

32.    On or about December 20, 2020, while acting in her capacity as a real estate agent, Stone Pointe's accounts manager, and Sanford's assistant, Ms. Wheeler finalized the terms of the "Real Estate Sales Contract For New Construction On Lot."

33.    On December 22, 2020, Callaway and Sanford for Stone Pointe signed Keller Williams Realty's and Kristen Wheeler's "Limited Consensual Dual Agency Agreement" and Ms. Wheeler signed as both listing and buyer's agent. **(Exh. A)**

6

34.     Premier Vestavia (d/b/a/ Keller Williams Realty) and Ms. Wheeler agreed to do the following as Mr. Callaway's real estate agent:

(1) **Conduct herself with honesty, integrity**, and in a professional matter toward all parties in a transaction; (2) **Not knowingly promote the advantages of one party** in a transaction **to the detriment of another**; (3) **Honestly apply her expertise**, skills, knowledge, and experience **to help facilitate a fair transaction** for all parties . . .; (5) **Act as an intermediary to the transaction between the parties and act as the follow-up person with the intent of causing everything necessary for the completion of the transaction to come together for a successful closing; (6) Respond honestly and accurately to questions concerning the property.**

(Exh. A)(emphasis added).

35.     Premier and Wheeler agreed to act as Mr. Callaway's agent and intermediary with Stone Pointe and Sanford through the Home's construction process and through closing. *Id.*

36.     Premier and Wheeler agreed further to provide honest and accurate responses to Mr. Callaway's questions about the construction of his Home and through the closing process. *Id.*

37.     Based on Premier's, Wheeler's, Sanford's assurances, Callaway signed the "Real Estate Sales Contract For New Construction On Lot" with Wayne Sanford at Stone Pointe Builders, LLC, on December 22, 2020. (Exh. B, pp. 10).

38.     As the real estate agent, Kristen Wheeler negotiated the contract terms between Stone Pointe, Sanford, and Callaway and she also witnessed the contract signatures on the document. (Exh. B, p. 10).

39.     Per the Contract, Callaway agreed to pay $460,430.00 to for the construction and purchase of his Home from Stone Pointe Builders, LLC. (Exh. B, p. 1). Stone Pointe and Mr. Sanford agreed to complete the residence within 217 workdays after the date of commencement. (Exh. B, p. 3, ¶ 12).

7

40. The contract stated that the Home would be completed within eight to ten months from Stone Pointe receiving the initial payment. **(Exh. B, p. 10)**

41. A "LIMITED WARRANTY AGREEMENT" was also provided by Defendants to Callaway at the time Callaway executed the Contract with Stone Pointe. **(Exh. C).**

42. Mr. Sanford signed the construction and sales contract, dual agency agreement, and warranty agreement on behalf of Stone Pointe Builders, LLC as its managing member. **(Exhs. A-C)**

43. Under the Contract, construction of Callaway's home was due to begin within 21 days after the "Real Estate Sales Contract For New Construction on Lot" was executed on December 22, 2020, or by January 12, 2021. (Exh. B. p. 3).

44. After Callaway signed the "Real Estate Sales Contract For New Construction On Lot," he met with a bank to obtain a construction to permanent loan for the contract price. Mr. Callaway notified Sanford and Wheeler about the same. Both Wheeler and Sanford they advised Callaway that it would make payment for the construction process easier if Stone Pointe carried the construction to permanent loan, whereby Callaway would pay a 10% down-payment on the contract price to Stone Pointe and the remainder at closing. At all relevant times, Sanford and Stone Pointe represented they owned the Lot 6.

45. Callaway relied on Wheeler's and Sanford's representations and agreed to pay 10% of the contract price up-front, while Stone Pointe and Sanford held the construction to permanent loan. Callaway would pay the remaining $413,980.00 at the sale closing and completion of construction.

46. Sanford and South Pointe instructed Mr. Callaway to pay the initial contract payment of $46,458.00 to Stone Pointe's construction lender, SouthPoint Bank, before they agreed to perform

8

any work on the lot.

47.    On February 12, 2021, Mr. Callaway paid $46,458.00 to SouthPoint Bank as a down payment on the contract as directed by Wheeler and Stone Pointe. **(Exh. D).**

48.    On or before February 26, 2022, SouthPoint Bank paid $46,457.00 of Mr. Callaway's $46,458.00 deposit to Stone Pointe as a "const. draw." **(Exh. E)**

49.    From February 2021-August 2021, Mr. Callaway routinely sent texts and made calls to Sanford and Wheeler requesting updates regarding the construction of his home. The responses from Wheeler and Sanford assured Mr. Callaway work was progressing on his home as scheduled.

50.    Around August 2021, Mr. Callaway learned only the land had been cleared at his lot and very little work had been performed, despite the fact Stone Pointe, Sanford, and Wheeler had received over $46,000.00 to commence work.

51.    Wheeler and Sanford assured him the footings were being designed and constructed.

52.    Starting in October 2021, Mr. Callaway was forced to rent another home for himself and his family because Stone Pointe and Sanford had not finished his home.

53.    On or about October10, 2021, Callaway complained again to Wheeler and Sanford and they told Callaway his home construction was delayed due to a material and labor shortage.

54.    On October 13, 2021, Callaway requested another update from Wheeler and Sanford regarding the next construction steps.

55.    On October 14, 2021, Sanford and Wheeler assured Callaway the subcontractors hired for the foundation footings were starting that day, but these statements were not true.

56.    By November 2021, no footings or foundational work had been performed.

57.    On December 21, 2021, Mr. Callaway sent an email to Sanford and Stone Pointe

9

about the lack of progress and Callaway demanded a time frame for completion.

58.     On or about December 22, 2021, Sanford and Wheeler responded that rebar workers were working on Callaway's house.

59.     On December 22, 2021, Callaway visited his lot and learned Wheeler and Sanford misrepresented the lack of progress and he found no work was performed.

60.     From November 2021 - January 2022, Callaway was in constant communication with Sanford and Wheeler. During this time, Wheeler and Stone Pointe represented footings were being completed, brick and trim were ordered, materials for framing were on their way, cabinets were ordered, and labor to perform the work by subcontractors was secured. However, Callaway later learned that none of these representations were true.

61.     On January 17, 2022, Callaway sent a written request to Sanford, Stone Pointe, and Wheeler demanding a refund of his payment due to Stone Pointe's and Sanford's failure to construct his house as they had promised. Callaway did not receive a response or a refund.

62.     On January 27, 2022, Callaway sent another message to Sanford about the lack of progress and the fact that framing needed to be done in order for him to lock in a mortgage rate for the final closing price of the construction project. Callaway did not receive a response.

63.     From the end of January 2022-mid February, Callaway texted Wheeler and Sanford multiple times about why no work was performed to which there was no explanation.

64.     Callaway continued to demand a refund, but his money was never returned.

65.     Instead, on February 10, 2022, Sanford informed Callaway his foundation would be poured the following Monday, but the pouring never occurred.

66.     Callaway immediately complained again to Stone Pointe and Sanford about the lack

of work being performed on his house, but he received no response.

67.    Due to the lack of communications from Wheeler and Sanford, Callaway visited Lot 6 to inspect his Home's progress and he found no additional work had been completed by Defendants.

68.    Callaway saw Sanford working on a nearby construction lot in the same subdivision and asked Sanford why no work had been performed. In response, Sanford demanded an additional $30,000.00 to continue working on Callaway's house. Callaway declined to give any additional money and asked Sanford to refund him his money or finish the house. Sanford promised again that he would complete the house.

69.    Following the in-person meeting in March 2022, Callaway sent additional emails and texts to Sanford requesting updates, but received no response.

70.    Callaway also called all of Sanford's last known phone numbers only to find the numbers have been disconnected.

71.    As of March 2022, Mr. Callaway had paid $46,458.00 (over 10% of the contract price) toward the construction of his home to Stone Pointe, Sanford, and Ms. Wheeler, but little work was performed by Defendants.

72.    From December 2020 through March 2022, Ms. Wheeler managed and was a signatory on Stone Pointe's and Mr. Sanford's bank accounts while acting as Callaway's real estate agent.

73.    In March 2022, Mr. Callaway contacted Kristen Wheeler and Stone Pointe asking for an accounting, the return of his funds, and explanation about abandoning the job and received no explanation or accounting.

11

74.     Mr. Callaway also notified Sanford's insurance company about his claims against Defendants.

75.     Wheeler never terminated her client-agent relationship with Mr. Callaway.

76.     Since October 1, 2017 to the present, Premier Vestavia, LLC (d/b/a Keller Williams Vestavia) has held Ms. Wheeler's real estate agent's license and it has overseen her duties as a real estate agent during this time.

77.     From December 22, 2020 through March 2022, Ms. Wheeler and Premier Vestavia, LLC continued to act on behalf of Mr. Callaway as his real estate agent concerning the Ivy Way property by virtue of their Agency Contract with Callaway. *(see supra Exhs. A-B).*

78.     From the execution date of December 22, 2020 through the completion and sale closing of Callaway's Home,  Premier and Wheeler owed him a duty to respond "accurately and honestly" to Callaway's questions concerning the status of his home and to "not knowingly promote the advantages of one party in a transaction to the detriment of another," and they breached this duty to the detriment of Callaway as plead below.

79.     From December 22, 2020 through at least March 2022,  Wheeler knew or should have known as Sanford's personal assistant and Stone Pointe's accounts manager that the $46,458.00 Callaway entrusted to Stone Pointe and Sanford was not being used for its intended purpose. Ms. Wheeler also knew or should have known that neither Stone Pointe and Sanford had any intention to comply with the terms of their "Real Estate Sales Contract For New Construction On Lot" concerning the construction and closing of Mr. Callaway's home.

80.     Despite this knowledge, Ms. Wheeler never informed Mr. Callaway that his funds were not being used to build his home. While acting as Callaway's agent, Ms. Wheeler

12

misrepresented the status of the construction project, including the work she claimed Stone Pointe

had performed from December 2020 through Stone Pointe's abandonment in March 2022.

81.    Toward the end of March 2022, Callaway contacted Wheeler, Stone Pointe,

SouthPoint Bank to demand the return of his $46,458.00 but his requests were ignored.

82.    Stone Pointe and Sanford failed to complete the construction project within the 217

days, by August 17, 2021, as the Contract required. (Exh. B. p. 3)

83.    Callaway's "Real Estate Sales Contract For New Construction on Lot" with Sanford

and Stone Pointe contains a penalty provision which requires Sanford and Stone Pointe to pay $75.00

per day for each day past the promised completion date of August 17, 2021 (using January 12, 2021

as the commencement date), totaling at least $30,600.00 for the delay of 408 days (as calculated on

September 29, 2022).[1]

84.    The work Defendants performed is incomplete, negligently constructed, negligently

mismanaged, and was not performed in a good and workmanlike manner.

85.    Neither Stone Pointe nor Mr. Sanford had justifiable reasons for their delay and the

delay violated the terms of the Contract.

86.    Prior to Stone Pointe and Sanford abandoning the job and breach of contract, Mr.

Callaway complained that the work performed by Defendants was not properly performed per the

construction plans. Defendants failed to rectify the issues at Callaway's home, honor the warranty

and perform the work for the negotiated fixed price amount in a good workmanlike manner.

87.    Since Defendants' abandonment, the cost of materials and labor has increased

---

[1] This number will continue to increase due to Defendants' breach and abandonment outlined herein.

13

drastically. Mr. Callaway has been forced to hire counsel to pursue the Defendants and to purchase another property for himself and his family.

88.     As of August 2022, Mr. Callaway learned that SouthPoint Bank intends to foreclose on the subject property to prevent Plaintiff from recovering the equity he paid to Defendants toward owning the property.

89.     As a direct and proximate result of Defendants' actions, Mr. Callaway has been damaged and continues to be damaged.

**III.    CAUSES OF ACTION**

**COUNT ONE**
**BREACH OF CONTRACT**
**(Against Defendants Wayne Sanford and  Stone Pointe Builders)**

Plaintiff re-alleges, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further alleges that:

90.     Mr. Callaway contracted with Stone Pointe and Sanford to build his home on December 22, 2020. (Exh. B)

91.     Pursuant to the terms of the contract, Stone Pointe and Sanford agreed to fulfill their obligations under the terms of the Contract by building Mr. Callaway's home in a good and workmanlike manner and in the time prescribed by the Contract.

92.     In return, Mr. Callaway agreed to pay Defendants $460,438.00.

93.     Plaintiff fulfilled his obligations to the Defendants under the Contract.

94.     After receiving $46,458.00 from Mr. Callaway (Exh. E), Defendants failed to secure the necessary materials and labor to complete the executed contract for Mr. Callaway's new home.

95.     Stone Pointe and Sanford failed to complete the construction project within the 217

days, by August 17, 2021, as the Contract required. (Exh. B. p. 3)

96.     Stone Pointe, Sanford, and Wheeler did not use Plaintiff's funds for the construction

and maintenance the home Callaway contracted to build and purchase, and instead converted the

funds for their own use as well as the use of others.

97.     Defendants breached the terms of the Contract between themselves and Plaintiff by

abandoning the job and failing to perform the work on the home in a good and workmanlike manner

in accordance with all residential construction industry standards, applicable building codes and the

plans, and by mismanaging draws and money paid for the construction of Plaintiff's home.

98.     Mr. Callaway has been damaged as a result of the breach of said contract and is

entitled to recover damages.

**COUNT TWO**
**BREACH OF CONTRACT**
**(Against Defendants Kristen Wheeler and Premier Vestavia, LLC)**

Plaintiff re-alleges, as if fully set forth, each and every allegation contained in the preceding

paragraphs, and further alleges that:

99.     Mr. Callaway contracted with Premier Vestavia, LLC (d/b/a Keller Williams

Vestavia) and its Agent, Kristen Wheeler, to represent him in negotiating the "Real Estate Sales

Contract for New Home on Lot" with Stone Pointe and Sanford on December 22, 2020. (Exhs. A-B)

100.     Wheeler and Premier contractually agreed to represent Callaway's interest from the

Agency Agreement date of December 22, 2020 through the date Callaway closed on purchasing his

home from Stone Pointe. *Id.*

101.     As the real estate agent for Callaway and Stone Pointe, Ms. Wheeler agreed to do the

following:

15

(1) conduct herself with honesty, integrity, and in a professional matter towards all parties in a transaction; (2) Not knowingly of one party in a transaction to the detriment of another; (3) Honestly apply her expertise, skills, knowledge, and experience to help facilitate a fair transaction for all parties . . . (5) Act as an intermediary to the transaction between the parties and act as the follow-up person with the intent of causing everything necessary for the completion of the transaction to come together for a successful closing; (6) Respond honestly and accurately to questions concerning the property.

(Exh. A)

102.    Per the agreement, Keller Williams agreed to contribute "its time , effort, expertise, knowledge, and skills" by assigning Ms. Wheeler to negotiate and finalize the construction of Callaway's home and its sale through closing for property known as 6783 Ivy Way, Trussville, Alabama (Lot 6) which they represented was owned by Stone Pointe and Sanford.

103.    Ms. Wheeler and Premier would receive commissions on the "Real Estate Sales Contract for New Home on Lot."

104.    Plaintiff fulfilled his obligations to the Defendants under the Contract.

105.    From December 22, 2020-March 2022, Defendants knew or had reason to know that Stone Pointe and/or Sanford had no ability or intention to abide by the terms of the "Real Estate Sales Contract For New Construction on Lot" concerning the construction and closing of Mr. Callaway's home and they failed to give information Callaway about the same.

106.    Per her agent agreement with Mr. Callaway (Exh. A), Ms. Wheeler and Premier owed Mr. Callaway a contractual obligation by virtue of their Realtor-Client relationship to notify Callaway if they knew or had reason to know that Stone Pointe and/or Sanford had no ability or intention to abide by the terms of the "Real Estate Sales Contract For New Construction on Lot" (Exh. B) concerning the construction and closing of Mr. Callaway's home and they failed to uphold

16

this obligation to Callaway's detriment.

107.    Per their agreement with Mr. Callaway (Exh. A), Ms. Wheeler and Premier had a duty to respond to Callaway's questions concerning the construction of his house honestly and accurately, and they failed to do so to Callaway's detriment.

108.    Per the terms of their agreement with Mr. Callaway, Premier Vestavia, LLC was obligated to provide an agent to Mr. Callaway who would act in good faith concerning Callaway's interests, but it did not uphold its obligation.

109.    Per its contract, Premier Vestavia, LLC agreed to provide, and it had a duty to make sure its agent had the "time, effort, expertise, knowledge, and skills" necessary to negotiate the "Real Estate Sales Contract For New Construction on Lot" and through the closing of Callaway's home once construction has been completed and the certificate of occupancy had been issued, but it failed to abide by the terms of the contract. (Exh. A).

110.    Defendants breached the terms of the Contract between themselves and Callaway.

111.    Mr. Callaway has been damaged as a result of the breach of said contract and is entitled to recover damages.

### COUNT THREE
### MONEY HAD AND RECEIVED
### (Against Defendants Wayne Sanford, Stone Pointe Builders, LLC)

Plaintiff re-alleges, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further alleges that:

112.    Pursuant to Defendants' contractual and warranty demands, Defendants had and received $46,458.00 from Mr. Callaway in payments toward the construction and purchase of his home located at 6783 Ivy Way, Trussville, Alabama 35173. (Exh. B)

17

113.    Defendants failed to perform as promised to construct Plaintiff's home in accordance with the contract, all to Plaintiff's detriment and have received and misapplied the Plaintiff's money.

114.    As shown in the facts stated above, Defendants owe Mr. Callaway $46,458.00 for money had and received from December 22, 2020-March 2, 2022.

115.    The Plaintiff is entitled to judgment against Defendants for the money had and received.

**COUNT FOUR**
**UNJUST ENRICHMENT**
**(ALL DEFENDANTS)**

Plaintiff re-alleges, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further alleges that:

116.    As a result of the conduct described above, Defendants have been unjustly enriched from the $46,458.00 Plaintiff paid them. Defendants should be required to return those funds to the Plaintiff.

117.    Defendants and Fictitious Defendants should be required to account for all monies spent, profits, and gains which they have obtained or will unjustly obtain in the future at the expense of Plaintiff, and a return on monies should be imposed thereon to compensate Plaintiff for the loss incurred.

**COUNT FIVE**
**CONVERSION**
**(ALL DEFENDANTS)**

Plaintiff re-alleges, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further alleges that:

118.    Defendants converted the $46,458.00 of Plaintiff's funds for their use and benefit

18

without the intention of returning the same.

119.    As a direct and proximate result of Defendants' acts, Plaintiff has suffered direct and consequential damages as set forth in the above Statement of Facts.

**COUNT SIX**
**BREACH OF WARRANTY**
**(Against Defendants Wayne Sanford and Stone Pointe Builders, LLC)**

Plaintiff re-alleges, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further alleges that:

120.    By contract and operation of law, Defendants impliedly and expressly warranted the construction of Mr. Callaway's new home to be done in a timely manner and in a good and workmanlike manner.

121.    Defendants breached the warranty owed to Mr. Callaway by failing to construct and complete Mr. Callaway's new home timely and in a good and workmanlike manner with good and substantial materials, in accordance with the plans and specifications, applicable building code and applicable industry standards.

122.    Prior to abandoning the project on March 2, 2022, Mr. Callaway notified Defendants about their failure to construct the house per the contract and gave the Defendants an opportunity to correct and/or repair the work performed.

123.    Defendants' breach of these warranties has caused Plaintiff's damage.

124.    As a direct and proximate result of Defendant's breach, Mr. Callaway has been damaged and continues to be damaged.

**COUNT SEVEN**
**DECEIT**
**(Against Defendants Wayne Sanford, Stone Pointe, Kristen Wheeler)**

19

Plaintiff re-alleges, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further alleges that:

125.    On December 22, 2020, Ms. Wheeler, Mr. Sanford, and Stone Pointe, on behalf of themselves individually and all Defendants, represented to Mr. Callaway that his new home would be constructed within 217 days, or within eight months after receiving the initial payment of $46,458.00 on February 26, 2021.

126.    Defendants told Mr. Callaway that his money would be used toward purchasing and constructing his new home.

127.    Ms. Wheeler, Mr. Sanford, and Stone Pointe represented to Mr. Callaway the construction of his new home would be performed in a good and workmanlike manner and in accordance with local and state building codes.

128.    Defendants claimed they would build the house within 217 days from January 12, 2021, knowing they would be unable to meet their own demand.

129.    At that time, Defendants had no intention of honoring their contract.

130.    From December 22, 2020-March 22, 2022, Defendants intentionally deceived Mr. Callaway to induce him to pay $46,458.00 in payments toward the construction of his new home by telling Plaintiff his home would be built timely and in a good and workmanlike manner, by failing to use the funds Plaintiff paid them for the construction of his home, by telling Plaintiff they were working on his home when in fact Defendants did nothing, by demanding additional payments from Plaintiff without the intention of applying the payments toward the construction of Plaintiff's home, by continually delaying the completion date of Plaintiff's home when Defendants had no intention to abide by the terms of the construction contract, and by misrepresenting the progress of Plaintiff's

20

home construction when Plaintiff complained about the lack of work being performed.

131.    Defendants' lack of intent to perform and their intent to deceive is shown by the facts stated above, including but not limited to their demand of a substantial percentage of the full contract price up front before beginning the construction; by failing to perform or do any work for an extended period of time despite Mr. Callaway's requests; by failing to respond to Mr. Callaway's concerns about the delays and performance; by demanding an additional payment even though minimal work had been done and the construction paid for to date remained incomplete; by failing to complete the work contracted for despite being paid; and by converting the funds provided by Callaway.

132.    Defendants' deceit proximately caused and continues to cause damage to Mr. Callaway.

**COUNT EIGHT**
**PROMISSORY FRAUD**
**(Against Defendants Wayne Sanford, Stone Pointe, Kristen Wheeler)**

Plaintiff re-alleges, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further alleges that:

133.    On December 22, 2020, Mr. Sanford, Stone Pointe, Ms. Wheeler, as the agent of Stone Pointe and Sanford, promised to Mr. Callaway that in exchange for the full contract price of $460,438.00 they could and would construct Mr. Callaway's new home per the Contract in the time prescribed and/or they would repair the same as needed in accordance with the Warranty Agreement.

134.    Sanford and Stone Pointe promised and agreed to construct Mr. Callaway's new home timely and in a good and workmanlike manner and in accordance with local and state building codes. Defendants also promised that the money requested of Callaway during the course of the

21

construction would be used for the costs of the construction and property purchase and not otherwise.

135.    At the times Defendants promised to perform these acts, Defendants knew these promises and representations were false, but Defendants made these promises and representations with the intention of Mr. Callaway relying on them and in reliance, paying the money requested by Defendants.

136.    Plaintiff believed Defendants' promises and in reliance on those paid substantial sums to Defendants.

137.    At the times Defendants made these promises, Defendants did not intend to perform as promised and intended to deceive Mr. Callaway.

138.    Defendants' lack of intent to perform and their intent to deceive is shown by the facts stated above, including but not limited to their demand to receive a substantial sum of the construction contract price $46,458.00 without performing the work Plaintiff hired Defendants to do; by failing to perform or do any work for an extended period of time despite Mr. Callaway's requests and despite being paid; by failing to pay costs of construction; by failing to respond to Mr. Callaway's concerns about the delays and performance; by demanding additional payments even though minimal work had been done and the work performed was incomplete; by failing to complete the work contracted for despite being paid; and by negotiating instruments in order to take Mr. Callaway's funds directed toward the construction.

139.    At all relevant times, Defendants made multiple false misrepresentations to Mr. Callaway about the construction status of his home for the purpose of acquiring additional contract draw payments.

140.    When asked about the status of his Home, Defendants knowingly made

22

misrepresentations which they knew to be false at the time the statements were made to Callaway.

141.    Defendants' representations were made knowingly and with the intention that Plaintiff would rely upon them.

142.    Mr. Callaway justifiably believed Defendants' promises and representations and in reliance on them, paid the $46,458.00 toward the contract price of $460,438.00 as requested by the Defendants from December 22, 2020-March 2, 2022.

143.    Defendants' fraudulent actions proximately caused and continues to cause damage to Mr. Callaway.  As stated above, Mr. Callaway has been unable to complete the construction and final closing of his home which causes him to suffer ongoing anxiety and distress as a result.

**COUNT NINE**
**NEGLIGENCE**
**(ALL DEFENDANTS)**

Plaintiff re-alleges, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further alleges that:

**Stone Pointe and Sanford:**

144.    Defendants had a duty to properly construct Mr. Callaway's home in a timely manner and in a good and workmanlike manner and in accordance with local and state building codes.

145.    Defendants breached their duty by negligently failing to properly construct Mr. Callaway's new home as identified and discussed above, failing to perform all of the repairs they warranted, and by failing to meet the time line bargained for and required by Mr. Callaway.

146.    The construction that was undertaken by Stone Pointe and Sanford was not done in a good and workmanlike manner and was not completed and the partial construction which was done was negligently done to the extent the work will need to be corrected and repaired further.

**Premier Vestavia, LLC and Kristen Wheeler:**

147.    Premier and Wheeler owed Mr. Callaway a duty to respond honestly and accurately respond to his questions concerning the construction of his house through the closing date, which they negligently failed to do.

148.    Premier owed Callaway a duty to ensure its agent, Kristen Wheeler, abided by Alabama Law, Realtor's Code of Ethics and Standards of Practice in representing Mr. Callaway and Premier negligently breached this duty to the detriment of Callaway.

149.    As Callaway's real estate agent, Wheeler, owed a duty to abide by the Realtor's Code of Ethics and Standards of Practice in representing Mr. Callaway as a licensed Alabama Realtor and she negligently breached this duty to Callaway's detriment.

150.    Wheeler owed a duty to not knowingly promote the advantages of herself or one party in the transaction between Callaway and Stone Pointe, but she negligently breached this duty to Callaway's detriment.

151.    Premier and Wheeler owed Mr. Callaway a duty to notify him if they knew or had reason to know that Stone Pointe and/or Sanford had no ability or intention to abide by the terms of the "Real Estate Sales Contract For New Construction on Lot" concerning the construction and closing of Mr. Callaway's home, which they negligently failed to do.

152.    Wheeler and Premier breached their duty owed to Mr. Callaway because they knew or had reason to know Stone Pointe and Sanford were unable to abide by the terms of the "Real Estate Sales Contract for New Construction on Lot" or the "Limited Warranty Agreement" but they by negligently failed to inform Mr. Callaway about Defendants' inability to perform.

153.    As a direct and proximate consequence of Defendants' negligence, Plaintiff has been

24

damaged and continues to be damaged.

## COUNT TEN
## NEGLIGENT MISREPRESENTATION
## (ALL DEFENDANTS)

Plaintiff re-alleges, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further alleges that:

154.    Defendants negotiated the construction contract between Stone Pointe and Mr. Callaway.

155.    From December 22, 2020 through at least March 2022, Wheeler knew or should have known as Sanford's personal assistant and Stone Pointe's accounts manager, that the $46,458.00 Callaway entrusted to Stone Pointe and Sanford was not being used for its intended purpose. Ms. Wheeler also knew or should have known that neither Stone Pointe and Sanford had any intention to comply with the terms of their "Real Estate Sales Contract For New Construction On Lot" concerning the construction and closing of Mr. Callaway's home.

156.    Despite this knowledge, Ms. Wheeler never informed Mr. Callaway that his funds were not being used to build his home. While acting as Callaway's agent, Ms. Wheeler misrepresented the status of the construction project, including the work she claimed Stone Pointe had performed from December 2020 through Stone Pointe's abandonment in March 2022.

157.    Defendants knew or should have known that Mr. Callaway's home would not be built in the time prescribed the contract.

158.    Defendants knew or should have known the money Mr. Callaway paid to Wheeler, Stone Pointe, and Sanford was not and/or would not be used for the intended purpose of constructing Mr. Callaway's home.

25

159.    Despite this knowledge, Defendants negligently represented to Mr. Callaway that his home would be constructed as they intended to build. These Defendants made these representations to induce Mr. Callaway's performance.

160.    These Defendants made these representations despite the fact they knew throughout the construction process that payment they received and negotiated from Mr. Callaway's account was not being used to construct his home.

161.    At all relevant times, Defendants negligently misrepresented to Mr. Callaway how the funds were being applied toward the construction and purchase of his home.

162.    As a direct and proximate consequence of Defendants' negligent misrepresentations, Mr. Callaway has been damaged and continues to be damaged.

**COUNT ELEVEN**
**<u>BREACH OF FIDUCIARY DUTY</u>**
**(ALL DEFENDANTS)**

Plaintiff re-alleges, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further alleges that:

163.    Defendants were aware through the Agency Agreement and Construction Contract that Mr. Callaway placed his trust and confidence in them to use the funds requested from Mr. Callaway to purchase property and pay the costs of construction of his home and not otherwise.

164.    At all relevant times, Defendants had a fiduciary duty to use the funds received from Mr. Callaway solely for the purchase of land and construction costs of Mr. Callaway's home.

165.    The funds Mr. Callaway paid were under the exclusive control of Ms. Wheeler, Stone Pointe, and Sanford.

166.    From December 22, 2020 through at least March 2022, Wheeler knew or should have

26

known as Sanford's personal assistant and Stone Pointe's accounts manager, that the $46,458.00 Callaway entrusted to Stone Pointe and Sanford was not being used for its intended purpose. Ms. Wheeler also knew or should have known that neither Stone Pointe and Sanford had any intention to comply with the terms of their "Real Estate Sales Contract For New Construction On Lot" concerning the construction and closing of Mr. Callaway's home.

167.    Despite this knowledge, Ms. Wheeler never informed Mr. Callaway that his funds were not being used to build his home. While acting as Callaway's agent, Ms. Wheeler misrepresented the status of the construction project, including the work she claimed Stone Pointe had performed from December 2020 through Stone Pointe's abandonment in March 2022.

168.    Mr. Callaway routinely asked his Premier Vestavia, LLC agent, Kristen Wheeler, questions concerning the status of the construction.

169.    Premier and Wheeler breached their fiduciary duty owed Mr. Callaway by not responding to his questions concerning the construction of his house honestly and accurately as his Realtor.

170.    Premier and Wheeler owed Mr. Callaway a duty from their Contract's execution date of December 22, 2022 through the sale closing of Callaway's home to notify him if they knew or had reason to know that Stone Pointe and/or Sanford had no ability or intention to abide by the terms of the "Real Estate Sales Contract For New Construction on Lot" concerning the construction and closing of Mr. Callaway's home, which they failed to do.

171.    Premier and Wheeler breached their fiduciary duty owed to Mr. Callaway further because they knew or had reason to know Stone Pointe and Sanford were unable and/or had no intention to abide by the terms of the "Real Estate Sales Contract for New Construction on Lot" or

27

the "Limited Warranty Agreement" but failed to inform Mr. Callaway about the same.

172.    Per Defendants' agreements with Mr. Callaway, Defendants had a duty to account for the funds Mr. Callaway paid toward the construction project and to not convert and/or mismanage the funds received.

173.    As Callaway's real estate agent, Wheeler owed Callaway a duty to inform him about any and all compensation she received and/or would receive as his agent for the "Real Estate Sales Contract for New Construction on Lot" during the construction process and through closing.

174.    Upon information and belief, Wheeler breached her duty owed to Callaway because she failed to disclose any and all compensation she was receiving as his agent.

175.    Plaintiff's payment made to Defendants was for the specific purposes of paying for the construction costs and purchase of his home.

176.    Defendants breached their duty owed to Plaintiff and as a result the Plaintiff was damaged because Defendants paid themselves instead of applying Plaintiff's funds towards the purchase and construction of his home.

177.    Defendants also breached the fiduciary duty they owed to Plaintiff by failing to make sure Plaintiff's funds were applied toward the land and the construction of the home and by failing to tell Plaintiff pertinent facts concerning the construction of his home.

178.    Upon information and belief, Defendants and Fictitious Defendants converted the funds Plaintiff paid to them for the construction of his home for Defendants' own use and gain.

179.    As a direct and proximate consequence of Defendants' breach of fiduciary duty, Plaintiff has been damaged and continues to be damaged.

### COUNT TWELVE

28

## SUPPRESSION
## (ALL DEFENDANTS)

Plaintiff re-alleges, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further alleges that:

180.    Defendants had superior knowledge of the facts and construction expertise not shared by Plaintiff.

181.    Mr. Callaway also made numerous inquiries of the Defendants which required Defendants to fully disclose to him the material facts.

182.    Despite the Plaintiff's questions, Defendants suppressed material facts from Plaintiff including, but not limited to the following: (1) the money negotiated/received/paid to Defendants was not used for construction of Plaintiff's home; (2) Plaintiff's home was not being built by competent and knowledgeable subcontractors; (3) Plaintiff's home was not being built in compliance with the applicable building codes and in a good and workmanlike manner in accordance with applicable residential construction industry standards; (4) Plaintiff's funds earmarked for certain phases of construction were not being properly managed; (5) Defendants could not construct Plaintiff's home in the time frame agreed upon; and (6) property was not fully purchased by Defendants in accordance with the Contract.

183.    Defendants suppressed and concealed material facts from Plaintiff in order to induce Plaintiff to enter into the Contract for the construction of his home and to continue to allow Defendants to use his funds towards the alleged construction of his Home.

184.    Without knowledge of the foregoing material facts, Plaintiff acted to his injury by continuing to allow Defendants to use his funds towards the alleged construction of his Home.

29

185.    The actions of Defendants constitute suppression of material facts pursuant to Ala. Code § 6-5-102 (1975).

186.    As a direct and proximate result of the above-described suppression, Mr. Callaway has been and continue to be damaged.

**COUNT THIRTEEN**
**SPECIFIC PERFORMANCE**
**(Against Defendants Wayne Sanford and Stone Point Builders, LLC)**

Plaintiff re-alleges, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further alleges that:

187.    Defendants had an unconditional contractual obligation to construct Plaintiff's Home located 6783 Ivy Way, Trussville, Alabama 35173 by August 17, 2021 (using January 12, 2021 as the commencement date) and Plaintiff was obligated to pay the full contract amount at closing once the construction was complete and the certificate of occupancy had been issued.

188.    Per the contract, Plaintiff had paid $46,458.00 toward the contract price by the time Defendants unilaterally breached their contract with Plaintiff and abandoned the job of constructing Plaintiff's house.

189.    The real property known as 6783 Ivy Way, Trussville, Alabama 35173 is particularly unique and valuable.

190.    The contract between the Plaintiff, Wayne Sanford, and Stone Pointe Builders, LLC was valid and enforceable in every respect.

191.    Plaintiff has been ready, willing and able to perform the contractual obligations under the terms of the contract, executed the contract with Defendants, and paid the initial draw and down payment towards the construction and purchase price of the home subject to the contract for those

30

purposes.

192.    Defendants have no valid excuse for the nonperformance of their obligations which consisted simply building the home and tendering the property upon receiving the installments of funds.

193.    Plaintiff prays that the Court, upon consideration of this matter, will compel Defendants Wayne Sanford and Stone Pointe Builders, LLC to specifically perform their obligations under their contract with the Plaintiff and tender the sale of real estate as agreed upon under their contract.

<b><u>PRAYER FOR RELIEF</u></b>

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff demands judgment against Defendants, jointly and severally**,** for compensatory damages, consequential damages, punitive damages, special damages, attorneys' fees and costs, interest, and costs of these proceedings, and all such other damages to which Plaintiff may be entitled under Alabama law and in an amount to be determined by the Court, and for such other relief and costs that are deemed just and proper.

Respectfully submitted this 30th day of September, 2022.

> s/ Daniel Patrick Evans
> Daniel Patrick Evans (EVA-048)
> The Evans Law Firm, P.C.
> 1736 Oxmoor Road, Suite 101
> Birmingham, Alabama 35209
> Telephone:  (205) 870-1970
> Fax: (205) 870-7763
> E-Mail: dpevans@evanslawpc.com
> Attorney for the Plaintiff

<b>JURY DEMAND</b>

Plaintiff demands trial by jury of all the claims so triable in this complaint.

31

Plaintiff's Address:

c/o The Evans Law Firm, P.C.

Defendants' Addresses:

**SERVED DEFENDANTS VIA CERTIFIED MAIL**

Stone Pointe Builders, LLC
Registered Agent USCA, Inc.
100 Oxmoor Road, Suite 110
Birmingham, Alabama 35209

Cecil Wayne Sanford
905 Forestdale Boulevard
Birmingham, Alabama 35214

Kristen Wheeler
24207 Hilbun Way
Birmingham, Alabama 35242

Premier Vestavia, LLC d/b/a/ Keller Williams Vestavia
Registered Agent:      Christine Petroff-Wicks
Registered Address:   809 Shoney Drive Suite 108
                      Huntsville, Alabama 35801

# KELLER WILLIAMS
R E A L T Y

### Rule 790-X-3-.13. Agency/Brokerage Services Disclosure

## Limited Consensual Dual Agency Agreement

Limited consensual dual agency is an agency relationship where the both the buyer and the seller in the same real estate transaction are represented by a real estate brokerage company licensed under the same broker. **Consensual dual agency requ[...] the licensee to obtain the written consent of both the buyer and the seller to act as their agent.** The two most common circumstances where dual agency is encountered are:

1. when two or more salespersons licensed under the same broker each represent a different party to the transaction, an[...]

2. when one licensee represents both the buyer and seller in the same sales transaction.

In the case of dual agency, the principle function of the licensee is to help both parties reach mutually satisfactory outcome to their negotiations.

Serving as a Limited Consensual Dual Agent, the Keller Williams agent(s) will be representing both the buyer and the seller, therefore the agent(s) will NOT represent the interest of one party to the exclusion or detriment of the interest of the other part[...] a LIMITED CONSENSUAL DUAL AGENCY agreement both parties to a possible sales contract (the seller and the buyer) agree[...] the following as an acceptable course of conduct of the LIMITED CONSENSUAL DUAL AGENT.
The LIMITED CONSENSUAL DUAL AGENT will:

1       Conduct himself or herself with honesty, integrity and in a professional manner toward all parties in a transaction.
2       Not knowingly promote the advantages of one party in a transaction to the detriment of another.
3       Honestly apply his or her expertise, skills, knowledge, and experience to help facilitate a fair transaction for all partie[...]
4       Not disclose information received in confidence to anyone without the permission of the person who confided same [...] him or her as their agent. (Confidential information might include: price a party is willing to pay to sell or buy, negotiating strategy, etc.).
5       Act as an intermediary to a transaction between the parties and act as the follow-up person with the intent of causing everything necessary for the completion of the transaction to come together for a successful closing.
6       Respond honestly and accurately to questions concerning the property.

In a LIMITED CONSENSUAL DUAL AGENCY role, KELLER WILLIAMS Realty will be contributing our time, effort, expertise, knowledge and skills to help the parties obtain an agreement that is acceptable to both the seller and the buyer.

I have read and understand the above agreement and have agreed, to allow KELLER WILLIAMS Realty to be a LIMITED CONSENSUAL DUAL AGENT on my behalf. If you do not understand this agreement, consult an attorney before signing.

| *Wayne Stone Pointe builders llc* | dotloop verified 12/22/20 9:38 PM CST FCEC-HVIH-01CU-LAGS | *Jonathan Callaway* | dotloop verified 12/22/20 8:22 PM CST EOMI-6IJB-TQIF-Y5KA |
|---|---|---|---|
| Seller | Date | Buyer | Date |
| | | | |
| Seller | Date | Buyer | Date |
| *Kristen Wheeler* | dotloop verified 12/22/20 8:20 PM CST H3TU-9KZX-AWCW-YDHB | *Kristen Wheeler* | dotloop verified 12/22/20 8:20 PM CST CYL1-NRGK-FFZ6-A8GH |
| Listing Agent | Date | Buyers' Agent | Date |

EXHIBIT B

# REAL ESTATE SALES CONTRACT FOR NEW CONSTRUCTION ON LOT

The undersigned Purchaser(s) <u>Jonathan Callaway</u> hereby agrees to purchase and the undersigned Seller(s) <u>Stone Pointe Builders LLC</u> hereby agrees to sell the following described real estate, together with all improvements, shrubbery, planting, fixtures and appurtenances (the "Property") situated in the City of <u>Trussville</u> County of <u>Jefferson</u>, Alabama, subject to all easements, restrictions, covenants, rights of way, and other matters of record, on the terms stated below:

> 6783 IVY WAY
> TRUSSVILLE, AL 35173
> 11-00-30-3-001-002.076Legal Description:
> LAKE HIGHLAND 11-30-3 BK 227 PG 7 LOT 6
> Plat Book: 227 / Plat Page: 7
> Census Tract: 011107 / Block: 2000

**1 CONSTRUCTION OF RESIDENCE; ACCEPTANCE OF PLANS AND SPECIFICATIONS.**
Purchaser and Seller acknowledge that the Property, and the Purchase Price set forth below, includes a residential dwelling (The "Residence") constructed or completed by Builder on the above described lot in accordance with the plans and specifications attached hereto as Exhibit "A" and initialed or signed by Purchaser and Builder on each page. Purchaser hereby confirms acceptance of the plans and specifications as well as the quality, design and appearance of the Property at the time Purchaser h signed this Contract. The Residence to be constructed or completed is commonly known as the Plan name   Plan # (if applicable)
    <u>20-317</u>            /              .

**2 PURCHASE PRICE.**

| | |
|---|---|
| The Base Price of the "Residence" (including the home site) is: | $ <u>460,438</u> |
| **plus any change orders or additions** | $ |
| Purchaser request extras or upgrades in addition to the basic plan outlined on the "Contract Summary" for the following sum in addition to the base price stated above: | $ ____ as |
| | $ |
| TOTAL PURCHASE PRICE | $ <u>460,438</u> |

**PAYMENT OF PURCHASE PRICE**

| | |
|---|---|
| The Purchase Price of the Residence shall be paid as follows: | $ <u>0</u> |
| Earnest money | $(<u>0</u>    ) |
| Amount of deposit made due to extras or upgrades being chosen at time of contract and included in sales price (the additional deposits are non-refundable for any reason) | $ <u>0</u> |
| Balance due from purchaser at the time of the closing* | $ <u>TBD</u> |

*this may be from additional cash down payment and/or loan proceeds. Closing costs are not included in this amount. Any monies due personally from the purchaser must be paid by to the closing agent by such method (cashier's check or wire transfer) as the closing agent may require.

4.   FINANCING. (Check as applicable)

(1)   Buyer will pay cash or obtain a loan for the property with no financing contingency.

(2)   This contract is contingent on Buyer obtaining approval of a ☑ Conventional ☐ FHA ☐ VA ☐ Other loan in the amount of $ ____ or ____ % of the purchase price (excluding any financed loan costs) at the prevailing interest rate and loan costs. If FHA or VA financing is utilized, the "FHA/VA Amendatory Clause Addendum" mu be part of this agreement. Purchaser will apply for financing within ____ days from finalized date (5 days if not specified and provide a letter of loan approval within 10 days and will provide any and all credit, employment, financial, and other information required by the Lender. After Purchaser provides the approval letter, this contingency is removed, and all earnest money is non-refundable due to any failure of the Purchaser to obtain financing. If Purchaser does not provide a letter of acceptance or denial to Seller within 10 days, this contingency is removed, and all earnest money shall become non-refundable due to any failure of the Purchaser to obtain financing.

5   **EARNEST MONEY AND PURCHASER'S DEFAULT. Purchaser hereby authorizes the Seller to hold the earnest m** pending the fulfillment of this Contract. In the event Purchaser fails to carry out and perform the terms of this Contract, the earnest money shall be forfeited, and Purchaser shall execute a general release relieving the Seller from any liability as it relates this contract. Further, nothing in this provision shall prohibit Seller from seeking reimbursement of all other costs, expenses a damage suffered as a result of Purchaser's breach.

6   **NON-REFUNDABLE FEES, UPGRADE/CUSTOM SELECTION CHARGES. Seller and Purchaser acknowledge that** the event this contract is canceled or does not close for any reason attributable to the Purchaser, any fees, upgrade selections (including but not limited to any floor selections, wall paper, lighting, appliance upgrades, custom changes in construction, etc. that have been paid will be NON-REFUNDABLE). Items unpaid will result in forfeiture of earnest money in the amount of the upgrade or custom selection. These items rarely increase the appraised value of the home and shall be forfeited as liquidated damages should Purchaser fail to close. Extras/upgrades chosen and included in sales price must be accompanied by addition money in the amount of the upgrade or extra that is non-refundable for any reasons.

7   **NON-PAYMENT. In the event Purchaser shall fail to pay any monies due Seller under this Contract for scheduled do** payments, extras or other additional items required by Purchaser, Seller may refuse to perform any further work to the premises under warranty or otherwise until Purchaser pays the full sum, plus interest at the legal rate, attorney's fees and court costs. Extras must be paid in full prior to installation or work involving said extras being performed.

8   **ALL LOAN CLOSING COSTS, DISCOUNTS AND PREPAID ITEMS. All loan closing costs, discounts, and prepaid** are to be paid by Purchaser unless agreed otherwise or otherwise specified herein.

9   **FHA VALUATION. If FHA financing is utilized, it is expressly agreed that notwithstanding any other provisions of the** Contract, Purchaser shall not be obligated to complete the purchase of the Property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless Seller has delivered to Purchaser a written statement issued by the Federal Housing Commissioner setting forth the appraised value of the Property (excluding closing costs) of not less than $ _____ which statement Seller hereby agrees to deliver to Purchaser promptly after such appraised value statement made available to Seller. Purchaser shall, however, have the privilege and option of proceeding with the consummation of the Contract without regard to the amount of the appraised valuation made by the Federal Housing Commissioner. The appraised valuation is arrived at to determine the maximum mortgage the Department of Housing and Urban Development will insure. H does not warrant the value or the condition of the Property. Purchaser should satisfy himself/herself that the price and condition of the Property are acceptable.

10  VA LOAN. If VA financing is used, it is expressly agreed that, notwithstanding any other provisions of this Contract, Purchas shall not incur any penalty by forfeiture of earnest money or otherwise be obligated to complete the purchase of the Property described herein, if the Contract purchase price or cost exceeds the reasonable value of the Property established by the Veteran Administration. Purchaser shall, however, have the privilege and option of proceeding with the consummation of this Contract without regard to the amount of the reasonable value established by the Veterans Administration.

11 ROCK AND OTHER SUBSURFACE CONDITIONS. If initialed by Seller and Purchaser here (Seller [____] Purchaser [____]), the price above does not include any costs or contingencies for rock or other abnormal subsurface conditions, includes but not limited to, sink holes, soft soils, etc. and Purchaser shall be responsible for the abnormal costs of correcting any such conditions. Should such abnormal conditions be encountered on the building site in connection with foundations and footing excavation, or installation of sewer lines, water lines, or other utility services, Seller shall promptly inform Purchaser of same estimate costs of additional work. Such costs may include, but are not necessarily limited to, blasting expenses, jackhammer, drill operations. Additional costs shall be billed at costs plus a twenty-five percent (25%) management and overhead fee and, the time that rock or subsurface conditions are encountered. Seller shall provide a maximum cost for written approval by Purchaser prior to proceeding with construction.

Choose "A", "B" or "C" (check only one)

12 (A) ☑  RESIDENCE TO BE CONSTRUCTED.  Purchaser and Seller acknowledge and agree that the Property (and To Purchase Price) includes a residential dwelling (the "Residence") which will be constructed by Seller or its agents on the above described lot.  Seller agrees to commence construction of said residence within 21 days after this Agreement has been finalized, and after all contingencies are removed, including but not limited to financing and Seller verifying himself/herself o through his agents, that desired home will fit on described lot and all necessary permits are obtained.  Residence shall be completed within217  workdays after date of commencement, except when Seller shall be prevented from complete such buildings by reason of change in plans or specifications required by Purchaser, or additional change orders required by Purchaser, rain or inclement weather delays, by warfare and terrorism, Acts of God, governmental regulations or decrees, strike acts of Purchaser, or shortage of material and supply beyond the control of the Seller or other causes beyond the control of Se Seller agrees to construct the Residence in a good and workmanlike manner in substantial accordance with the Plans and Specifications and in a quality substantially equal to the standards of construction currently prevailing in the greater Birmingham Alabama metropolitan area for single-family residential dwellings similar to the Residence.  Purchaser hereby confirms acceptance of the Plans and Specifications as well as the quality, design, and appearance of the Property as it exists at the time Purchaser has signed the Agreement.  Purchaser acknowledges that, in the course of construction of the Residence certain changes, deviations or omissions in the Plans and Specifications may be required by governmental authorities having jurisdiction over the Property or by any utility company providing utility service to the Property.  Furthermore, job or site conditions on the Property may require certain changes, deviations, or omissions in the Plans and Specifications or Seller may determine that certain changes, deviations, additions, or omissions in the Plans and Specifications are necessary.  Purchaser hereby consents any of the foregoing described changes, deviations, and omissions in the Plans and Specifications in the construction of the Residence.  Purchaser also acknowledges and agrees that Seller may substitute materials, equipment, and appliances of equal quality for those specified in the Plans and Specifications.  If Purchaser fails to close by the Closing Date set by Seller or its agents because of financing delays or any other matters attributable to Purchaser, Seller reserves the right to terminate this agreement or increase the Total Purchase Price by an amount equal to $75.00 per day for each day that the Closing is delayed beyond the Closing Date.  If Purchaser fails to pay the increase in Purchase Price, Seller may, at its option, cancel and termination this Agreement in which event the Earnest Money and any amounts paid to Seller for Upgrade Costs and Change Orders, if an shall be retained by Seller and, except for the obligations and liabilities under this Agreement which survive the termination Agreement, neither party shall have any further obligation or liability to the other hereunder.  Possession shall be given upon delivery of the deed.

12 (B) ☐   RESIDENCE UNDER CONSTRUCTION.  Purchaser and Seller acknowledge and agree that the property and the total purchase price includes a residential dwelling "the Residence" which is under construction by Seller or its agents.  The residence shall be completed within _____ workdays after this agreement has been finalized except where by the Seller sha prevented from completing such residence by reason of change orders required by Purchaser, rain or inclement weather delays warfare and terrorism, Acts of God, governmental regulations or decrees, strikes, act of Purchaser, or shortage of material and supply beyond the control of the Seller or other causes beyond the control of the Seller.  Seller agrees to complete the residence good workmanlike manner in substantial accordance with the plans and specs already established prior to this agreement, excessive for change orders, if any, agreed upon between Purchaser and Seller, and in a quality substantially equal to the standards of construction currently prevailing in the greater Birmingham, Alabama metropolitan area for single-family residential dwelling similar to the residence Purchaser hereby confirms acceptance of the plans and specs already established prior to the agreement in addition to change orders agreed upon between Purchaser and Seller, if any, as well as the quality, design, and appearance o the property as it exists at the time Purchaser has signed the agreement, except that Purchaser acknowledges that a homeowner orientation will be completed prior to the closing date.  Purchaser acknowledges that the homeowner orientation will be completed with the Purchaser and the Seller or its agents to bring together a punch list.  If Purchaser fails to close by the Closing Date set by Seller or its agents because of financing delays or any other matters attributable to Purchaser, Seller reserves the right to terminate this Agreement or increase the Total Purchase Price by an amount equal to $75.00 per day for each day that the closing is delayed beyond the Closing Date.  If Purchaser fails to pay the increase in purchase price, Seller may, at its option, cancel and terminate this Agreement in which event the earnest money and any amounts paid to Seller for upgrade costs and change orders, if any, shall be retained by Seller and except for the obligations and liabilities under this Agreement which survive the termination of the Agreement, neither party shall have any further obligation or liability to the other hereunder.  Possession shall be given upon delivery of the deed.

12 (C) ☐    COMPLETED CONSTRUCTION. Purchaser and Seller acknowledges and agree that a residential dwelling (the "Residence") has been constructed and completed on the Lot. Purchaser acknowledges and agrees that Purchaser has had the opportunity to inspect the Property and does hereby accept the Property in its current "AS IS" condition, subject to those change and upgrades agreed upon between Purchaser and Seller, except that Purchaser acknowledges that a homeowner orientation w be completed prior to the closing date. Purchaser acknowledges that the homeowner orientation will be completed with the Purchaser and the Seller or its agents to bring together a punch list. The sale shall be closed and the deed delivered on or before

_____, hereinafter called Closing Date, except Seller shall have a reasonable length of time within which to complete any item required as a result of the homeowner orientation and/or perfect title or cure defects in the title to said Property. If Purchaser fails to close by the Closing Date set by Seller or its agents because of financing delays or any other matters attributable to Purchaser, Seller reserves the right to terminate this Agreement or increase the Total Purchase Price by amount equal to $75 per day for each day that Closing is delayed beyond the Closing Date. If Purchaser fails to pay the increase in Purchase price, Seller may, at its option, cancel and terminate this Agreement in which event the Earnest Money and any amounts paid to Seller for Upgrade Costs and Change Orders, if any, shall be retained by Seller and, except for the obligations and liabilities under this Agreement which survive the termination of the Agreement, neither party shall have any further obligation or liability to the other hereunder. Possession is to be given upon delivery of the deed.

13 CONVEYANCE. Builder agrees to convey the Property to Purchaser by statutory warranty deed (check here ☐ if Purchas desire title as joint tenants with right of survivorship), free of all encumbrances except as permitted in this Contract. Builder a Purchaser agree that any encumbrances not herein accepted or assumed may be cleared at the time of closing from sales proceeds
THE PROPERTY IS SOLD AND IS TO BE CONVEYED SUBJECT TO ANY MINERAL AND MINING RIGHTS NOW OWNED BY Seller AND SUBJECT TO PRESENT ZONING CLASSIFICATION, AND ☐ IS ☑ IS NOT LOCATE A FLOOD PLAIN, AND , UNLESS OTHERWISE AGREED HEREIN, SUBJECT TO UTILITY EASEMENTS SERVING THE PROPERTY, DEVELOPER'S DECLARATION OF MASTER PLAN, RESIDENTIAL SUBDIVISION COVENANTS AND RESTRICTIONS, AND BUILDING LINES OF RECORD AND OTHER EASEMENTS, PROVIDED THAT NONE O THE FOREGOING MATERIALLY IMPAIRS USE OF THE PROPERTY FOR RESIDENTIAL PURPOSES IN ADDITION TO THE GENERAL EXCEPTION FOR MINERAL AND MINING RIGHTS NOT OWNED BY THE Seller. Seller MAKE NO REPRESENTATIONS REGARDING THE STATUS OR CONDITION OF THE PROPERTY BELOW THE SURFACE OR RELATING TO THE EXISTENCE OF MINING SHAFTS, TUNNELS, GASES OR OTHER CONDITIONS BELOW O AFFECTING THE SURFACE OF SAID REAL PROPERTY.

14 TITLE INSURANCE. Seller agrees to furnish Purchaser a standard form owner's title policy insurance at Seller's expense, issued by a company qualified to insure titles in Alabama, in the amount of the purchase price, insuring Purchaser against loss account of any defect or encumbrance in the title, subject to exceptions herein; otherwise, the earnest money shall be refunded the event both Owner's and Mortgagee's title policies are obtained at the time of closing, the total expense of procuring the two policies will be divided equally between Seller and Purchaser, even if the Mortgagee is Seller. In the event of a second loan, Purchaser will pay the costs for the second lender's title policy.

15 SURVEY. Purchaser ☑ does ☐ does not (check one) require a ☑ Full ☐ Foundation survey by a registered Alabama land surveyor. If Purchaser chooses to require a survey, the Builders or Builder's agents will order the survey on the behalf of the Purchaser. Unless otherwise agreed herein, the survey shall be at Purchaser's expense. (NOTE: Lender may require a survey.) **Survey will be done during permitting phase and submitted to buyer after** _____

16 SELECTION OF SETTLEMENT/CLOSING AGENT: Buyer and Seller hereby agree that the closing of this transaction shall be conducted by a closing attorney or title insurance company and Buyer and Seller ☑ do ☐ do not agree to share equal the settlement or closing charge imposed by the settlement agent. Buyer and Seller acknowledge and agree that such sharing m involve a potential conflict of interest and they may be required to execute an affidavit at closing acknowledging their recognition and acceptance of same. The parties further acknowledge that they have a right to legal representation of their own choosing, a their own expense, at all times in connection with this contract and the closing of this transaction.

If Purchaser elects to use a loan program that requires more than one closing fee, the Builder will only share equally the cost o the closing attorney's fee on the primary loan.

17  PRORATIONS. Ad valorem taxes and assessments (whether paid in arrears or advance) fire and library district assessments, any, for the property as determined on the closing date are to be prorated between Seller and Purchaser as of the Closing Date All ad valorem taxes, except municipal taxes, are presumed to be paid in arrears for purposes of proration; municipal taxes, if are presumed to be paid in advance. Seller and Purchaser acknowledge that the proration of taxes is based on prior year tax assessments and/or estimated amounts based on the time of the year of the start of construction of the house situated on the property and the date that the record map, if any, for the development was recorded in the Probate Office. The actual ad valor taxes payable by Purchaser for the Property after the Closing Date may be greater than or less than the prorated amount but shall not be subject to re-proration after the Closing. Purchaser shall be responsible for the payment of all real estate and ad valorem taxes and assessments, including any "roll-back" taxes assessed to the Property after the date of the Closing pursuant to Ala. C Section 40-7-25(3) (1975). The foregoing provisions shall survive the Closing.

18  ASSESSMENTS. At the Closing, any homeowner's association assessments shall be prorated between Seller and Purchaser a of the Closing Date. From and after the Closing Date, Purchaser shall be solely responsible for the payment of all assessments attributed or assessed to the Property. To the extent any transfer fees or other amounts are payable which may encumber the Property, Purchaser shall be responsible for the payment of the same at the Closing. Such amounts shall be in addition to all o amounts payable by Purchaser at the Closing. At the time of the execution of the contract, the annual homeowner's assessment $ 0 but is subject to change from time to time.   ☐  Monthly   ☐  Quarterly   ☐  Annually  **NO HOA**

BUILDER WARRANTS: Seller has not received notification from any lawful authority regarding any assessments, pending public improvements, repairs, replacement, of alterations to the Property, which remain outstanding except as, set forth herein

19  CONDITION OF PROPERTY/LIMITATION OF WARRANTY: Seller shall provide Purchaser with a one-year Limited New Home Warranty ("Warranty"), the form of which is attached as Exhibit "B", and Purchaser agrees to accept the terms and conditions of the Warranty as the only implied or express warranty from Seller. Seller represents that to the best of Seller's

20  knowledge, no underground mining shafts or tunnels exist below the surface of the Property. Seller further represents that Seller has not used any lead based paint in the construction of the Dwelling, has not installed any underground storage tanks on the Property, that Seller has not disposed of toxic or hazardous substances or wastes on the Property and that to the best of Seller' knowledge no such tanks have been installed or toxic or hazardous substances or wastes have been disposed of on the Property

EXCEPT AS SET FORTH IN THIS SECTION, SELLER HAS NOT MADE AND DOES NOT MAKE ANY REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, AS TO THE CONDITION OF THE PROPERTY OR THE DWELLING INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, HABITABILITY OR WORKMANSHIP. PURCHA EXPRESSLY WAIVES AND RELEASES ANY CLAIMS BASED ON ANY SUCH IMPLIED OR ALLEGED WARRANT AND REPRESENTATIONS. EXCEPT AS SET FORTH IN THIS SECTION, SELLER HAS NOT MADE AND DOES NO MAKE ANY REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, AS TO THE CONDITION O THE PROPERTY AND WHETHER THERE EXISTS ANY TOXIC OR HAZARDOUS SUBSTANCE OR WASTE (INCLUDING, BUT NOT LIMITED TO, RADON GAS, MOLD OR FUNGUS), OR OTHER SUBSTANCE OF ANY KIN ON THE PROPERTY OR IN THE DWELLING. FURTHERMORE, PURCHASER HEREBY WAIVES AND RELEASES SELLER, ITS AGENTS, EMPLOYEES, OFFICERS, DIRECTORS, SHAREHOLDERS, PARTNERS, MORTGAGEES AN THEIR RESPECTIVE HEIRS, REPRESENTATIVES, SUCCESSORS AND ASSIGNS FROM ANY LIABILITY OF ANY NATURE ON ACCOUNT OF LOSS, DAMAGE OR INJURY TO THE PROPERTY, IMPROVEMENTS, PERSONAL PROPERTY OR TO PURCHASER OR ANY OWNER, OCCUPANTS OR OTHER PERSON WHO ENTERS UPON ANY PORTION OF THE PROPERTY AS A RESULT OF ANY PAST, PRESENT OR FUTURE SOIL, SURFACE AND/OR SUBSURFACE CONDITIONS, KNOWN OR UNKNOWN (INCLUDING, WITHOUT LIMITATION, SINKHOLES, UNDERGROUND MINES, TUNNELS AND LIMESTONE FORMATIONS AND DEPOSITS) UNDER OR UPON THE PROPERTY OR ANY PROPERTY SURROUNDING, ADJACENT TO OR IN CLOSE PROXIMITY WITH THE PROPER THE AGENT MAKES NO REPRESENTATION OR WARRANTY AND IS NOT AUTHORIZED BY SELLER TO MAKE ANY REPRESENTATION OR WARRANTY OF ANY KIND AS TO THE CONDITION OF THE PROPERTY. AS ADDITIONAL CONSIDERATION TO SELLER, THE FOREGOING PROVISIONS SHALL SURVIVE CLOSING AND MAY BE INCLUDED IN THE DEED.

SELLER AND PURCHASER HAVE NEGOTIATED AND AGREED UPON THE LIMITATIONS OF WARRANTY CONTAINED HEREIN AND IN THE LIMITED NEW HOME WARRANTY ATTACHED TO THIS CONTRACT

PURCHASER ACKNOWLEDGES THAT THE LIMITATION IN THE DURATION OF THE LIMITED NEW HOME WARRANTY IS IN CONSIDERATION FOR SELLER AGREEING TO SELL THE PROPERTY FOR THE PURCHASE PRICE SPECIFIED IN THIS CONTRACT.

**Purchaser(s) has read and agrees to the foregoing limitations of Warranty:**

Seller [WS / 12/22/20 / 9:37 PM CST / dotloop verified]    Purchaser [JC / 12/22/20 / 9:11 PM CST / dotloop verified]    Purchaser [        ]

**21** EXCLUSIONS FROM WARRANTY. THE EXCLUSIONS FROM WARRANTY ARE IMPORTANT.  PURCHASER MUS READ ALL EXCLUSIONS CAREFULLY AND INITIAL BELOW. Notwithstanding anything to the contrary in this Contractor any Addendum, the Limited New Home Warranty attached as Exhibit "B" shall not extend to, include or be applicable to, and there is no warranty of any kind from the Seller with respect to (a) defects in outbuildings not attached to the Property; swimming pools; other recreational facilities; driveways; walkways; retaining walls; fences; landscaping; or items furnished or installed b the Purchaser or parties who have dealt directly with the Purchaser; (b) any cosmetic finishes including but not limited to painting, sheetrock (including nail pops and shrinkage cracks), and caulking not identified for correction during the walk-thru; damaged concrete due to stains of gas, oil or any foreign fluid; (d) damage to personal property of the Purchaser, or cleaning o personal property of the Purchaser; or (e) any repair after the warranty period.  The Limited New Home Warranty shall further extend to, include or be applicable to any loss, damage or injury caused by or resulting from riots; civil commotion; fire; explosion; smoke; accidents; water escape; falling objects; aircraft; vehicles; acts of God; lightning; windstorm; hail; flood; m slides; damage to personal property; earthquakes; volcanic eruptions; wind driven water; radon gas; mold, fungus(i) or spore(s any substance, vapor or gas produced by or arising out of any mold, fungus(i) or spore(s), or any material, product, building component or structure that contains, harbors, nurtures or acts as a medium for mold, fungus(i) or spore(s), or any material, product, building component or structure that contains, harbors, nurtures or acts as a medium for mold, fungus(i) or spore(s): infestation from termites or other insects; sink holes; subsurface conditions; or changes in the underground water table; included but not limited to, any damages for mental anguish or bodily injury or death and any incidental, consequential or secondary damages caused or claimed to be caused thereby; and the Purchaser hereby waives any claim arising out of any such loss, dam or injury.  The Purchaser hereby waives any claim arising out of any such occurrences or defects.  A more comprehensive list exclusions from the warranty provided in this Contract is in Exhibit "B". Any exclusion listed in this Section or in Exhibit "B hereby accepted as a binding exclusion from the Limited New Home Warranty - even if it is not listed in Exhibit "B".  Slight deviations from Plans and Specifications are normal and shall be construed as substantial compliance with this Contract and a Warranty hereunder.

**Purchaser(s) has read and agrees to the foregoing exclusions from Warranty:**

Seller [WS / 12/22/20 / 9:37 PM CST / dotloop verified]    Purchaser [JC / 12/22/20 / 9:08 PM CST / dotloop verified]    Purchaser [        ]

**22** SELLER'S RIGHT TO TERMINATE FOR INTERFERENCE BY PURCHASER: PURCHASER AGREES NOT TO **ISSUE ANY INSTRUCTIONS TO OR OTHERWISE INTERFERE WITH SUBCONTRACTORS AND WORK FORCES. For Seller to fulfill its obligations under this Contract, Purchaser must not interfere in any manner** Seller's subcontractors or other labor forces.  Any such interference could substantially delay progress of the work and impose additional costs and Seller is unwilling to construct the Dwelling for Purchaser if Purchaser interferes with such construction. Therefore, the Purchaser agrees, prior to closing, neither to negotiate for additional or different work with Seller's subcontract nor to engage other contractors, subcontractors, vendors or material suppliers except with Seller's consent and then only in accordance with any instructions given by the Seller and in such a manner as, in Seller's sole discretion, will not interfere with Seller's completion of work under this Contract.  In the event of the violation by the Purchaser of any one or more of the provisions of this Section 22, or in the event that the Purchaser should in any manner interfere with the progress of work on the Property or inspections of the Property or any portion thereof by any building inspectors or other governmental officials or by utility companies or quasi-governmental personnel, or in any other manner interfere with the progress of construction of the dwelling upon the Property, then the Seller shall have the right, at the election of the Seller and in the sole discretion of the Se to terminate this Contract, whereupon both parties shall be relieved of all obligations hereunder and the Seller shall be free to the Property to another party.  The rights of the Seller under this Section 22 are in addition to and independent to any rights the Seller might have under Alabama law or pursuant to the provisions of this Contract as the result of any default by the Purchaser of the obligations of Purchaser hereunder.  The Purchaser acknowledges that the terms and provisions of this Section 22, including the right of termination by the Seller, are material to the willingness of the Seller to enter into this Contract, and the provisions of this Section 22 shall be fully enforceable by the Seller in the discretion of the Seller.  In the

event Seller shall terminate this contract, Seller shall reimburse Purchaser for all earnest money and upgrade money received from Purchaser an both parties shall be released from any further liability to the other party.

**23** ENTRY INTO PROPERTY. Purchaser acknowledges and agrees that any entry onto Property at any time prior to the Closing by Purchaser or any of Purchaser's agents, representatives, or invitees is at the sole risk of Purchaser and Purchaser does hereby (a) waive and release Seller or its agents from and against any and all claims for damages to person or property occurring as a result of any entry into the Property prior to Closing by Purchaser or any of Purchaser's agents, representatives, or invitees and does agree to indemnify, agree to defend and hold Seller and/ or its agents harmless from and against, any and all claims or demands for loss, damage, injury, liability, cost or expense (including reasonable attorney's fees and expenses) of any nature suffered, paid or incurred by Seller or its agents as a result of any entry onto the Property by Purchaser or any of Purchaser's agents, representatives, or invitees at any time prior to Closing. Purchaser further covenants and agrees with Seller that any onto the Property by Purchaser and any of Purchaser's agents, representatives, or invitees shall occur only on days or at times which are approved or specified by Seller and shall not, in any event, interfere with the construction of the Residence. The provisions of this Paragraph shall survive the termination of this Agreement and the Closing.

**24** ACCESS TO THE DWELLING. Purchaser must provide Seller with timely, reasonable workday access to the Dwelling (weekdays between 7:30 a.m. and 3:30 p.m.) in order to perform any warranty service required under the Limited New Home Warranty. Failure or refusal of Purchaser to provide such access to Seller or its agent will relieve the Seller of its obligations under the Limited New Home Warranty.

**25** AGENCY DISCLOSURE:

The Listing Company is <u>Keller Williams Vestavia</u>
(Two blocks may be checked)

☐ An agent of the Builder
☐ An agent of the Purchaser
☐ An agent of both Builder and Purchaser, and is acting as a   limited consensual dual agent
☑ Assisting the     Purchaser ☐ Builder as a transaction broker
☐ **Seller** *WS* 12/22/20 9:37 PM CST dotloop verified

The Selling Company is <u>**Keller Williams Vestavia**</u>
(Two blocks may be checked)

☐ An agent of the Builder
☐ An agent of the Purchaser
☐ An agent of both Builder and Purchaser, and is acting as a   limited consensual dual agent
☑ Assisting the     Purchaser     Builder as a transaction broker
☐ **Purchaser** *gc* 12/22/20 9:08 PM CST dotloop verified     **Purchaser**

**26** DISCLAIMER. Purchaser acknowledges that Purchaser has not relied upon any advice or representations of Seller or Listing Agent (or Broker's associated salesperson) relative to (i) the legal or tax consequences of this Contract and the sale, purchase ownership of the Property; (ii) except as provided in the Warranty, the structural condition of the Property; (iii) the character o the neighborhood; (iv) the investment or resale value of the Property; (v) the use or condition of adjoining or neighboring property; (vi) subsurface conditions including radon and other potentially hazardous materials and or gases; (vii) any other

matters affecting Purchaser's willingness to purchase the Property on the terms and price herein set forth. Purchasers represent that if such matters are of concern to Purchaser's purchase of the Property; Purchaser has sought and obtained independent ad relative thereto. Purchaser further acknowledges that the promotional brochures and drawings are not exact depictions of the Property or surrounding areas but are Seller's reasonable approximations and are subject to change at Seller's discretion.

**27** RISK OF LOSS. Seller agrees to keep in force sufficient hazard insurance on the Property to protect all interests until this sale closed and the deed is delivered. If the Property is destroyed or materially damaged between the date hereof and the Closing, Seller is unable or unwilling to restore it to its previous condition prior to Closing, Purchaser shall have the option of canceling this Contract and receiving a refund of the Earnest Money and any Additional Earnest Money or extending the Closing Date a sufficient time for Seller to complete construction. If Purchaser elects to extend the Closing Date, this Contract shall continue full force and effect with the extended Closing Date.

**28** ARBITRATION OF DISPUTES. The Seller and the Purchaser acknowledge that this Agreement involves interstate commerce in that many of the transactions necessary for Purchaser and Seller to perform their obligations hereunder, including without limitation, the manufacture of materials and components contained in the Dwelling, the financing of loans related to construction of the Dwelling, the provision of insurance related to the construction of the Dwelling and other activities, occur in interstate commerce. Each of the undersigned hereby agrees that any past, present or future dispute, controversy or claim arising out of, relating to, this Contract, the parties' relationship under this Contract, the construction of the Dwelling or the breach of this Contract shall be submitted to final and binding arbitration by the American Arbitration Association under its the Commercial Arbitration Rules or by such other arbitration tribunal and under such other arbitration rules as the parties may agree. The obligation of arbitrate such disputes shall extend to claims not only between the parties to this contract, but also their respective agents, brokers, employers, employees, contractors, suppliers, settlement service providers, title insurers, closing agents and attorneys and any other person or entity who provides goods or services to the parties to this Agreement in connection with the Property. The decision of the arbitrator appointed thereunder shall be final and binding (subject to rights of appeal contained I the rules of arbitration) and judgment on the award may be entered in any Court of competent jurisdiction. Each party agrees pay all reasonable attorney's fees and arbitration or court costs which the prevailing party may incur in enforcing any provision this Contract. Payment of arbitration fees may be required in advance of any proceedings. In the event this arbitration provision shall be held to be invalid or unenforceable in whole or part for any reason, then the parties agree that the resolution of any dispute arising out of this contract shall be in the state courts located in the county in which the Property is located, with the tr of said dispute being tried to the judge of said court, who shall hear and decide such dispute without a jury. Each party hereby waives its right to trial by jury under the provisions of the United States Constitution and the Constitution of the United States America. The provisions of this section 28 shall survive the closing of the transaction contemplated by this agreement and the delivery of the deed.

**29** MISCELLANEOUS: Purchaser may not assign, transfer, convey or encumber this Contract or any interest herein, without Seller's prior written consent. This Contract shall be binding upon and shall inure to the benefit of Seller and Purchaser and the respective heirs, executors, successors and assigns. This Contract and Addenda attached hereto constitute the sole and entire agreement between the parties hereto and supersede any and all prior discussions representations, negotiations and agreements between Purchaser and Seller, whether oral or written. Neither Purchaser, nor Seller, nor Listing Agent, nor any sales agent shall be bound by any understanding, agreement, promise, or representation concerning the Property, express or implied, not specification herein. This Contract may not be modified or amended except in writing signed by all parties hereto. No representations, promises, warranties, understandings or inducements with respect to this Contract or any of the matters contemplated herein which are not set forth in this Contract shall be binding upon the parties hereto. The section headings are used for convenience reference only and in no way define, limit or describe the scope or intent of this Contract. Time is of the essence of this Contract This Contract has been executed in the State of Alabama and the laws of the State of Alabama shall govern this Contract. If a provision of this Contract should be invalid or unenforceable, then such provision only shall be held unenforceable and the validity and enforceability of the remaining provisions hereof shall not be affected thereby. Each party agrees to pay all reasonable attorney's fees and arbitration or court costs which the prevailing party may incur in enforcing any provision of this Contract. Except pursuant to the Limited New Home Warranty and the terms and provisions hereof which specify their surviving after Closing and delivery of the deed, Closing shall be deemed to satisfy and fulfill the obligations of the parties hereunder an neither party shall thereafter have any further obligation hereunder.

**30** INSULATION. Insulation has been or will be installed in the home as follows:

    a.   Exterior walls will be insulated with (type of insulation) fiberglass batt to a thickness of 3 ½ inches, which, according to the manufacturer, will yield an R-value of 11.

    b.   Ceilings in all areas will be insulated with (type of insulation) blown fiberglass to a thickness of 10-12 inches, which according to the manufacturer, will yield an R-value of 30.

    c.   Interior walls and garage walls will be insulated with (type of insulation) N/A to a thickness of N/A inches, which, accord into the manufacturer, will yield an R-value of N/A. d. Exclusions:

**31** SEWER/SEPTIC SYSTEMS. Builder represents that Property ☐ is ☑ is not connected to sewer and all impact and connection fees have been paid. If not on sewer, Builder represents that the property ☑ is ☐ is not connected to a septic system. If property is on a septic system, Purchaser ☐ does ☑ does not require a septic system inspection at Purchase expense.

**32** TERMITE CONTRACT. Builder shall transfer current termite contract to purchaser at time of closing at Builder's expense. The termite contract will be effective for 1 year from the soil treatment date that was completed at the start of construction.

**33** INTEREST RATE LOCKS AND MOVING DAY. Purchaser(s) agree that they shall not make any final moving plans or interest rate locks until a firm closing date has been established by the Builder. Under no circumstance shall the Builder accept responsibility for interest rate locks, temporary housing, furniture storage or other expenses related to a changed closing date.

**34** UTILITIES: Seller agrees that the water, gas, and electric meters when installed will be in Seller's name through the Closing Date at which time Purchaser is obligated to transfer such utility services to Purchaser.

**35** MAINTENANCE AND PREVENTION OF MOISTURE-RELATED CONDITIONS.

(A)   Purchaser hereby acknowledges and agrees that, upon the completion of the construction of the Home and occupancy of the Property by Purchaser: (i) it shall be the responsibility and obligation of Purchaser to maintain the Property, including the Home and all components thereof, in good condition and repair, including caulking, water seals, exterior surfaces and finishes mortar, water pipes, drainage systems, HVAC pipes and systems, basement and crawl space areas, gutters. roofs, and landscape for the prevention of water penetration, mildew, mold, spores, fungi, damage to wood and other materials, and other moisture related conditions; (ii) the failure to do so could result in health-related problems and/or damage of the Property; (iii) Builder/Seller shall have no liability or responsibility with respect to same; and (iv) Purchaser hereby waives and disclaims an claims against Builder/Seller arising out of any such condition and any loss, damage, or injury resulting there from.

(B)   Purchaser further acknowledges and agrees that: (i) if Purchaser becomes aware of water intrusion into the Property, Purchaser should respond immediately; (ii) in cases of serious water damage, Purchaser should hire construction and indoor a quality consultants to assess the damage and determine what remediation is needed; (iii) inadequate remediation, even if well intentioned, will only create more problems; (iv) water damaged materials may need to be removed, and the source of the water intrusion should be addressed; (v) the Property may have to be vacated while remediation work is in progress; and (vi) a certified industrial hygienist experienced with testing for molds in indoor environments should be retained to determine whether the water damage has caused a source of mold growth and amplification.

(C)   Purchaser further acknowledges and agrees that: (I) unusual odors should be investigated promptly; (ii) unusual odors may be indicative of water intrusion and mold growth and (iii) chronic complaints of illness (especially respiratory, breathing, allergy-type problems), headaches or nausea may indicate indoor air quality problems and should be taken seriously and investigated promptly.

**The Purchaser acknowledges that the Purchaser has read, understood and accepted the foregoing.**

**(Initials)**

> *JC*
> 12/22/20
> 9:08 PM CST
> dotloop verified

**36** SEVERABILITY. In case any one or more of the provisions contained in the Contract shall for any reason be held to be illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision here of and this Contract shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

**37** AFFILIATED BUSINESS ARRANGEMENTS. In connection with the purchase or sale of this property, you may need to obtain certain services. This is to notify you that the Builder may have a business relationship with certain services, and this relationship may provide the Builder a financial or other benefit. If applicable, the nature and extent of any affiliated business relationship will be fully described in a separate disclosure statement.

**38** OTHER OFFERS WHILE PURCHASER'S OFFER IS PENDING. Purchaser acknowledges that offers other than the Purchaser's may have been made or may be made before Builder acts on the Purchaser's offer or counteroffer or while Builder considering Purchaser's offer or counteroffer. Builder expressly reserves the right to accept, reject, counter or withdraw any o or counteroffer at any time prior to one of the offers becoming the primary contract.

THIS IS A LEGALLY BINDING CONTRACT. IF YOU DO NOT UNDERSTAND THE LEGAL IMPLICATIONS OF AN PART OF THIS CONTRACT SEEK LEGAL ADVICE BEFORE SIGNING.

| | |
|---|---|
| Witness to Purchaser's Signature(s) _____ | Purchaser _____ *Jonathan Callaway* — dotloop verified 12/22/20 9:08 PM CST UTIK-DVTF-U1WA-VF4F |
| Witness to Purchaser's Signature(s) _____ | Purchaser _____ |
| Witness to Seller's *Kristha Wheeler* — dotloop verified 12/22/20 9:07 PM CST 8FKQ-DTEB-IKIC-K9DF | Seller _____ *Wayne Stock Pristawbuilderville* — dotloop verified 12/22/20 9:37 PM CST G9BL-S1I7-D7JB-NO7I |

**EARNEST MONEY: Receipt is hereby acknowledged of the earnest money as hereinabove set forth:** _____

Cash _____ Check _____ Seller/Agent _____

No Earnest Money will be given due to buyer holding construction loan

*WS* 12/22/20 9:37 PM CST dotloop verified

Real Estate Agent _____ Date _____ Builder _____ Date _____

1. Construction of the home will take approximately 8-10 months of builder receiving pre-build payment.

2. Builder to move coffered ceiling beams from kitchen area (shown on plans) to living room area at not cost.

3. Builder to complete the build out of basement as shown on plans at contracted price. (basement includes shower surround, vanity cabinet, and toilet in basement bathroom. Mirror is not included in basement bathroom)

4. Builder to construct brick arch leading from kitchen to living room at contracted price. (shown on plans)

## LIMITED WARRANTY AGREEMENT

This Limited Warranty Agreement is hereby entered into on this the | Date of completion. |,

Jonathan Callaway _____, hereafter (whether one or more) referred to as Buyer, and

Stone Pointe Builders LLC _____ hereafter referred to as Seller.

WHEREAS, Seller and Buyer on this same day entered into a Purchase and Sale Agreement (the "Contract") of which this Limited Warranty Agreement is a part, for the sale by Seller and the purchase by Buyer of a house (the "Dwelling") located upon that certain parcel of real property located in Jefferson _____ County, Alabama, the address of which is 6783 IVY WAY _____ : and TRUSSVILLE, AL 35173 _____

WHEREAS, Seller has agreed in the Contract to provide to Buyer and Buyer has agreed to accept this Limited Warranty Agreement, in lieu of all other warranties and claims whatsoever, whether implied by law or otherwise.

NOW, THEREFORE, in consideration of the premises, the agreements herein, the agreements set forth in the above-mentioned Contract, the payment of the purchase price as set out in the Contract, and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree to the terms and conditions of this Limited Warranty Agreement as follows:

27      Warranty Period.  Seller does hereby provide to Buyer this Limited Warranty Agreement on the Dwelling for a period of One Year (the "Limited Warranty Period") beginning on the date of conveyance of title to Buyer or the date of initial occupancy of the Dwelling, whichever occurs first (the "Limited Warranty Commencement Date"), and Buyer does hereby agree to the terms of this Limited Warranty Agreement and further agrees to accept this Limited Warranty Agreement as the only warranty given, in lieu of all other warranties of any kind, expressed or implied, with respect to the Dwelling and the sale thereof to Buyer.   The Limited Warranty Period has been negotiated between Seller and Buyer as a part of the negotiation of the terms and provisions of the Contract.

1.      Limited Warranty.  Seller hereby warrants to Buyer that, for and during the Limited Warranty Period, the Dwelling will be free from Latent Defects, as hereinafter defined.  If a Latent Defect occurs in an item which is covered by this Limited Warranty Agreement, Seller will repair, replace, or pay to Buyer the reasonable cost of repairing or replacing any such item.  Seller shall in its sole discretion determine whether to repair, replace, or pay the reasonable cost of repairing or replacing any such item.  THE LIABILITY OF SELLER IS STRICTLY LIMITED TO THE OBLIGATION TO REPAIR, REPLACE, OR PAY THE REASONABLE COST OF REPAIRING OR REPLACING ANY SUCH ITEM, AND ANY RIGHT THAT BUYER MIGHT HAVE TO RECOVER ANY OTHER OR ADDITIONAL DAMAGES IS HEREBY WAIVED AND EXCLUDED.  BUYER ACKNOWLEDGES THAT THE SOLE REMEDY AVAILABLE TO BUYER HEREUNDER IS THE RIGHT TO REQUIRE SELLER TO REPAIR, REPLACE, OR PAY THE REASONABLE COST OF REPAIRING OR REPLACING ANY SUCH ITEM. Steps taken by Seller to correct any Latent Defect under this Limited Warranty Agreement shall not extend the Limited Warranty Period.

2.      Definition of Latent Defect.  For the purposes of this Limited Warranty Agreement, a Latent Defect is defined as and limited to a defect in a necessary component in the Dwelling which (i) is not apparent at the Limited Warranty Commencement Date but which becomes apparent during the Limited Warranty Period; (ii) is not otherwise excluded in this Limited Warranty Agreement;

(iii) results in actual physical damage to the Dwelling; (iv) is the direct result of the failure by Seller to construct the Dwelling in accordance with the applicable Building Standard portion of the Building Quality Standards Section attached hereto as Exhibit I; and (v) has been set forth in detail by Buyer in a written notice to Seller prior to the expiration of the Limited Warranty Period. The responsibility of Seller to repair or replace certain items with respect to which there might be a Latent Defect shall be as set forth in the Responsibility portion of the Building Quality Standards Section. If a specific Latent Defect is not addressed in the Building Quality Standards Section, then the applicable codes adopted by the local governing body with respect to residential construction standards (or if no such codes have been adopted, then the standards of construction prevailing in the geographical area of the Dwelling) will be used in lieu of the provisions of the Building Quality Standards Section. The Building Quality Standards Section lists specific defects that might occur within specified categories of the construction and the responsibilities of Seller and Buyer with respect thereto, pursuant to the following format:

    3.

Possible Defect -   a brief statement of problems that may be encountered.

Building Standard - a building standard relating to a specific defect.

Responsibility -   a Statement of the corrective action required of Seller to repair the defect or a statement of Buyer's maintenance responsibilities.

    4.    LIMITATION UPON LIABILITY. THE SOLE REMEDY AVAILABLE TO BUYER UNDER THIS LIMITED WARRANTY AGREEMENT IS THE RIGHT TO REQUIRE SELLER TO REPAIR, REPLACE, OR PAY THE REASONABLE COST OF REPAIRING OR REPLACING LATENT DEFECTS, AS HEREIN DEFINED, IN THE DWELLING. SELLER'S TOTAL LIABILITY UNDER THIS LIMITED WARRANTY AGREEMENT SHALL NOT EXCEED THE ORIGINAL PURCHASE PRICE PAID TO SELLER UNDER THE CONTRACT, LESS THE VALUE OF THE REAL PROPERTY UPON WHICH THE DWELLING IS LOCATED. THIS LIMITED WARRANTY AGREEMENT DOES NOT EXTEND TO OR INCLUDE LIABILITY FOR INDIRECT OR CONSEQUENTIAL DAMAGES.

    5.    Pre-Closing Inspection. Prior to closing the purchase of the Dwelling, Buyer and Seller will inspect the Dwelling and Buyer will **execute the Acknowledgment of Acceptance** in accordance with the form attached hereto as **Exhibit II**, and any exceptions, omissions, or malfunctions agreed upon and noted thereon will be corrected promptly by Seller. Seller may elect, at the discretion of Seller, to correct all exceptions, omissions, or malfunctions and document, with Buyer, such corrections of exceptions, omissions, or malfunctions, prior to proceeding with closing, and may extend the Closing as necessary to complete said corrections.

    6.    Assignment of Insurance and Warranties to Seller. In the event Seller repairs, replaces, or pays to Buyer the reasonable cost of repairing or replacing any Latent Defect covered by this Limited Warranty Agreement which is covered by insurance or other warranties, Buyer will, upon the request by Seller, assign the products or proceeds of such insurance or warranties to Seller to the extent of the cost to Seller of such repair, replacement, or payment.

    7.    Exclusions and Disclaimers. This Limited Warranty Agreement shall not extend to, include, or be applicable to (a) defects in garages, storage buildings or other outbuildings not attached to the Dwelling; swimming pools; other recreational facilities; driveways; walkways; retaining walls; fences; landscaping (including sodding, seeding, shrubs, trees, and plantings); or items furnished or installed by Buyer or by parties who have dealt directly with Buyer; or (b) defects which are the result of characteristics common to the materials used, such as (but not limited to) warping

and deflection of wood; the presence of mildew, mold, spores, fungi, or other moisture-related conditions; fading, chalking, and checking of paint due to sunlight; cracks due to drying and curing of concrete, stucco, plaster, bricks, and masonry; shrinking and cracking of caulking and weather-stripping; or non-uniformity of appearance of brick and mortar; or (c) defects resulting from failure to perform general maintenance, including but not limited to the presence or growth of mildew, mold, spores, fungi, or other moisture-related conditions; negligence; normal wear and tear; improper maintenance; or improper operation of the Dwelling or any part of the systems in the Dwelling; and Buyer hereby waives and disclaims any claim arising out of any such defects.

**Buyer acknowledges that Buyer has read, understood, and accepted the foregoing paragraph.**



This Limited Warranty Agreement shall not extend to, include or be applicable to any loss, damage, or injury caused by or resulting from any events, conditions or circumstances not within the complete control of Seller; riots; civil commotion; fire; explosion; smoke; accidents; water escape; mildew, mold, spores, fungi, or other moisture-related conditions; falling objects; aircraft; vehicles; acts of God; lightning; windstorm; hail; flood; mud slides; damage to personal property; earthquakes; volcanic eruptions; wind driven water; radon gas; the presence of fiberglass (also known as rock wool) as a component in the construction of the Dwelling; infestation from termites or other insects; sink holes; subsurface conditions; or changes in the underground water table; including, but not limited to, any mental anguish or bodily injury and any incidental, consequential, or secondary damages caused or claimed to be caused thereby; and Buyer hereby waives and disclaims any claim arising out of any such loss, damage or injury.

**Buyer acknowledges that Buyer has read, understood, and accepted the foregoing paragraph.**



This Limited Warranty Agreement does not limit or enhance any manufacturer's warranty that is given on any appliance, fixture, equipment, or material included within the Dwelling ("Manufacturer's Warranted Items"). The warranties supplied by the manufacturers, either directly or indirectly, to Buyer, on some Manufacturer's Warranted Items, may be greater in both scope and time than warranties provided in this Limited Warranty Agreement. These warranties are the property of Buyer, and Seller shall deliver all such warranties at the pre-occupancy inspection and transfer the rights that Seller has in such warranties, if any, to Buyer. Buyer will file with the manufacturer any forms contained in these manufacturer's warranties that are necessary to activate such warranties. These Manufacturer's Warranted Items are specifically not covered by this Limited Warranty Agreement, and Buyer shall rely on the manufacturers to correct any deficiencies with respect to these Manufacturer's Warranted Items.

**Buyer acknowledges that Buyer has read, understood, and accepted the foregoing paragraph.**

8.      Access to the Dwelling. Buyer must provide Seller with reasonable workday access to the Dwelling in order to perform any warranty service required under this Limited Warranty Agreement. Failure or refusal of Buyer to provide such access to Seller will relieve Seller of its obligations under this Limited Warranty Agreement.

9.      Opportunity to Perform. Prior to filing any action under this Limited Warranty Agreement, Buyer must give to Seller reasonable notice of and a reasonable opportunity to repair, replace, or pay the reasonable cost of repairing or replacing any Latent Defect covered hereunder. SUCH NOTICE MUST, IN ANY EVENT, BE GIVEN IN THE MANNER DESCRIBED IN PARAGRAPH

13 OF THIS LIMITED WARRANTY AGREEMENT AND MUST BE GIVEN PRIOR TO THE EXPIRATION OF THE LIMITED WARRANTY PERIOD. Buyer acknowledges that the right of Buyer to require Seller to repair, replace, or pay the reasonable cost of repairing or replacing any Latent Defect covered hereunder is the sole and exclusive remedy available to Buyer.

10.    Arbitration. Any controversy, claim, or dispute arising out of or relating to any obligation of Seller to repair, replace, or pay to Buyer the reasonable cost of repairing or replacing any Latent Defect covered under this Limited Warranty Agreement shall be settled by binding arbitration pursuant to the Federal Arbitration Act, 9 USC § 1, et seq., and shall be administered in accordance with the applicable rules of **"the Construction Industry Rules of the American Arbitration Association"** . Seller and Buyer acknowledge and agree that this Limited Warranty Agreement substantially affects interstate commerce by virtue of the materials and components contained in the Dwelling. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

11.    No Assignment. This Limited Warranty Agreement is provided to Buyer only and is not transferable or assignable by Seller or Buyer nor enforceable by any subsequent owner or occupant of the Dwelling.

12.    General Provisions.

(1)    If any provision of this Limited Warranty Agreement is determined by a court of competent jurisdiction to be unenforceable, that determination will not affect the enforceability of the remaining portions.

(2)    This Limited Warranty Agreement shall be binding upon Seller and Buyer and their respective heirs, executors, administrators, successors and assigns.

(3)    This Limited Warranty Agreement shall be governed by and construed in accordance with the laws of the State of Alabama.

(4)    The titles or headings to the paragraphs included herein are for convenience only and shall not add to, reduce, limit, or modify in any manner the content thereof.

(5)    The use of one gender shall include all other genders, the use of singular shall include the plural, and the use of the plural shall include the singular, all as may be appropriate to the context in which they are used.

13.    Notice to Seller. Buyer shall notify Seller in writing before the expiration of the Limited Warranty Period of any alleged defect covered by this warranty. Such notice and any other notices to be given to Seller hereunder must be sent by certified mail to Seller at the following address:

905 Forestdale BLVD. Birmingham, AL 35214

FAILURE OF BUYER TO GIVE SUCH WRITTEN NOTICE TO SELLER BEFORE THE EXPIRATION OF THE LIMITED WARRANTY PERIOD SHALL BAR ANY RIGHT TO RECOVERY BY BUYER PURSUANT TO THIS LIMITED WARRANTY AGREEMENT.

14.    Consumer Products. This Limited Warranty Agreement does not extend to or cover any appliance, piece of equipment, or any item defined as a consumer product for purposes of the Magnusson-Moss Warranty Act (15 USC 2301-2312, as amended).

15.    WAIVER OF WARRANTIES AND CLAIMS. THIS LIMITED WARRANTY AGREEMENT IS GIVEN IN LIEU OF ANY AND ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, HABITABILITY AND WORKMANSHIP AND IS ALSO IN LIEU OF ANY CLAIMS FOR CONSEQUENTIAL DAMAGES, MENTAL ANGUISH OR DISTRESS, AND FOR DAMAGES BASED UPON NEGLIGENCE, AND BUYER HEREBY EXPRESSLY WAIVES AND DISCLAIMS ANY SUCH WARRANTIES AND CLAIMS WITH RESPECT TO BOTH THE DWELLING AND THE REAL PROPERTY UPON WHICH THE DWELLING HAS BEEN CONSTRUCTED.

**Buyer acknowledges that Buyer has read, understood, and accepted the foregoing paragraph.**



16.    SOLE WARRANTY/ENTIRE AGREEMENT. IT IS SPECIFICALLY AGREED BY THE PARTIES HERETO THAT THIS LIMITED WARRANTY AGREEMENT IS ACCEPTED BY BUYER AS THE SOLE WARRANTY GIVEN BY SELLER. BUYER ACKNOWLEDGES THAT THIS LIMITED WARRANTY AGREEMENT IS THE ENTIRE AGREEMENT OF THE PARTIES RELATED TO WARRANTIES. BUYER FURTHER AGREES THAT BUYER HAS NOT RELIED UPON ANY ORAL OR WRITTEN STATEMENTS, UNDERTAKINGS, OR REPRESENTATIONS EXCEPT AS SPECIFICALLY SET FORTH IN THIS LIMITED WARRANTY AGREEMENT AND THAT NO PRIOR AGREEMENT OR UNDERSTANDING PERTAINING TO WARRANTIES SHALL BE VALID OR OF ANY FORCE OR EFFECT.    THE COVENANTS AND AGREEMENTS OF THIS LIMITED WARRANTY AGREEMENT CANNOT BE ALTERED, CHANGED, MODIFIED, OR ADDED TO, EXCEPT IN A WRITTEN INSTRUMENT SIGNED BY BUYER AND SELLER.    NO REPRESENTATION, INDUCEMENT, UNDERSTANDING, OR ANYTHING OF ANY NATURE WHATSOEVER MADE, STATED, OR REPRESENTED BY SELLER OR ON SELLER'S BEHALF, EITHER ORALLY OR IN WRITING, (EXCEPT AS SPECIFICALLY SET FORTH IN THIS LIMITED WARRANTY AGREEMENT) HAS INDUCED BUYER TO ENTER INTO THIS LIMITED WARRANTY AGREEMENT OR SHALL BE ENFORCEABLE IN ANY MANNER AGAINST SELLER.
**Buyer acknowledges that Buyer has read, understood, and accepted the foregoing paragraph.**



IN WITNESS WHEREOF the parties hereto have set their hands and seals on this the

_____

SELLER:

Wayne StonePointebuildersllc   dotloop verified 12/22/20 9:40 PM CST NVOS-WNWN-T0JX-ZPQ2

BUYER:

*Kristen Wheeler*

dotloop verified
12/22/20 8:16 PM CST
6CUY-PLTD-NYWB-0JCB

Witness

_____

Witness

*Jonathan Callaway*

dotloop verified
12/22/20 8:20 PM
CST
TXXS-9VVA-ZIZJ-SZYH

EXHIBIT D



**Stone Pointe Builders**
905 Forestdale Blvd
Birmingham, AL  35214 US
contact@stonepointebuildersllc.com
www.stonepointebuildersllc.com

# Invoice

## EXHIBIT E



BILL TO
Jim Maples
South Point Bank
3501 Grandview Pkwy

SHIP TO
6783 Calvary Crossings
Trussville. AL
Highland Crest

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 629 | 02/26/2021 | $0.00 | 02/26/2021 | Due on receipt | |

| DATE | ACTIVITY | DESCRIPTION | QTY | RATE | AMOU |
|---|---|---|---|---|---|
| | **Const. Draw** | Deposit | 1 | 46,457.00 | 46,457 |
| | | PAYMENT | | | 46,457 |
| | | BALANCE DUE | | | **$0.(** |

